MUNSCH HARDT KOPF & HARR, P.C.
Kevin M. Lippman
Texas Bar No. 00784479
Julian P. Vasek
Texas Bar No. 24070790
500 N. Akard Street, Suite 4000
Dallas, TX 75201
Telephone:      (214) 855-7500
Email:          klippman@munsch.com
                jvasek@munsch.com

*Attorneys for Blakemore Investments LLC*
*and Milwaukee Investments LP*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HARVEST SHERWOOD FOOD DISTRIBUTORS, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-80109 (SGJ)<br><br>(Jointly Administered) |
| BLAKEMORE INVESTMENTS LLC, MILWAUKEE INVESTMENTS LP,<br><br>        Plaintiffs,<br><br>        v.<br><br>HAMILTON MEAT, LLC, HARVEST MEAT COMPANY, INC., HARVEST SHERWOOD FOOD DISTRIBUTORS, INC., SHERWOOD FOOD DISTRIBUTORS, L.L.C., WESTERN BOXED MEAT DISTRIBUTORS, INC., DEL MAR HOLDING, LLC, DEL MAR ACQUISITION INC., SURFLINER HOLDINGS, INC., LAMCP CAPITAL, LLC, CASCADE FOOD BROKERS, INC., SFD ACQUISITION LLC, SFD TRANSPORTATION CORP., SFD COMPANY LLC, and JPMORGAN CHASE BANK, N.A., as AGENT.<br><br>        Defendants. | Adv. Proc. No.<br><br><br>__ADVERSARY COMPLAINT__ |

Plaintiffs Blakemore Investments LLC and Milwaukee Investments LP, by their undersigned attorneys, as and for their Adversary Complaint, allege, on knowledge as to their own actions and status, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.        This is an adversary proceeding brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure to declare the validity, priority, and extent of the respective interests, if any, of the parties in postpetition proceeds of prepetition antitrust claims asserted by certain of the debtors.  Such proceeds include those expected from an antitrust settlement that the Court is currently being requested (i) to approve and (ii) upon approval, to direct distribution to the debtors' secured lenders.  As set forth herein, a justiciable controversy exists as to whether it is the plaintiffs or any of the defendants that have a first priority interest in any such proceeds.  As such, until that controversy is determined in this adversary proceeding, no proceeds of antitrust claims should be distributed.  Rather, they should be held in escrow.

2.        In addition to a declaration of rights, the plaintiffs seek to enforce as against all of the defendants the plain terms of an agreement by certain debtors to subordinate their entitlement to the payment of antitrust claim proceeds, if any, to the "priority" of payment granted to plaintiffs. Because that agreement was executed two years before the same debtors granted any enforceable security interest in the claims and proceeds thereof to the agent for the debtors' secured lenders, the lenders' agent, under applicable law, took its lien subject to the prior rights of the plaintiffs. And under the bankruptcy code, the agreement is enforceable now against all of the defendants in these bankruptcy cases.

3.        The plaintiffs also seek to enjoin the debtors from continuing to impair, undermine and interfere with the rights that certain of those debtors granted to them. Lastly, but only in the

2

alternative to all of the foregoing, in the event that the agent for the secured lenders is determined to be entitled to a first priority lien on the proceeds of antitrust claims, the plaintiffs seek a declaration that the extent of any such lien is limited solely to the secured lenders' postpetition extensions of credit, and not any "roll up" of their prepetition extensions of credit.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1344. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue has been determined by the Court to be proper under 28 U.S.C. §§ 1408 and 1409.

## PARTIES

5.     Plaintiff Blakemore Investments LLC ("Blakemore") is a Delaware limited liability company ("LLC") that is party to the Capital Provision Agreement defined and discussed below.

6.     Milwaukee Investments LP ("Milwaukee") is a Cayman limited partnership that also is party to the Capital Provision Agreement. Blakemore and Milwaukee collectively are hereinafter referred to as the "Capital Providers" or "Plaintiffs." Blakemore and Milwaukee are affiliated companies under common control with Burford Capital LLC, a Delaware LLC that is, indirectly, wholly owned by Burford Capital Limited, a publicly held corporation registered in Guernsey.  The Capital Providers and certain of their affiliates are engaged in a capital provision and advisory business principally focused on assets connected to litigation, arbitration or mediation.

7.     Defendant Hamilton Meat, LLC ("Hamilton"), is a California LLC, one of the debtors in these jointly administered bankruptcy cases, and a counterparty to the Capital Provision Agreement.

3

8.    Defendant Harvest Meat Company, Inc. ("Harvest") is a Delaware corporation, one of the debtors in these jointly administered bankruptcy cases, and a counterparty to the Capital Provision Agreement.

9.    Defendant Harvest Sherwood Food Distributors, Inc. ("Harvest Sherwood") is a Delaware corporation, the lead debtor in these jointly administered bankruptcy cases, and another counterparty to the Capital Provision Agreement.

10.    Defendant Sherwood Food Distributors, L.L.C. ("Sherwood") is a Michigan LLC, a debtor in these jointly administered bankruptcy cases, and a counterparty to the Capital Provision Agreement.

11.    Defendant Western Boxed Meat Distributors, Inc. ("Western Boxed") is an Oregon corporation, one of the debtors in these jointly administered bankruptcy cases, and a counterparty to the Capital Provision Agreement.    Defendants Hamilton, Harvest, Harvest Sherwood, Sherwood, and Western Boxed collectively are hereinafter referred to as the "Counterparties" or "Counterparty Defendants" or "Counterparty Debtors" or "Antitrust Claimant Debtors."

12.    Defendant Del Mar Holding, LLC ("Del Mar Holding") is a Delaware LLC and one of the debtors in these jointly administered bankruptcy cases.

13.    Defendant Del Mar Acquisition Inc. ("Del Mar Acquisition") is a Delaware corporation and another of the debtors in these jointly administered bankruptcy cases.

14.    Defendant Surfliner Holdings, Inc. ("Surfliner") is a Delaware corporation and a debtor in these jointly administered bankruptcy cases.

15.    Defendant LAMCP Capital, LLC ("LAMCP") is a Delaware LLC and one of the debtors in these jointly administered bankruptcy cases.

16.    Defendant Cascade Food Brokers, Inc. ("Cascade") is an Oregon corporation and a debtor in these jointly administered bankruptcy cases.

17.    Defendant SFD Acquisition LLC ("SFD Acquisition") is a Delaware LLC and one of the debtors in these jointly administered bankruptcy cases.

18.    Defendant SFD Transportation Corp. ("SFD Transportation") is a Delaware corporation and a debtor in these jointly administered bankruptcy cases.

19.    Defendant SFD Company LLC ("SFD Company") is a Michigan LLC and one of the debtors in these jointly administered bankruptcy cases. Defendants Del Mar Holding, Del Mar Acquisition, Surfliner, LAMCP, Cascade, SFD Acquisition, SFD Transportation and SFD Company collectively are hereinafter referred to as the "Non-Counterparty Defendants" or "Non-Counterparty Debtors"). The Counterparty Debtors and Non-Counterparty Debtors collectively are hereinafter referred to as the "Debtors."

20.    According to the Debtors, Del Mar Holding owns 100% of the shares of Del Mar Acquisition; Del Mar Acquisition owns 100% of the shares of Surfliner; Surfliner owns 100% of the shares of Harvest Sherwood; and Harvest Sherwood is the sole member of Hamilton, Harvest, Western Boxed, and SFD Acquisition.  Harvest, in turn, is the sole member of LAMCP; Western Boxed owns 100% of the shares of Cascade; and SFD Acquisition owns 100% of the shares of SFD Transportation and is the sole member of Sherwood, which is the sole member of SFD Company.

21.    Prior to their bankruptcy filings, according to the Debtors, the Debtors, collectively with their affiliates, constituted the largest independent wholesale food distributor in the United States.

5

22.     Defendant JPMorgan Chase Bank, N.A. ("JPM") is a national banking association chartered by the Office of the Comptroller of the Currency.  JPM is, and is named as a defendant herein solely in its capacity as, the administrative agent ("JPM, as Agent") for itself, Bank of America, N.A. and Fifth Third Bank, National Association (the "Lenders"), as lenders party to (i) the Credit Agreement, dated June 17, 2022 (the "Credit Agreement"), among JPM, as Agent, and the Lenders, on the one hand, and Surfliner, Harvest Sherwood, Harvest, Hamilton, Western Boxed, SFD Acquisition, SFD Company, and Sherwood (collectively, the "Grantor Debtors," and, collectively without Surfliner, the "Borrower Debtors"), on the other, and (ii) the Senior Secured Superpriority Debtor in Possession Credit Agreement, dated as of May 5, 2025 (the "DIP Agreement"), among JPM, as Agent, and the Lenders, on the one hand, and the Grantor Debtors, on the other.  The Debtors and JPM, as Agent, are hereinafter collectively referred to as the "Defendants."

## FACTUAL BACKGROUND

### A.    The Claims

#### 1.  The Chicken Claims

23.     On September 2, 2016, Maplevale Farms, Inc. filed a class action complaint in the United States District Court for Northern District of Illinois against a series of chicken producers, including Tyson, Pilgrim's Pride, Koch Foods, and others.  The action, captioned *Maplevale Farms, Inc. v. Koch Foods, Inc.*, 16 Civ. 08637, alleges that the defendants conspired to fix, raise, maintain, and stabilize the price of "Broilers" (chickens raised for meat consumption and slaughtered before 13 weeks of age) beginning at least as early as 2008, causing members of the putative class of direct purchasers to overpay for Broilers. Sherwood, Harvest, Western Boxed and

Hamilton (the "<u>Antitrust Claimant Debtors</u>" or "<u>Counterparties</u>") were members of this and similar alleged putative classes.

24.     As additional lawsuits alleging antitrust conduct amongst chicken producers were filed in the same district, they were consolidated and coordinated for pre-trial purposes under the caption, *In re Broiler Chicken Antitrust Litig.*, 16 Civ. 08637, in the United States District Court for the Northern District of Illinois.

25.     On January 17, 2019, the Antitrust Claimant Debtors commenced their own individual, opt-out action, entitled *Sherwood Food Distributors, L.L.C., et al. v. Tyson Foods, Inc.*, 19 Civ. 00354, in the United States District Court for the Northern District of Illinois against Tyson Foods, Inc. and other chicken producers, alleging that the defendants agreed to, and did, restrain trade and impose supracompetitive chicken prices from at least 2008 through at least 2016.  The case was reassigned as a cased related to *In re Broiler Chicken Antitrust Litig.*, 16 Civ. 08637.  The Antitrust Claimant Debtors' antitrust claims ("<u>Chicken Claims</u>") remain pending.

## 2.     The Pork Claims

26.     On June 28, 2018, Wanda Duryea and a number of other individuals filed a class action complaint in the United States District Court for the District of Minnesota on behalf of all persons who had indirectly purchased pork from major pork producers.  The action, captioned *Wanda Duryea, et al. v. Agri Stats, Inc., et al.,* 18 Civ. 0-1776-JRT, alleged that defendant pork producers conspired to fix, raise, maintain, and stabilize the price of pork from at least January 1, 2009, causing members of the putative class to overpay for pork.

27.     That action was soon thereafter followed by other class action complaints, *e.g.,* *John Gross & Co., Inc. v. Agri Stats, Inc., et. al.*, 18 Civ. 01810-JRT, filed in the same district against the same defendants alleging similar allegations of pork price-fixing, this time on behalf

of putative classes of direct purchasers of pork. The Antitrust Claimant Debtors were members of these putative classes. The district court consolidated for pre-trial purposes all of the cases alleging pork price-fixing filed before it under the caption, *In re Pork Antitrust Litig.*, 18 Civ. 01776-JRT.

28.    In relative short order, similar complaints, on behalf of individual litigants and putative classes of indirect and direct purchasers of pork, were filed in other United States District Courts. By order entered on June 22, 2021, the Judicial Panel on Multi-District Litigation ("JPML") centralized all such cases in single a multi-district litigation ("MDL") (MDL No. 2998) in the United States District Court for the District of Minnesota, captioned *In re Pork Antitrust Litig.*, 21 MD 02998-JRT.

29.    On November 15, 2021, the Antitrust Claimant Debtors commenced their own individual, opt-out action, entitled *Sherwood Food Distributors, L.L.C., et al. v. Agri Stats, Inc.*, 21 Civ. 06329-PKC, in the United States District Court for the Eastern District of New York against Agri Stats, Inc. and other pork producers, alleging that the defendants entered into an ongoing conspiracy from around 2008 or early 2009 to fix the price of pork. By transfer order entered on December 7, 2021, the JPML transferred the case to the United States District Court for the District of Minnesota to be centralized with the other cases in *In re Pork Antitrust Litig.*, 21 MD 02998-JRT. The same day, the United States District Court for the District of Minnesota entered an order consolidating for pre-trial purposes MDL 2998 with the series of earlier filed, similar pork price-fixing cases under the lead caption, *In re Pork Antitrust Litig.*, 18 Civ. 01776-JRT. The Antitrust Claimant Debtors' price-fixing claims, as amended (the "Pork Claims"), remain pending.

### 3.    The Beef Claims

30.    Beginning in 2019, plaintiffs who directly purchased beef from meat processing and packing companies began filing complaints against Cargill, Inc. and others in the United States District Court for the District of Minnesota alleging that the defendants had conspired to limit supply and fix prices of beef from at least January 1, 2015. The Antitrust Claimant Debtors were members of such putative classes. Similar actions were filed individually and on behalf of commercial and institutional indirect purchasers and indirect consumer purchasers in the same district. These actions also alleged beef price fixing, and were consolidated for pre-pretrial purposes in the same court under the caption *In re Cattle and Beef Antitrust Litig*.

31.    On June 3, 2022, the JPML centralized individual beef pricing fixing actions filed against the same defendants in other United States District Courts with the earlier filed actions pending in the United States District Court for the District of Minnesota in an MDL (MDL No. 3031), captioned *In re Cattle and Beef Antitrust Litig*., 22 MD 03031-JRT.

32.    On March 7, 2023, the Antitrust Claimant Debtors commenced an individual, opt-out action, entitled *Sherwood Food Distributors, L.L.C., et al. v. Cargill, Inc*., 23 Civ. 01749-BMC, in the United States District Court for the Eastern District of New York against Cargill, Inc. and other meat processing and packing companies, alleging that the defendants conspired to limit supply and fix prices of beef from at least January 1, 2015 through the filing of the complaint. By order of the JPML, entered on March 22, 2023, the case was transferred to the United States District Court for the District of Minnesota and centralized in MDL No. 3031. The Antitrust Claimant Debtors' beef antitrust claims (the "Beef Claims," and with the Chicken and Pork Claims, the "Claims") remain pending.

**B.      The Prepetition ABL Facility**

33.      On or about June 17, 2022, the Grantor Debtors, JPM, as Agent, and the Lenders entered into the Credit Agreement, pursuant to which the Lenders collectively agreed to extend to the Borrower Debtors a revolving, asset-based lending ("ABL") facility and other forms of credit of up to $380,000,000 based on the terms of the Credit Agreement (the "Prepetition ABL Facility").  (By Amendment No. 2 to Credit Agreement, dated as March 18, 2025, the Lenders decreased their total commitment under the Prepetition ABL Facility to $140,000,000.)  The Credit Agreement provides that it and all other "Loan Documents," and all claims, controversies, and disputes relating to such Loan Documents, shall be governed by the laws of New York, but giving effect to federal laws applicable to national banks.

34.      In order to secure the Grantor Debtors' obligations under the Credit Agreement, the same parties contemporaneously entered into a Pledge and Security Agreement, dated as of June 17, 2022 (the "Security Agreement").  In the Security Agreement, each of the Grantor Debtors granted to JPM, as Agent, for the benefit of the Lenders, "a security interest in all of its right, title and interest in, to and under all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Grantor," collectively referred to as "Collateral."  The Security Agreement (expressly referenced in the Credit Agreement as one of the Loan Documents) provides that it, and all claims, controversies or disputes relating to it, shall be governed by the internal laws of New York, but giving effect to federal laws applicable to national banks.

35.      Section 9-203 of the New York Uniform Commercial Code ("NYUCC") provides, and at all relevant times has provided, in pertinent part that a security interest is enforceable against the debtor and third parties with respect to collateral only if: (i) value has been given; (ii) the debtor

has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(iii) the debtor has authenticated a security interest that provides a description of the collateral.

36.    As to the last element for enforceability of a security interest under New York law,

which requires a description of the covered collateral, Section 9-108 of the NYUCC describes, and

at all relevant times has described, when a "description of the collateral" is "sufficient."  That

statutory section provides that, "[e]xcept as otherwise provided in subsections (c), (d) and (e), a

description of personal or real property is sufficient, whether or not it is specific, if it reasonably

identifies what is described."  In that vein, Official Comment 2 to Section 9-108 explains that "an

'all assets' or 'all personal property' description *for purposes of a security agreement* is *not*

sufficient."  (emphasis in original).  Rather, to satisfy Section 9-108's sufficiency requirement, a

description of the collateral by type generally is necessary.

37.    An exception to the general sufficiency provisions of Section 9-108 of the NYUCC

is found in subsection (e).  Subsection (e) sets out "[w]hen description by type [is] insufficient."

It provides, in pertinent part, that "[a] description only by type of collateral defined in this chapter

is an insufficient description of . . . a commercial tort claim."  Official Comment 4 to Section 9-

108 of the NYUCC goes on to explain that "Subsection (e) requires greater specificity of

description in order to prevent debtors from inadvertently encumbering certain property"; hence,

"a description by defined 'type' of collateral alone of a commercial tort claim . . . is not sufficient."

Under Section 9-102(13) a "commercial tort claim" is any "claim arising in tort with respect to

which . . . the claimant is an organization."

38.    In the case of the Security Agreement, it set out each of the types of Collateral,

including "proceeds" thereof, in which each of the Grantor Borrowers was granting a security

interest to JPM, as Agent. One of those Collateral types was "all Commercial Tort Claims as specified in Exhibit B."

39.    Exhibit B to the Security Agreement, in turn, included the following:

---

# COMMERCIAL TORT CLAIMS

# None.

---

40.    Neither the Credit Agreement nor the Security Agreement (at least until the recent events described below) expressly referred to any of the Claims. Nor (again, until recently, as discussed below) did any of the types of Collateral described in the Security Agreement, other than the possibility of "Commercial Tort Claims as specified in Exhibit B" (of which there were "None"), cover the Claims.

41.    Moreover, the Security Agreement expressly carved out from any Collateral grant, as "Excluded Property," any "Commercial Tort Claims having a value not in excess of $5,000,000."

42.    Accordingly, in the original Security Agreement, the Grantor Debtors did *not* grant any security interest in the Claims or any proceeds thereof to JPM, as Agent. And, thus, the Lenders' extensions of credit under the Prepetition ABL Facility could not have been based, in any respect, on the Claims. Rather, the Claims necessarily were irrelevant to the Lenders' credit making decisions.

C.    **The Capital Provision Agreement**

43.    On or about December 21, 2022, the Capital Providers and the Counterparties entered into the Capital Provision Agreement (the "Capital Provision Agreement"), wherein the Capital Providers agreed to provide to the Counterparties, on a "non-recourse basis," a total of $35 million no later than December 31, 2022.

44.    To induce the Capital Providers to enter into the Capital Provision Agreement and provide the $35 million, each of the Counterparties made a series of representations and warranties, both as of the execution of the Capital Provision Agreement and on a continuing basis at the end of each calendar quarter thereafter (each such period being defined in the agreement as a "Representation Date"). Among the representations and warranties made on each Representation Date was that each Counterparty "has not taken any steps or executed any documents which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect." A Material Adverse Effect is defined in the agreement, in turn, "as any event or circumstance" that would cause either "the material impairment of the [Counterparties'] ability to perform any of its obligations under this Agreement" or "the material impairment of the rights or remedies available under this Agreement . . . to the other party [*i.e.*, the Capital Providers]." The Capital Providers relied on each of the Representations and Warranties, both in initially agreeing to provide the $35 million and thereafter in not exercising remedies (as discussed below).

45.    In consideration for the $35 million of capital, which the Capital Providers disbursed to the Counterparties in accordance with the executed Capital Provision Agreement, the Counterparties agreed to subordinate their receipt of any payment of "Proceeds" to "the priority of payment" set forth in the Capital Provision Agreement, which grants to the Capital Providers "a first dollar return."

13

46.     The agreement provides that the Capital Providers "shall" be entitled to receive from Proceeds (i) their contributed $35 million, plus (ii) an additional $35 million, plus an additional 10% return on any of the foregoing amounts not paid by the third anniversary of the Capital Provision Agreement's closing date (in total, the "Capital Providers' Entitlement"). Subordinating *their* payment of Proceeds, if any, to that of Capital Providers, the Counterparties agreed that Proceeds "shall" be distributed, "*first*," to the Capital Providers in the amount of $35 million, and, "*second*," until the Capital Providers receive their Capital Providers' Entitlement in full (including, if applicable, any contractual interest), 50% to the Capital Providers and 50% to the Counterparties (emphases in original).

47.     "Proceeds" are defined to include "any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value recovered by or on behalf of (or reduced to a debt owed to) the Counterparty on account or as a result or by virtue (directly or indirectly) of a Claim, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, or otherwise," as well as any other form of "value conveyed to any Person in connection with a Claim or the resolution or termination thereof," "including cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds," etc.  But Proceeds do not include any amounts due to Cadwalader as "attorneys' fees or for reimbursement of litigation expenses."

48.     Consistent with both the "non-recourse basis" on which the Capital Providers provided the $35 million in capital to the Counterparties and the Counterparties' concomitant agreement to subordinate their entitlement, if any, to the payment of Proceeds, the Capital Provision Agreement makes clear that "the Capital Providers' Entitlement is derived from, computed on the basis of and paid from" proceeds of Claims only and, thus, unless the Claims are

14

monetized, "the Counterpart[ies] shall not have any obligation to pay the Capital Providers' Entitlement."

49.     Hence, it was an (unencumbered) "undivided interest" in Proceeds, if any, that the Capital Providers received under the Capital Provision Agreement, and *not*, as the agreement is explicit, a lender-borrower relationship.    Indeed, the Credit Agreement prohibited the Counterparties from incurring "Indebtedness."    In contrast, nothing in the Credit Agreement appears to prohibit the Counterparties from entering into the Capital Provision Agreement, and JPM, as Agent, has not asserted any default arising from the Counterparties' execution thereof.

50.     To ensure that their subordination agreement is honored, the Capital Provision Agreement specifically provides for the Counterparties *not* to receive and distribute proceeds of Claims.    Instead, the parties expressly agreed for the appointment of a third party "Payment Agent," initially (and still) the Counterparties' counsel of record on the Claims, Cadwalader, Wickersham & Taft LLP ("Cadwalader"), to receive and distribute Claim proceeds.    The agreement provides:

> Prior to any payment or delivery of Proceeds, if such Proceeds shall be delivered in cash or by check or other instrument, then the Counterparty shall direct the payor to pay or deliver such Proceeds not to the Counterparty but rather directly to the Payment Agent (with proper endorsements if by check or other instrument).

51.     To further ensure enforcement of the Counterparties' subordination agreement, the Counterparties, contemporaneously with executing the Capital Provision Agreement, executed and delivered to the Payment Agent "Irrevocable Instructions to Legal Counsel" (the "Instruction Letter").    In the Instruction Letter, the Counterparties irrevocably instructed their attorneys, Cadwalader, (i) to promptly inform the Capital Providers of the receipt of any funds that would even "arguably" constitute Proceeds, and (ii) after retaining any amounts owed to Cadwalader

under their engagement letters, to pay to the Capital Providers any amounts owed to the Capital

Providers "as soon as possible" and only "[f]ollowing such payments," to pay "remaining

Proceeds" to the Counterparties.

52.     And as an additional assurance that the subordination agreement would be honored,

the Capital Provision Agreement provides:

> Proceeds Held in Trust, etc.  If, notwithstanding Section 3.2(a), any Proceeds are instead received by the Counterparty or a third party other than the Payment Agent on the Counterparty's behalf, the Counterparty shall, or shall direct such third party to, (i) hold such Proceeds in trust for the benefit of the Capital Providers in the amount to which the Capital Providers are entitled under this Agreement; (ii) segregate such Proceeds from all other funds and property; and (iii) forthwith pay or deliver such Proceeds to the Payment Agent in accordance with clauses (i) and (ii) of Section 3.2(a).

53.     Thus, if *any* party other than the Payment Agent, including the Counterparties or

even Non-Counterparty Debtors, were to receive Proceeds, then the Capital Provision Agreement

provides for such Proceeds to be "segregated . . . from all other funds and property," held "in trust

for the benefit of the Capital Providers" and delivered "forthwith" to the Payment Agent for

distribution in accordance with the Instruction Letter.

54.     In addition to the express provisions, the Capital Provision Agreement forged a

relationship of trust and confidence between the parties concerning the Claims in other respects.

55.     As set forth in the Capital Provision Agreement, the Counterparties "provided or

may provide confidential materials protected by the attorney work product doctrine . . . to the

Capital Providers" in respect of the Claims; and, for their part, "the Capital Providers or their

Affiliates . . . conducted research and analysis and communicated views and opinions . . . to the

Counterpart[ies], all in reliance on the work product doctrine," regarding the Claims.  Further, the

parties agreed that their continued sharing of attorney work product and/or attorney-client privileged material would "preserve intact to the fullest extent applicable, and not to waive, . . . any and all Privileges" and would continue to be "subject to work product protection." Moreover, the parties agreed that any "information shared between the Counterpart[ies] and Capital Providers is shared pursuant to a common interest and non-disclosure agreement."

56.     The Capital Provision Agreement thus cautioned anyone coming into its possession, in bold and capital letters, on its cover page:

**PRIVATE & CONFIDENTIAL**

**ATTORNEY WORK PRODUCT**

**SUBJECT TO CONFIDENTIALITY AGREEMENT**

**PROTECTED FROM DISCLOSURE BY APPLICABLE PRIVILEGES**

57.     Under the Capital Provision Agreement, a Remedy Event includes, but is not limited to, "the inability or failure generally, or admission in writing of [a Counterparty's] inability, to pay its debts as they become due (except to the extent the inability or failure to do so does not materially impact its ability to perform obligations under this Agreement)." "A representation by the Counterpart[ies] [that] proves to have been inaccurate or misleading in any material respect when made or deemed to have been made" is another Remedy Event.

58.     Following a Remedy Event, the Capital Providers have the right, among others, under the Capital Provision Agreement to "take any and all actions on behalf of the Counterparty that the Capital Providers may reasonably deem necessary or advisable in order to prosecute the Claim(s) to bring about the monetization thereof through a Claim Resolution and to collect and enforce any settlement, final judgment or award."

59.     The Capital Provision Agreement provides that it, and "all matters arising out of or relating in any way whatsoever to" it, shall be governed by New York law, without reference to any choice or conflict of law principles.

**D.     The Defendants Scheme and Take Steps to Materially Impair the Capital Providers' Rights under the Capital Provision Agreement by Subsequently Granting an Enforceable Security Interest in the Claims to JPM, as Agent**

60.     At some point in time, the Debtors disclosed the existence of the agreement and receipt of cash thereunder to JPM, as Agent, which declared no default under the Loan Documents and took no other action.

61.     But that changed when the Debtors' financial circumstances took a significant downward turn.

62.     According to the Debtors, by June 2024, the Debtors were facing "operational headwinds relating to shifting market dynamics, rising operational costs, and changing consumer preference" that "put a strain on the company's liquidity and forced it to explore various sale, turnaround, and refinancing scenarios."

63.     By October 2024, according to the Debtors, they were facing what they described as "financial distress" and therefore fully engaged, together with JPM, as Agent, and the Lenders, in a "Restructuring Process" that involved the Debtors' evaluation of "strategic options," including exploring, among other things, an in- or out-of-bankruptcy court sale process.

64.     It was at that time when the Debtors schemed with JPM, as Agent, to take active steps to disregard the Counterparties' ongoing representations and warranties to the Capital Providers (on which they relied in funding $35 million funding and not exercising remedies) and materially impaired the Capital Providers' rights under the Capital Provision Agreement.

18

65.    Facing the possibility of the Debtors' bankruptcy filings, in October 2024, JPM, as Agent, demanded an increase in the Collateral securing the Grantor Debtors' obligations under the Prepetition ABL Facility.

66.    In fact, the Security Agreement permitted JPM, as Agent, to do so.  Section 4.4 of the Security Agreement provides that:

> From the date of this Security Agreement, and thereafter until this Security Agreement is terminated . . . , each Grantor agrees that . . . [s]uch Grantor . . . shall promptly upon the Administrative Agent's reasonable request, deliver to the Administrative Agent a duly executed amendment to this Security Agreement, in the form of Exhibit C hereto (the "Amendment"), pursuant to which such Grantor shall pledge such *additional* Collateral described in this Section 4.4. (emphasis added).

67.    Consequently, on or about October 9, 2024, "pursuant to Section 4.4 of the Security Agreement," JPM, as Agent, demanded, and the Grantor Debtors agreed to, Amendment # 1 to the Security Agreement.  Amendment #1 provides that the "Collateral listed on Schedule 1 to this Amendment shall be and *become* a part of the Collateral referred to in said Security Agreement and shall secure all Obligations referred to in the Security Agreement." (emphasis added).

68.    Schedule 1 to Amendment #1 (in contrast to the original Security Agreement) contains a description of "Commercial Tort Claims" that is sufficient under NYUCC Section 9-108 for Sherwood and Harvest to grant a lien on to JPM, as Agent.  Schedule 1 identifies:

● *Sherwood Food Distributors, L.L.C. et al v. Cargill, Inc. et al*, 0:23-cv-00703 (District of Minnesota) (consolidated into *In Re: Cattle and Beef Antitrust Litigation* (0:22-md- 03031, D. Minn));

● *In re Pork Antitrust Litigation*, 0:18-cv-01776 (District of Minnesota);

● *Sherwood Food Distributors, L.L.C. et al v. Agri Stats, Inc. et al*, 0:21-cv-02617 (District of Minnesota) in Lead Case: *In Re: Pork Antitrust Litigation*, 0:21-md-02998, (District of Minnesota);

● *Sherwood Food Distributors, LLC et al v. Tyson Foods, Inc. et al*, 1:19-cv-00354 (Northern District of Illinois) (open for internal administrative purposes for cases related *In re Broiler Chicken Antitrust Litigation*, 1:16-cv-08637 (Northern District of Illinois)); and

● *In re Broiler Chicken Antitrust Litigation*, 1:16-cv-08637 (Northern District of Illinois).

69.     The Grantor Debtors could have argued that JPM's, as Agent, demand for "additional" Collateral in the form of Sherwood's and Harvest's Claims was not "reasonable" in light of the prior Capital Provision Agreement, and, thus, that the Grantor Debtors were not obligated under Section 4.4 of the Security Agreement to provide such "additional" Collateral. But they did not.

70.     Rather, both the Grantor Debtors' and JPM's intent underlying Amendment #1 was to give to JPM, as Agent – for the very first time – an *enforceable* security interest in Sherwood's and Harvest's Claims that JPM, as Agent, did not previously have.  The mutual plan, shared by both the Grantor Debtors and JPM, as Agent, was to give JPM, as Agent, in anticipation of the Debtors' possible bankruptcy filings, first priority to any Proceeds realized from the Claims – something JPM, as Agent, did not receive in the Security Agreement and which, if the plan were to succeed, constituted a deliberate material impairment of the Capital Providers' rights in derogation of the Counterparties' express ongoing representations and warranties to the contrary on each Representation Date.

71.     But the Grantor Debtors and JPM, as Agent, did not stop there.  As the Debtors' financial condition continued to deteriorate, JPM, as Agent, and the Grantor Debtors made efforts to further improve the Lenders' Collateral position, at the intended expense of the Capital Providers.

72.    In January 2025, according to the Debtors, they were "downgraded from 'Recommended' to 'Cautionary' status by SEAFAX, a well-known industry credit rating agency." The downgrade had an immediate and pronounced impact on the Company's liquidity and vendor/customer relationships," such that, "[w]ithin days of the credit rating downgrade, the Company was placed on hold by a substantial number of its vendors and customers and received an even greater amount of vendor and customer outreach citing operational and liquidity concerns."

73.    In the face of the credit downgrade, coupled with an irreversible decrease in purchases followed by a claimed withholding of receivables by the Debtors' largest customer, the Debtors, by mid-February 2025, "made the difficult decision to shut down its operations" and, "with the support of its ABL Lenders, commenced an orderly winddown process to liquidate its remaining inventory, collect on its accounts receivable, and transition certain of its national distribution centers to new operators."

74.    Facing the immediate prospect of the Debtors' liquidations and possible bankruptcy filings, JPM, as Agent, demanded more "additional" Collateral in the form of sufficiently described "Commercial Tort Claims" pursuant to Section 4.4 of the Security Agreement. And the Grantor Debtors, intending to undercut the Capital Providers' rights under the Capital Provision Agreement, acceded without resistance.

75.    On March 18, 2025, at JPM's, as Agent, request, the Grantor Debtors delivered (within the 90-day preference period) Amendment #2 to the Security Agreement to JPM, as Agent. Amendment #2 likewise provides that the "Collateral listed on Schedule 1 to this Amendment shall be and *become* a part of the Collateral referred to in said Security Agreement and shall secure all Obligations referred to in the Security Agreement." (emphasis added). And Schedule 1 thereto

likewise contains a description of "Commercial Tort Claims" (sufficient under NYUCC Section 9-108 to be enforceable) granted as security to JPM, as Agent.

76. Schedule 1 to Amendment #2 identifies, this time granted as security by Western Boxed and Hamilton as "Grantors," the following Claims:

● *Sherwood Food Distributors, L.L.C. et al v. Cargill, Inc. et al*, 0:23-cv-00703 (District of Minnesota) (consolidated into *In Re: Cattle and Beef Antitrust Litigation* (0:22-md- 03031, D. Minn));

● *Sherwood Food Distributors, L.L.C. et al v. Agri Stats, Inc. et al*, 0:21-cv-02617 (District of Minnesota) in Lead Case: *In Re: Pork Antitrust Litigation*, 0:21-md-02998, (District of Minnesota); and

● *Sherwood Food Distributors, LLC et al v. Tyson Foods, Inc. et al*, 1:19-cv-00354 (Northern District of Illinois) (open for internal administrative purposes for cases related *In re Broiler Chicken Antitrust Litigation*, 1:16-cv-08637 (Northern District of Illinois)).

77. Again, the intent of both the Grantor Debtors and JPM underlying Amendment #2 was to give to JPM, as Agent – for the very first time – an *enforceable* security interest in Western Boxed's and Hamilton's Claims that JPM, as Agent, did not previously have. The plan, shared by the Grantor Debtors and JPM, as Agent, was to give JPM, as Agent, as the Debtors were preparing for liquidation and possible bankruptcy filings, first priority to any Proceeds realized from the Claims – something JPM, as Agent, did not receive in the Security Agreement and which, if the plan were to succeed, constituted a deliberate material impairment of the Capital Providers' rights in derogation of the Counterparties' express representations and warranties to the contrary.

**E.     Under New York Law, the Grantor Debtors' and JPM's, as Agent, Scheme to Impair the Capital Providers' Rights under the Capital Provision Agreement Failed**

22

78.     Despite their intentions to the contrary, under New York law, the Grantor Debtors and JPM, as Agent, failed to destroy and undermine the Capital Providers' priority of payment to any Proceeds under the Capital Provision Agreement.

79.     It is an axiom of New York law, which governs all of the relevant agreements here, that an assignee stands in the shoes of an assignor and takes only the rights of the assignor, no greater and no less.

80.     In this case, in December 2022, the Counterparties granted a "priority" of payment, and subordinated their right to payment, of Proceeds to the Capital Providers.   And the Counterparties ensured the Capital Providers' "first dollar" payment through, among things, the appointment of a Payment Agent to receive any Proceeds with explicit instructions to pay the Capital Providers first, an express trust arrangement in the event Proceeds were to bypass the Payment Agent, and a grant of an "undivided interest" in any Proceeds to the Capital Providers. In October 2024 and March 2025, when the Counterparties subsequently conveyed an enforceable security interest in Proceeds to JPM, as Agent, JPM, as Agent, could take only such rights to Proceeds that the Counterparties could give.   Consequently, despite their intent and efforts to the contrary, under New York law, any interest in the Claims and Proceeds that JPM received from the Counterparties in October 2024 and March 2025 was and is subordinate to that of the Capital Providers and subject to all of the limitations on the Counterparties' rights to Proceeds that are set forth in the Capital Provision Agreement.

**F.     Additional Events Preceding these Bankruptcy Filings, the Filings, and the Justiciable Controversy as to Priority of Payment**

81.     On March 31, 2025, the MDL court overseeing the *In re Pork Antitrust Litig.* cases issued a significant ruling, denying, in substantial part, the motions of the pork producers to

dismiss the antitrust claims against them.  Among other things, the court concluded that "genuine issues of material fact" existed regarding "whether Defendants formed an agreement to fix prices," "whether Agri Stats, Clemens, JBS, Seaboard, Smithfield, Triumph, and Tyson knowingly joined a price-fixing conspiracy," "whether Agri Stats reports violate the rule of reason," and "whether the statute of limitations for the Sherman Act claims is tolled under the continuing violation or fraudulent concealment doctrines."

82.    Days later, according to the Debtors, in early April 2025, various antitrust plaintiffs, including the Antitrust Claimant Debtors, reached a "tentative agreement to resolve the [Pork Antitrust] Actions as they relate to JBS in exchange for pro rata payments to the Plaintiff Debtors and the other participating plaintiffs," therefore, fixing, at that time, the amount JBS would pay on account of the Claims.  In accordance with their rights under the Capital Provision Agreement, the Capital Providers were informed of the settlement in principle.

83.    On April 9, 2025, by then aware that the Debtors were undergoing a liquidation process (but unaware of the active steps the Counterparties and JPM, as Agent, had taken to undermine the Capital Providers' rights), the Capital Providers delivered a notice of Remedy Event (the "Notice of Remedy Event") to the Counterparties, with a copy to Cadwalader.

84.    The Notice of Remedy Event cited reports that, as of February 18, 2025, "Harvest Sherwood commenced a shutdown of substantially all business operations and provided 60-day notices of mass terminations of its employees" and that "that Hilco Global has been engaged to conduct a liquidation of Harvest Sherwood's assets."  Based on that, the Capital Providers indicated that "it is apparent that Harvest Sherwood is very likely insolvent, or at the very least is in the zone of insolvency," and, thus, "Harvest Sherwood's representation" to the contrary in its quarterly report as of March 31, 2025, "was inaccurate or misleading," thereby constituting a

Remedy Event.  Consequently, the Counterparties indicated, and advised Cadwalader, that, in accordance with the Capital Provision Agreement, Blakemore was acting "as Harvest Sherwood's attorney-in-fact with respect to all of the Claims."

85.    On April 18, 2025, three creditors of Sherwood filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against it in the United States Bankruptcy Court for the Eastern District of Michigan.  That led to deliberations among the Debtors and Lenders, and ultimately negotiations with the petitioning creditors and other creditors, whereby it was agreed that the Debtors would file chapter 11 petitions in this District in lieu of the insolvency proceedings in Michigan.

86.    Accordingly, on May 5, 2025, Sherwood and the petitioning creditors entered into a stipulation to dismiss the involuntary case contemporaneously with the Defendants' chapter 11 filing in the United States Bankruptcy Court for the Northern District of Texas.  On the same day, each of the Debtors' filed chapter 11 petitions for relief in this Court.

87.    In these bankruptcy cases, the Debtors have indicated that the Claims are, or are among, the Debtors' most valuable assets.  They tout that the Claims seek over $1 billion in damages (excluding any statutory trebling of damages that may be available).

88.    And, yet, perhaps because the Claims are the centerpiece of, and raison d'etre for, the Debtors' liquidation in chapter 11 (and all of the associated administrative expenses, including professional fees and debtor-in-possession financing ("DIP") costs), the Debtors and JPM, as Agent, continue in their efforts to impair the Capital Providers' rights and priority to Proceeds, including by now engaging in revisionist history.

89.    Contrary to the plain terms of the Capital Provision Agreement, and to their own negative covenants in the Credit Agreement prohibiting the incurrence of Indebtedness, the

Debtors now describe the Capital Provision Agreement as "an unsecured *loan* document," pursuant to which "Burford Capital provided the Debtors with an unsecured $35 million *loan* in exchange for payment in the amount of $70 million of proceeds obtained from the Anti-Trust Litigation Assets." (emphasis added).  Hence, according to the Debtors, "Burford Capital holds nothing more than a non-recourse unsecured loan."  Indeed, it is on the very basis of blatantly mischaracterizing the Capital Provision Agreement as a "loan" that the Debtors seek to escape the consequences of black letter New York law recognizing the Capital Providers' priority of payment of Proceeds, asserting instead that "[t]o the extent the Debtors obtain proceeds on account of the Anti-Trust Litigation Assets on a postpetition basis, those proceeds are estate property and Burford Capital would have at most, an unsecured claim."

90.     Beyond mischaracterizing the nature and priority of the Capital Providers' interest in the Proceeds, the Debtors mischaracterize the extent of that interest as well.  By its plain terms, the Capital Provision Agreement provides for the payment of Proceeds to the Capital Providers of $70 million "plus, an additional 10% return on any of the foregoing amounts not paid by the third anniversary of the Capital Provision Agreement's closing date" (emphasis in original), an anniversary fast approaching.  In short, the Debtors' revisionism is blatant and patently false.

91.     The Debtors' efforts to recast and negate the Capital Providers' rights and priority to Proceeds under the Capital Provision Agreement is not limited to words only.  The Debtors' actions in these bankruptcy cases have constituted even more forceful efforts to impair the rights of the Capital Providers.

92.     The *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-petition Financing, (B) Use Cash Collateral, (C) Grant Senior Secured Liens and provide Claims with Superpriority Administrative Expense Status, and*

26

*(D) Grant Adequate Protection to the Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* ("DIP Motion") [Dkt. 12] and *Debtors Motion Seeking Entry of an Order (A) Approving a Settlement Agreement with JBS USA Food Company, JBS USA Food Company Holdings, and Swift Pork Company Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* ("JBS Motion") [Dkt. 192] illustrate the point.

93.    To start, in the DIP Motion, the Debtors sought to grant to the Lenders, pursuant to the DIP Agreement, a post-petition lien on and superpriority claim to, among other things, the Claims and any Proceeds thereof.  That motion, if granted as filed, would have eviscerated the rights of the Capital Providers because it would have given rise to a Court order (albeit erroneous) ordaining that the Lenders have a first priority lien on any Proceeds and, further, that the extent of that lien would have included both the Lenders' postpetition and prepetition debt totaling in excess of $105 million.

94.    Then, in the JBS Motion, the Debtors seek an order not only approving a compromise of the Antitrust Claimant Debtors' Claims against JBS for $13,322,083.00 in wired funds, but additionally directing that "the Debtors shall deliver such funds to the DIP Lenders in accordance with the terms of the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Claims; and (III) Granting Related Relief* [Docket No. 108] or any other order entered by this Court authorizing the Debtors to obtain postpetition financing and to use cash collateral (any such order, the "DIP Order")."

95.    The one-two punch of the Debtors' DIP Motion and JBS Motion (both supported by JPM, as Agent), if granted as filed, effectively would have deprived the Capital Providers of

27

their rights (or, at least, their claim of rights) under the Capital Provision Agreement without due process.

96.     The Capital Providers' vigorous opposition to the DIP Motion resulted in modifications to the DIP Order that ensured that "nothing in this Final Order purports to impair the ability of the Capital Providers to, during the Challenge Period, assert any claims and defenses in respect of the Antitrust Claim Proceeds" and that "[a]ny Antitrust Claim Proceeds shall be treated in accordance with a subsequent Court order," *not* pursuant to the postpetition liens and superpriority claims otherwise granted in the DIP Order.

97.     And while the JBS Motion should be granted to the extent it approves the compromise with JBS, it should be *denied* to the extent it directs distribution of any Proceeds received from JBS (the "JBS Proceeds") pending the outcome of this adversary proceeding.

98.     The words and actions of the Debtors and JPM, as Agent, give rise to (i) a justiciable controversy as to the validity, extent and priority of the interests, if any, in the JBS Proceeds and any other Proceeds by, respectively, the Capital Providers, JPM, as Agent, and the Debtors, (ii) a need by the Capital Providers for relief to subordinate the interests, if any, of JPM, as Agent, and the Debtors in the JBS Proceeds and any other Proceeds, and (iii) a need by the Capital Providers for an injunction and other equitable relief to preserve their rights in and to the JBS Proceeds and any other Proceeds.  All of the foregoing can be determined solely in the context of an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.[1]

---

[1] That is not to assert that *all* claims that the Capital Providers now, or may in the future, have against the Counterparties, or any of the other Defendants, need be and are asserted in this adversary complaint.  The Capital Providers reserve their right to assert monetary claims for breach of, or for indemnification under, the Capital Provision Agreement through the proof of claim process, as appropriate, pursuant to the Capital Provision Agreement's arbitration clause, and/or otherwise.

**FIRST CAUSE OF ACTION**
**(AS TO ALL DEFENDANTS)**

**DECLARATORY JUDGMENT AS TO THE VALIDITY,**
**EXTENT AND PRIORITY OF RESPECTIVE INTERESTS,**
**IF ANY, IN THE JBS PROCEEDS AND ANY OTHER PROCEEDS**

99.      The Capital Providers repeat and reallege the allegations contained in paragraphs 1

through 98 hereof, as if fully set forth herein

100.    The Capital Providers have a valid, first-priority interest in the JBS Proceeds and

any other Proceeds for at least the following reasons:

- In December 2022, the Counterparties entered into the Capital Provision

  Agreement granting the rights and interests set forth therein in and to any

  Proceeds to the Capital Providers, which was two years *before* October

  2024 and March 2025, when the Counterparties and the other Grantor

  Debtors granted, for the first time, any security interest, enforceable under

  applicable law, in the Claims and any Proceeds thereof to JPM, as Agent;

- Under applicable law, when JPM, as Agent, received any rights to and

  security interest in the Claims and any Proceeds thereof, it could receive no

  greater rights to and interests in the Claims and Proceeds than the Grantor

  Debtors had at that point in time.  And the only rights to and interests in the

  Claims and Proceeds that the Grantor Debtors had were those belonging to

  the Counterparties, which previously had entered into the Capital Provision

  Agreement.  None of the Non-Counterparty Debtors had or have any rights

  to or interests in the Claims or any Proceeds thereof;

29

- In the Capital Provision Agreement, the Counterparties agreed to subordinate their entitlement, if any, to Proceeds in favor of the Capital Providers, to which the Counterparties granted a "priority" of payment. That subordination agreement limited, under applicable law, any rights to Proceeds that the Counterparties subsequently granted to JPM, as Agent, and is enforceable in these bankruptcy proceedings pursuant to Section 510 of the United States Bankruptcy Code;

- The Counterparties agreed to measures in the Capital Provision Agreement and otherwise to ensure enforcement of their subordination agreement in favor of the Capital Providers, including, but not limited to: (i) their eschewing any receipt of Proceeds, and their appointment of their counsel of record instead as Payment Agent to receive any and all Proceeds and to distribute them, *first*, to the Capital Providers and *second*, until the Capital Providers were paid in full their Capital Providers' Entitlement, to the Counterparties and Capital Providers in equal parts; (ii) their providing for an express trust in the amount of the Capital Providers' Entitlement in the event that any Proceeds bypassed the Payment Agent; and (iii) their granting an undivided interest in any Proceeds to the Capital Providers;

- The Counterparties' grant of an undivided and/or beneficial interest in Proceeds, if any, to the Capital Providers preceded the Counterparties' grant of any enforceable security interest in the Claims and any Proceeds thereof to JPM, as Agent; thus, under applicable law and bankruptcy law, JPM, as Agent, took and may take any security interest in the Claims and Proceeds

30

only subject to, and/or exclusive of, the prior interest granted to the Capital Providers. Moreover, the security interests granted by Western Boxed and Hamilton in March 2025 to JPM, as Agent, are avoidable on their faces, as they were either on account of the antecedent debt in the Credit Agreement, outside the ordinary course, and within 90 days prior to the bankruptcy filings or prepetition conveyances at a time when those Debtors were insolvent and for no consideration;

- Any Proceeds delivered into the possession or custody of the Debtors are subject to an express trust in favor of the Capital Providers to the extent of their Capital Providers' Entitlement; and

- If not the subject of an express trust, any Proceeds delivered into the possession or custody of the Debtors are the subject of a constructive, resulting and/or equitable trust in favor of the Capital Providers to the extent of their Capital Providers' Entitlement, because (i) the Capital Provision Agreement gave rise to a confidential relationship between the parties thereto, (ii) the Counterparties expressly promised the Capital Providers a "first dollar return" and also that they would not take any actions to impair such rights of the Capital Providers, (iii) in reliance on that promise, the Capital Providers delivered $35 million to the Counterparties, and (iv) the Debtors would be unjustly enriched at the expense of the Capital Providers if they were to retain, or to pay down obligations owing to the Lenders from, the Capital Providers' Entitlement, especially in light of the inequitable misconduct in which the Counterparties have engaged by actively and

31

deliberately seeking to impair the Capital Providers' rights, both prior to and after these bankruptcy filings, in breach of representations and warranties on which the Capital Providers relied.

101.    Notwithstanding the foregoing, the Debtors' and JPM's, as Agent, words and actions indicate that they (wrongly) view the Capital Providers as having no more than the rights of an unsecured lender to the Counterparties, no interest in any Proceeds, no priority to any payment of the JBS Proceeds or any other Proceeds and a cap on payment of Proceeds of $70 million. Rather, by their words and actions, the Defendants' (incorrect) view is that JPM, as Agent, is entitled to exclusive payment of the JBS Proceeds and any other Proceeds (net of legal fees and expenses) until all of post- and pre-petition obligations owing to the Lenders are paid.

102.    Pursuant to Rule 7001(b) and (i) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 2201, the Capital Providers are entitled to a declaratory judgment declaring that the Capital Providers have a valid, first priority interest in the JBS Proceeds and any other Proceeds in accordance with, and to the extent provided under, the terms of the Capital Provision Agreement.

### SECOND CAUSE OF ACTION
### (AGAINST ALL DEFENDANTS)

### ENFORCEMENT OF SUBORDINATION AGREEMENT

103.    The Capital Providers repeat and reallege the allegations contained in paragraphs 1 through 102 hereof, as if fully set forth herein.

104.    In the Capital Provision Agreement, entered into in December 2022, the Counterparties agreed to subordinate their entitlement, if any, to Proceeds in favor of the Capital Providers, to which the Counterparties granted a "priority of payment."

105.    The Counterparties agreed to measures in the Capital Provision Agreement and otherwise to ensure enforcement of their subordination agreement in favor of the Capital Providers, including, but not limited to: (i) their eschewing any receipt of Proceeds, and their appointment of their counsel of record instead as Payment Agent to receive any and all Proceeds and to distribute them, first, to the Capital Providers and second, until the Capital Providers were paid their full Capital Providers' Entitlement, to the Counterparties and Capital Providers equally; (ii) their providing for an express trust in the amount of the Capital Providers' Entitlement in the event that any Proceeds bypassed the Payment Agent; and (iii) their granting an undivided interest in any Proceeds to the Capital Providers.

106.    Such measures also include the remedy provisions in the Capital Provision Agreement, which entitle the Capital Providers, upon a Remedy Event (multiple of which occurred prepetition), among other things, to "take any and all actions on behalf of the Counterparty that the Capital Providers may reasonably deem necessary or advisable in order to prosecute the Claim(s) to bring about the monetization thereof through a Claim Resolution and to collect and enforce any settlement, final judgment or award."

107.    The Counterparties' subordination agreement limited, under applicable law, any rights to Proceeds that the Counterparties subsequently granted to JPM, as Agent, in October 2024 and March 2025, when the Counterparties and the other Grantor Debtors granted, for the first time, any security interest, enforceable under applicable law, in the Claims and any Proceeds thereof to JPM, as Agent.   Under applicable law, when JPM, as Agent, received any rights to and a security interest in the Claims and any Proceeds thereof it could receive no greater rights to and interests in the Claims and Proceeds than the Counterparties had at that point in time.

108.    The Counterparties' subordination agreement also is enforceable in these bankruptcy proceedings pursuant to Section 510 of the United States Bankruptcy Code.

109.    Pursuant to Rule 7001(h), the Capital Providers are entitled to an order subordinating the interest of the Debtors, the Debtors' estates and JPM, as Agent, in payment of the JBS Proceeds and any other Proceeds to that of the Capital Providers and enforcing such other features of the Counterparties' subordination agreement as are just, equitable and proper.

### THIRD CAUSE OF ACTION
### (AGAINST THE DEBTORS)

### PERMANENT INJUNCTION

110.    The Capital Providers repeat and reallege the allegations contained in paragraphs 1 through 109 hereof, as if fully set forth herein.

111.    The Debtors, by their words and actions, have taken and continue to take affirmative actions to eradicate, impair and/or undermine the right of the Capital Providers under the Capital Provision Agreement.  Those rights include, but are not limited to, the subordination of the Counterparties' (and any assignees') entitlement, if any, to payment of Proceeds in favor of the Capital Providers and concomitant "first dollar" "priority" return granted to the Capital Providers, an express trust in favor of the Capital Providers to the extent of their Capital Providers' Entitlement, a grant of an undivided and/or beneficial interest in Proceeds and the right, following a Remedy Event, to "take any and all actions on behalf of the Counterparty that the Capital Providers may reasonably deem necessary or advisable" to prosecute and/or monetize the Claims.

112.    Given that the Debtors are in bankruptcy proceedings that they have not indicated will be a full pay case, monetary damages for the Debtors' conduct are not adequate and, thus, the harm to the Capital Providers is irreparable.

113.    Pursuant to Rule 7001(g), the Capital Providers are entitled to a preliminary and permanent injunction enjoining the Debtors from continuing to take actions to eradicate, impair and/or undermine the Capital Providers' rights under the Capital Provision Agreement.

**FOURTH CAUSE OF ACTON, IN THE ALTERNATIVE
AGAINST JPM, AS AGENT**

**DECLARATORY JUDGMENT AS TO THE EXTENT OF JPM'S, AS AGENT,
INTEREST IN THE JBS PROCEEDS AND ANY OTHER PROCEEDS**

114.    The Capital Providers repeat and reallege the allegations contained in paragraphs 1 through 113 hereof, as if fully set forth herein.

115.    In the event that JPM, as Agent, is determined to hold and/or be entitled to a first priority interest in the JBS Proceeds and any other Proceeds (which it should not), the extent of the interest should be limited to any post-petition credit extended by the Lenders and should *not* include any of the Debtors' pre-petition obligations.

116.    Under Section 552(a) of the Bankruptcy Code, any lien on the Claims asserted by JPM, as Agent, would not attach to any proceeds thereof "acquired" by the Debtors or their estates after the commencement of these cases, except as provided in Section 552(b).

117.    Section 552(b) provides, in relevant part, that if the Lenders "entered into a security agreement before the commencement of the case and . . . the security interest created by such security agreement extends to . . . proceeds, products, offspring, or profits of [property of the debtor acquired by the debtor before the commencement of the case], then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law . . . ."

118.     According them their plain meaning, proceeds "acquired by the estate" after the commencement of these cases means postpetition proceeds that the Debtors' estates "come into possession" of or "get as [their] own."  Furthermore, "applicable nonbankruptcy law" refers to "any law that is not aimed solely at bankruptcy proceedings," including state contract law.

119.     The Capital Provision Agreement contains express contractual restrictions on the Debtors' ability to acquire Claim proceeds. It provides that the subset of Debtors who brought the claims, *i.e.*, the Counterparties, have no right to possess Proceeds at all, unless and until the Capital Providers are paid the amounts to which they are entitled. Rather, any and all Proceeds are to be delivered into the custody of a third-party Payment Agent that is directed to pay the Debtors only after the Capital Providers receive their "priority of payment" and only net of the full Capital Providers' Entitlement. Moreover, in the event any such Claim proceeds somehow were to bypass the Payment Agent and be delivered directly to any of the Debtors (even Debtors that are not Counterparties), then such proceeds are to be held by the Debtors "in trust for the benefit of the Capital Providers in the amount to which the Capital Providers are entitled."

120.     Accordingly, the only "proceeds" of the Claims that would be "acquired" by the Debtors' estates postpetition are those, if any, that come into the estates' possession after the Capital Providers receive their "priority of payment."  As such, under Section 552, any lien granted to JPM, as Agent, prepetition would not attach to the Capital Providers' interest in any Proceeds acquired by the Debtors' estates postpetition.

121.     Because JPM, as Agent, does not have a prepetition lien that attaches to Proceeds acquired by the Debtors postpetition, JPM, as Agent, should not be permitted to rely on the Lenders' postpetition lending as a means of bootstrapping any postpetition lien on Proceeds to secure its prepetition lending that was not based on Proceeds.  To do so would be inequitable and

unjustified, especially given that the Lenders' postpetition lending is unneeded to monetize Claims and collect Proceeds because the Claims are being prosecuted and resolved on a contingency basis by Cadwalader, which is also advancing all antitrust litigation expenses.

122.    JPM's, as Agent, words and actions reflect that it disagrees and that, therefore, a justiciable controversy exists as to the extent to which JPM, as Agent, should have a first priority lien on Proceeds, in the event the Court were (erroneously) to grant or recognize a postpetition lien on Proceeds in favor of JPM, as Agent.

123.    Pursuant to Rule 7001(b) and (i) of the Federal Rules of Bankruptcy Procedure and 28 U.S.C. § 2201, the Capital Providers, solely in the alternative, are entitled to a declaratory judgment declaring that, in the event that JPM, as Agent, is granted a first-priority lien on Proceeds, such lien should be to the extent of no more than the amount of any post-petition credit the Lenders extend.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court enter judgment in their favor against Defendants as follows:

A.    On the First Cause of Action against all Defendants, awarding Plaintiffs a declaratory judgment declaring that the Plaintiffs have a valid, first priority interest in the JBS Proceeds and any other Proceeds in accordance with, and to the extent provided under, the terms of the Capital Provision Agreement;

B.    On the Second Cause of Action against all Defendants, subordinating the interests of the Defendants to the JBS Proceeds and any other Proceeds to that of the Capital Providers and enforcing such other features of the Counterparties' subordination agreement as are just, equitable and proper;

37

C.      On the Third Cause of Action against the Debtors, preliminarily and

permanently enjoining the Debtors from continuing to take actions to eradicate, impair and/or

undermine the Capital Providers' rights under the Capital Provision Agreement;

D.      On the Fourth Cause of Action against JBS, as Agent, asserted solely in the

alternative, granting Plaintiffs a declaratory judgment declaring that, in the event that JPM, as

Agent, is granted a first-priority lien on Proceeds, such lien should be to the extent of no more than

the amount of any post-petition credit the Lenders extend.

E.      Awarding Plaintiffs their reasonable costs and expenses incurred in this

adversary proceeding; and

F.      Granting Plaintiff such other and further relief as the Court deems just,

equitable and proper.

Dated:      July 10, 2025
            Dallas, TX

/s/ *Julian P. Vasek*
**MUNSCH HARDT KOPF & HARR, P.C.**
Kevin M. Lippman
Texas Bar No. 00784479
Julian P. Vasek
Texas Bar No. 24070790
500 N. Akard Street, Suite 4000
Dallas, TX 75201
Telephone:      (214) 855-7500
Email:          klippman@munsch.com
                jvasek@munsch.com