SIDLEY AUSTIN LLP
Rakhee V. Patel (00797213)
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        rpatel@sidley.com
              cmcmanus@sidley.com

SIDLEY AUSTIN LLP
Stephen Hessler (admitted *pro hac vice*)
Anthony R. Grossi (admitted *pro hac vice*)
Jon Muenz (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        shessler@sidley.com
              agrossi@sidley.com
              jmuenz@sidley.com

SIDLEY AUSTIN LLP
Jason L. Hufendick (admitted *pro hac vice*)
Ryan Fink (admitted *pro hac vice*)
Daniela Rakowski (admitted *pro hac vice*)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jhufendick@sidley.com
              ryan.fink@sidley.com
              drakowski@sidley.com

*Attorneys for the Debtors
and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re:<br><br>HARVEST SHERWOOD FOOD<br>DISTRIBUTORS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25- 25-80109 (SGJ)<br><br>(Jointly Administered) |

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each debtor's federal tax identification number, are Del Mar Holding LLC (9207), Del Mar Acquisition Inc. (8866), Surfliner Holdings, Inc. (9456), Harvest Sherwood Food Distributors, Inc. (8995), Harvest Meat Company, Inc. (9136), LAMCP Capital, LLC (N/A), Western Boxed Meats Distributors, Inc. (8735), Cascade Food Brokers, Inc. (1389), Hamilton Meat, LLC (6917), SFD Acquisition LLC (8995), SFD Transportation Corp. (1551), Sherwood Food Distributors, L.L.C. (4375), and SFD Company LLC (1175).  The Debtors' service address is c/o Epiq Corporate Restructuring, LLC 10300 SW Allen Blvd., Beaverton, OR 97005.

BLAKEMORE INVESTMENTS LLC,
MILWAUKEE INVESTMENTS LP,

        Plaintiffs,

        v.

HAMILTON MEAT, LLC, HARVEST
MEAT COMPANY, INC., HARVEST
SHERWOOD FOOD DISTRIBUTORS,
INC., SHERWOOD FOOD
DISTRIBUTORS, L.L.C., WESTERN
BOXED MEAT DISTRIBUTORS, INC.,
DEL MAR HOLDING, LLC, DEL MAR
ACQUISITION INC., SURFLINER
HOLDINGS, INC., LAMCP CAPITAL,
LLC, CASCADE FOOD BROKERS, INC.,
SFD ACQUISITION LLC, SFD
TRANSPORTATION CORP., SFD
COMPANY LLC, and JPMORGAN CHASE
BANK, N.A., as AGENT.

        Defendants.

Adv. Pro. No. 25-08008-sgj

## DEBTOR DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

*A.*      The Prepetition ABL Facility ........................................................................ 4

B.      The Agreement ............................................................................................. 5

C.      The Chapter 11 Cases ................................................................................. 5

    i)      The DIP Facility ..................................................................................... 6

    ii)      The JBS 9019 Settlement ...................................................................... 7

I.      Legal Standard ................................................................................................... 7

II.      Burford's Legal Interpretation of the Agreement is Implausible ...................... 10

A.      The Agreement did not Grant an Interest in the Claim Proceeds that is Senior to the Postpetition Debtors' Interests ............................................... 10

B.      The Agreement is not a Subordination Agreement ..................................... 12

C.      The Agreement Does not Establish an Express Trust in Favor of Burford ............... 15

D.      The Agreement did not Grant an Interest in the Claim Proceeds that is Senior to the ABL Lenders' Interests ............................................................ 17

III.      Burford Does Not Plead Facts That Could Plausibly Warrant Equitable Relief .............. 19

A.      Burford's Constructive Trust Theory Fails as a Matter of Law ................... 20

B.      Burford's Equitable Lien Theory Fails as a Matter of Law ......................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Advent Management Corp*,
178 B.R. 480 (B.A.P. 9th Cir. 1995)......................................................................20

*In re Air Safety Int'l, L.C.*,
336 B.R. 843 (S.D. Fla. 2005) .............................................................................13

*In re Ajax Integrated, LLC*,
2016 WL 1178350 (Bankr. N.D.N.Y. 2016) ........................................................24

*Amendola v. Bayer*,
907 F.2d 760 (7th Cir. 1990) ...............................................................................21

*In re Ames Dept. Stores, Inc.*,
144 Fed. Appx. 900 (2nd Cir 2005)......................................................................16

*In re Amret, Inc.*,
174 B.R. 315 (M.D. Ala. 1994) ............................................................................13

*In re Andrade*,
2010 WL 5347535 (Bankr. E.D.N.Y. 2010)...................................................10, 12

*In re Bailey Pontiac, Inc.*,
139 B.R. 629 (N.D. Tex. 1992)..............................................................................20

*Bank of Chicago v. Park Nat. Bank*,
266 Ill. App. 3d 890 (1994) ..................................................................................13

*In re Bonner*,
2014 WL 890477 (B.A.P. 9th Cir. 2014)...............................................................24

*Carlson Inc. v. Commercial Disc. Corp.*,
382 F.2d 903 (10th Cir.1967) ...............................................................................16

*Cherno v. Dutch American Mercantile Corp.*,
353 F.2d 147 (2d Cir. 1965)..................................................................................24

*Cinel v. Connick*,
15 F.3d 1338 (5th Cir. 1994) ..................................................................................8

*Cotton v. Texas Express Pipeline, LLC*,
2017 WL 3709093 (W.D. Tex. 2017).....................................................................9

*Crutchfield v. Match Grp., Inc.*,
   529 F. Supp. 3d 570 (N.D. Tex. 2021) ...............................................................7, 8

*D Legal Funding Partners, LP v. Powell*,
   No. A-4909-15T2, 2019 WL 3405136 (N.J. Super. Ct. App. Div. July 29,
   2019) .............................................................................................................13

*In re Doman*,
   68 A.D.3d 862 (2nd Dept. 2009) ...................................................................16

*Donohue v. Cuomo*,
   38 N.Y.3d 1 (2022) .......................................................................................18

*Dorsey v. Portfolio Equities, Inc.*,
   540 F.3d 333 (5th Cir. 2008) ..........................................................................8

*Dunlap–McCuller v. Riese Org.*,
   1995 WL 42241 (S.D.N.Y.1995).....................................................................12

*In re Einhorn Vacation Planning Ctr.*,
   59 B.R. 179 (Bankr. E.D.N.Y. 1986).........................................................16, 17

*In re Emerald Oil Co.*,
   807 F.2d 1234 (5th Cir.1987) ........................................................................23

*In re England Motor Co.*,
   426 B.R. 178 (Bankr. N.D. Miss. 2010) .........................................................11

*In re Erickson Ret. Communities, LLC*,
   425 B.R. 309 (Bankr. N.D. Tex. 2010)...........................................................13

*In re First Cent. Financial Corp.*,
   269 B.R. 481 (Bankr. E.D.N.Y. 2001)............................................................20

*In re Flanagan*,
   503 F.3d 171 (2d Cir. 2007)......................................................................22, 23

*In re Foos*,
   183 B.R. 149 (Bankr. N.D. Ill. 1995) .........................................................20, 22

*Funk v. Stryker Corp.*,
   631 F.3d 777 (5th Cir. 2011) ...........................................................................8

*Matter of Haber Oil Co., Inc.*,
   12 F.3d 426 (5th Cir. 1994) .......................................................................20, 23

*In re Harvest Sherwood Food Distributors, Inc.*,
   No. 25-80109 (SGJ) (Bankr. N.D. Tex. July 15, 2025) (Hr'g Tr. ) ...................1, 2, 3

*Matter of Holly's, Inc.*,
    140 B.R. 643 (Bankr. W.D. Mich. 1992) ................................................................13

*HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.)*,
    364 F.3d 355 (1st Cir. 2004) ..............................................................................13

*In re IYS Ventures, LLC*,
    662 B.R. 336 (Bankr. N.D. Ill. 2024) ...................................................................24

*In re Kors, Inc.*,
    819 F.2d 19 (2d Cir. 1987) ..................................................................................13

*In re Kuranda*,
    466 B.R. 39 (Bankr. E.D. Penn. 2012) .................................................................12

*In re Lehman Bros. Holdings Inc.*,
    422 B.R. 407 (Bankr. S.D.N.Y. 2010) ................................................................13

*LFD Operating, Inc. v. Ames Department Stores, Inc.*,
    2004 WL 1948754 (S.D.N.Y. 2004) ...................................................................16

*M & B Joint Venture, Inc. v. Laurus Master Fund, Ltd.*,
    12 N.Y.3d 798 (Ct. App. 2009) ..........................................................................24

*In re Mandel*,
    2013 WL 4829150 (Bankr. E.D. Tex. 2013) .......................................................21

*In re Markair, Inc.*,
    172 B.R. 638 (9th Cir. BAP 1994) ......................................................................23

*In re MarketXT Holdings Corp.*,
    336 B.R. 67 (Bankr. S.D.N.Y. 2006) ...................................................12, 15, 16

*In re Mason*,
    600 B.R. 765 (Bankr. E.D.N.C. 2019) ................................................................19

*In re Minor*,
    482 B.R. 80 (Bankr. W.D.N.Y. 2012) ...................................................................2

*In re N. Am. Coin & Currency, Ltd.*,
    767 F.2d 1573 (9th Cir. 1985) ............................................................................21

*In re O.P.M. Leasing Servs.*,
    Inc., 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982) ..................................................24

*In re Omegas Group, Inc.*,
    16 F.3d 1443 (6th Cir. 1994) ..............................................................................22

*Polk 33 Lending LLC v. Schwartz,*
    555 F. Supp. 3d 38 (D. Del. 2021) ...................................................................... 15

*In re Reviss,*
    628 B.R. 386 (Bankr. E.D.N.Y. 2021) ........................................................ 10, 12, 21

*Rowe v. Great Atl. & Pac. Tea Co.,*
    46 N.Y.2d 62 (1978) ............................................................................................ 18

*In re S & A Restaurant Corp.,*
    2010 WL 3619779 (Bankr. E.D. Tex. 2010) ........................................................ 21

*Septembertide Pub., B.V. v. Stein & Day, Inc.,*
    884 F.2d 675 (2d Cir. 1989) ........................................................................... 11, 12

*In re Shulman Transp. Enters.,*
    744 F.2d 293 (2d Cir. 1984) ................................................................................ 16

*Strategy & Execution, Inc. v. Black Rifle Coffee Co., LLC,*
    No. SA-23-CV-135-FB, 2024 WL 1481433 (W.D. Tex. Mar. 28, 2024) ................ 8

*Sullivan v. Leor Energy, LLC,*
    600 F.3d 542 (5th Cir. 2010) ................................................................................. 8

*Torch, Inc. v. LeBlanc,*
    947 F.2d 193 (5th Cir. 1991) ................................................................................. 8

*In re Trim-Lean Meat Products, Inc.,*
    10 B.R. 333 (D. Del. 1981) ................................................................................... 24

**Statutes**

11 U.S.C §§ 541(a)(1) ................................................................................................ 10

11 U.S.C § 541(a)(7) .................................................................................................. 10

11 U.S.C § 544 ...................................................................................................... *passim*

New York General Obligations Laws, § 5-501 ........................................................... 2

New York Judiciary Law, § 489 .................................................................................. 2

U.C.C. § 9-108(e)(1) ................................................................................................. 18

U.C.C. § 9-301(3) ..................................................................................................... 25

**Other Authorities**

Fed R. Bankr P. 9019 ................................................................................................. 7

Fed R. Civ P 12(b)(6)..................................................................................................................7, 8

## PRELIMINARY STATEMENT

1.      In December 2022, Blakemore Investments LLC and Milwaukee Investments LP (collectively, "Burford") provided certain of the above-captioned debtors (the "Debtors") with $35 million pursuant to a Capital Provision Agreement (the "Agreement," attached hereto as **Exhibit A**). The Agreement further provides that the repayment of the original $35 million (plus a two-times multiple and ten percent interest per annum) be sourced from the proceeds of certain antitrust litigation claims held by the Debtors (the "Claims" and such proceeds, the "Claim Proceeds"). The Agreement does not provide for an assignment of the Claims or the Claim Proceeds and does not provide a grant of any security interest. The Agreement also expressly permits the grant of "all asset" liens on the Claims and the Claim Proceeds in favor of the Debtors' secured lenders (the "ABL Lenders" or "DIP Lenders").

2.      Notwithstanding these undisputed facts, Burford posits that it entered an agreement that conferred a "valid, first-priority interest" above all other stakeholders without any notice to those stakeholders.[2] Burford makes this assertion even though it refuses to define the grant of its so-called "valid, first-priority interest."[3] That unwillingness is instructive, because if Burford defined the granting instrument among any of the universally understood options, the only plausible conclusion is that Burford is an unsecured creditor of the Debtors' bankruptcy estates.

---

[2] Adversary Complaint [Adv. Docket No. 1] (hereinafter "Complaint"), ¶ 100.

[3] *In re Harvest Sherwood Food Distributors, Inc.*, No. 25-80109 (SGJ) (Bankr. N.D. Tex. July 15, 2025) (Hr'g Tr. at 72:14–74:24) ("THE COURT: [] When it's between a creditor and a debtor, it can be an unsecured loan, it can be a secured loan, it could be a sale, it could be maybe you think the Debtor has sold you a percentage of future litigation proceeds. For some reason, I'm not hearing a very clear answer . . . MR. SILVERSTEIN: [] It's not a loan . . . THE COURT: Then what is it? MR. SILVERSTEIN: [] [I]t is a few things. One, it is a grant of an interest in the proceeds of the antitrust claims. THE COURT: [] A sale? Assignment? MR. SILVERSTEIN: I would say it's a grant of a beneficial interest in the proceeds of the antitrust claims. . . I don't want to use the word assignment. . . I'm going to call it a grant of an interest in the proceeds. THE COURT: [] I'm not sure . . . what that means, other than a sale or assignment. MR. SILVERSTEIN: [] [T]he characterization of whether it's an assignment, a sale, a grant, whatever words you want to use, the point is that the Debtor gave up rights in these proceeds, and gave up rights in these proceeds such that the proceeds weren't its possession anymore.").

If the Agreement constituted a loan, it must be unsecured as there was no security interest granted nor any perfection thereof and may be subject to usury laws.[4]  If the Agreement constituted a sale or assignment of the Claims, the Agreement may be subject to New York champerty laws.[5]  If the Agreement constituted a sale or assignment of the Claim Proceeds, that sale or assignment is cut off by the Debtors' bankruptcy filing under both New York and bankruptcy law.[6]

3.    Instead, through the Complaint,[7] Burford attempts to invent a property right so powerful that Burford could advance funds without any credit risk and without any notice to third-parties.  Indeed, that is exactly what Burford said to this bankruptcy court (the "Court").[8]  This position is wrong.  Burford entered an agreement that carried material credit risk and took no ordinary precautions to perfect or otherwise elevate its purported interest.  That Burford now claims not to have appreciated such risk at the time despite being a sophisticated litigation financier represented by counsel is not a justification to read the Agreement as conferring a greater interest

---

[4] *See generally* New York General Obligations Laws, § 5-501.

[5] *See generally* New York Judiciary Law, § 489.

[6] *See In re Minor*, 482 B.R. 80, 84 (Bankr. W.D.N.Y. 2012) ("First, in order to avoid a violation of [personal injury champerty laws], PSF took not an assignment of any cause of action, but only an assignment of proceeds. Under New York law, such a contract 'will take effect as an equitable assignment.' With respect to litigation proceeds, therefore, PSF acquired only an equitable lien . . . .  Outside bankruptcy, PSF might have little reason to fear the existence of a competing legal right . . . .  But bankruptcy creates an estate by operation of law [and PSF's] equitable rights are unenforceable as against the superior legal interest of a bankruptcy estate [and] a bankruptcy trustee [supersedes] the interest of a creditor claiming a mere equitable lien.") (internal citation omitted).  Indeed, it is black letter law that an equitable lien is junior to a debtor in possession's interest pursuant to section 544(a)(i) of the Bankruptcy Code.  *See infra* Section III(B).

[7] Capitalized terms used but not defined herein have the meaning ascribed to such terms in the Complaint or the *Declaration of Eric Kaup in Support of Debtors' Chapter 11 Petitions, Debtor in Possession Financing, and First Day Pleadings* [Docket No. 14] (the "First Day Declaration"), as applicable.

[8] *In re Harvest Sherwood Food Distributors, Inc.*, No. 25-80109 (SGJ) (Bankr. N.D. Tex. July 15, 2025) (Hr'g Tr. at 55:8–20) ("MR. SILVERSTEIN: So, Your Honor, in December of 2022, [] five of the Debtors entered into this Capital Provision Agreement. It was signed by the CEO at the time of the entities. And in return for $35 million of capital, there were rights granted. Among those rights[,] this document says . . . this wasn't a credit risk that our clients were taking. This was a nonrecourse provision of capital where the only payments being made back were out of the proceeds. So this was not a credit risk that our clients took with regard to these particular counterparties.").

than is evident from its unambiguous four corners.  To do so would elevate Burford's unsecured

status to the detriment of thousands of stakeholders.

4.      In its Complaint, Burford asserts a range of flawed legal theories to mask the clear

infirmities in the Agreement.  These assertions were reiterated to the Court by Burford at the

Debtors' July 15, 2025 hearing.[9]  None of these legal theories, however, survive even a cursory

amount of scrutiny and all warrant dismissal of the Complaint with prejudice.  These theories are

either contradicted by black letter law and long-standing Bankruptcy Code and Uniform

Commercial Code practice or otherwise require severe allegations of misconduct by the Debtors

that are wholly absent from the Complaint.  Taking the factual assertions of the Complaint at face

value, Burford has not pled facts sufficient to state a claim for relief that is plausible on its face.

5.      No amount of time to further litigate or issue discovery could change this reality—

Burford sits in the same position as all of the Debtors' unsecured creditors.  Burford's counsel has

similarly acknowledged that the extent of Burford's interest is a question of law based on the plain

text of the Agreement.[10]  Nonetheless, Burford grasps at straws in its Complaint in the hope that

an extended litigation process can somehow improve Burford's weak legal footing.  Accordingly,

the Debtors file their motion to dismiss the Complaint (the "Motion to Dismiss") with the support

of the DIP Lenders and the Official Committee of Unsecured Creditors (the "Committee") to end

Burford's blatant attempt to elevate the status of an unsecured claim and ideally reduce any further

waste of estate resources combatting specious arguments.  The assertion of an amorphous senior

---

[9] *Id.* at 79:8–16 ("MR. SILVERSTEIN: We believe it's a subordination [agreement] . . . It is a grant of an interest in the proceeds, and it's also a grant of an equitable lien on the proceeds, a beneficial interest in the proceeds, such that when the proceeds come in, if they don't go to the Payment Agent and aren't paid in accordance with this, they are subject to an express trust and a constructive trust.").

[10] *In re Harvest Sherwood Food Distributors, Inc.*, No. 25-80109 (SGJ) (Bankr. N.D. Tex. June 26, 2025) (Hr'g Tr. at 89:11–90:7) ("MR. SILVERSTEIN: The [Agreement] is a payment subordination by the Debtors in favor of [Burford] . . . it's a legal matter.").

interest without basis in law or fact cannot defeat the Motion to Dismiss.  If it could, all unsecured

creditors would commence declaratory judgment actions to exert leverage over chapter 11 debtors.

6.      Ultimately, the Agreement is not a complicated document and there is only one

plausible interpretation of it—a contract to provide the Debtors with funds in exchange for a claim

that future proceeds would be remitted to Burford.  This results in a simple unsecured contract

claim.  If the Agreement silently conferred the interests Burford asserts, the Agreement would

upend the public policy of the Bankruptcy Code and the Uniform Commercial Code, as well as

unravel long-standing practice regarding grants of security interests.  A ruling in favor of Burford

would create a loophole to universal perfection rules regarding commercial tort claims that require

public disclosure.  Burford's legal interpretation, therefore, cannot plausibly be correct and the

Debtors respectfully request that the Motion to Dismiss be granted by the Court.

## BACKGROUND

### A.      The Prepetition ABL Facility

7.      On June 17, 2022, certain of the Debtors entered into that certain Credit Agreement

(as amended, restated, amended and restated, supplemented, or otherwise modified from time to

time, including as amended by that certain Amendment No. 1 to Credit Agreement, dated as of

October 10, 2024 (the "First Amendment"), and that certain Amendment No. 2 to Credit

Agreement, dated as of March 18, 2025 (the "Second Amendment"), the "Prepetition Credit

Agreement") with the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative

agent for the lenders party thereto, which initially provided for a $350 million revolving credit

facility (the "Prepetition ABL Facility").

8.      The Prepetition ABL Facility is secured by liens on substantially all of the Debtors'

assets, including after-acquired assets.  Pursuant to the First Amendment and Second Amendment,

the Claims were scheduled in the Prepetition Secured Documents (as defined below).[11]   The

Prepetition Secured Documents, including applicable Uniform Commercial Code filings are

attached hereto as **Exhibits B** through **I**.

### B.      The Agreement

9.      On December 21, 2022, certain of the Debtors executed the Agreement with

Burford, pursuant to which Burford provided the Debtors with $35 million in exchange for the

provisions that require the repayment of such funds (plus a two-times multiple and ten percent

interest per annum) from the Claim Proceeds.   On April 5, 2025, Burford sent a Notice of Remedy

Event to the Debtors and their counsel asserting that Burford had taken full control of the Antitrust

Litigation Assets for its own benefit.   *See* **Exhibit J**.   The Debtors promptly denied that any such

remedy event occurred and that Burford was entitled to take any action regarding the Antitrust

Litigation Assets.   First Day Declaration, ¶ 50.

### C.      The Chapter 11 Cases

10.     On May 5, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code in the Court.   The Debtors continue to operate

their businesses and manage their properties as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.   No party has requested the appointment of a trustee or examiner

in these cases.   On May 21, 2025, the United States Trustee for the Northern District of Texas

appointed the Committee [Docket No. 148].

---

[11] The schedules to the First Amendment and Second Amendment contain descriptions of the Claims which, as Burford stated in the Complaint, "[are] sufficient under NYUCC Section 9-108 for Sherwood and Harvest to grant a lien on to [*sic*] JPM, as Agent."   *See* Complaint,  ¶ 68.

*i)   The DIP Facility*

11.      On the Petition Date, the Debtors filed a motion seeking approval of a $105 million senior secured superpriority debtor-in-possession credit facility (the "DIP Facility').[12]   On May 12, 2025, the Debtors received interim approval of the DIP Facility.[13]

12.      On May 27, 2025, Burford filed the *Limited Objection and Reservation of Rights of Blakemore Investments LLC and Milwaukee Investments LP to Debtors' Motion for Debtor in Possession Financing* [Docket No. 157] (the "Burford DIP Objection"), and subsequently, on June 20, 2025, filed the *Supplement to Limited Objection and Reservation of Rights of Blakemore Investments LLC and Milwaukee Investments LP to Debtors' Motion for Debtor in Possession Financing* [Docket No. 280] (the "Burford DIP Supplement" and, together with the Burford DIP Objection, the "Burford DIP Objections").   Taken together, the Burford DIP Objections asserted a number of legal theories substantially identical to those raised in the Complaint.

13.      Notwithstanding the Burford DIP Objections, following a final hearing on the proposed DIP Facility, on June 27, 2025 the Court entered its *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Claims; and (III) Granting Related Relief* [Docket No. 339] (the "Final DIP Order").

---

[12] *See Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Senior Secured Liens and Provide Claims with Superpriority Administrative Expense Status, and (D) Grant Adequate Protection to the Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 12] (the "DIP Motion").

[13] *See Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral; (II) Granting Liens and Superpriority Claims; and (III) Granting Related Relief* [Docket No. 108] (the "Interim DIP Order").

*ii)  The JBS 9019 Settlement*

14.     On May 30, 2025, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (A) Approving a Settlement with JBS USA Food Company, JBS USA Food Company Holdings, and Swift Pork Company Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* [Docket No. 192] (the "JBS 9019 Motion"), seeking approval of a settlement agreement in connection with the Pork Claims (the "JBS 9019 Settlement").

15.     On June 23, 2025, Burford filed the *Limited Objection of Blakemore Investments LLC and Milwaukee Investments LP to Debtors' Motion for Approval of JBS Settlement* [Docket No. 284] (the "Burford 9019 Objection").  In the Burford 9019 Objection, Burford urged the Court to deny the relief requested in the JBS 9019 Motion until entitlement to the Claim Proceeds is determined pursuant to a separate proceeding.  Burford 9019 Objection, ¶ 4. On July 10, 2025, five days before the hearing on the JBS 9019 Settlement, Burford filed the Complaint. On July 18, 2025, the Court approved the JBS 9019 Motion.  *See Order (A) Approving a Settlement Agreement with JBS USA Food Company, JBS USA Food Company Holdings, and Swift Pork Company Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (B) Granting Related Relief* [Docket No. 409] (the "JBS 9019 Order").

16.     Burford and the Debtors now address, for the third time, the concerns first raised by Burford in the Burford DIP Objections that were briefed and heard by the Court at a hearing on June 26, 2025, as well as the hearing on the JBS 9019 Settlement on July 15, 2025.

## ARGUMENT

### I.    Legal Standard

17.     "To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 587 (N.D. Tex. 2021) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To meet this standard, a plaintiff must establish

"more than a sheer possibility that a defendant has acted unlawfully." *Id.*  The court must accept

well-pleaded facts as true and view them in the light most favorable to the plaintiff, however, the

court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal

conclusions." *Id.*  (citing *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)).  A plaintiff

must provide "more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do." *Id.*  (quoting *Twombly*, 550 U.S. at 555).[14]

18.      In ruling on a Rule 12(b)(6) motion the court may consider documents outside of

the pleadings if they fall within certain limited categories.  *Id.*  First, a "court is permitted . . . to

rely on 'documents incorporated into the complaint by reference, and matters of which a court may

take judicial notice.'"  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citation

omitted).  Second, a "court may consider documents attached to a motion to dismiss that 'are

referred to in the plaintiff's complaint and are central to the plaintiff's claim.'"  *Sullivan v. Leor

Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (citation omitted).  Third, "[i]n deciding a

12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record."

*Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (citations omitted); *see also, e.g.*, *Funk

v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal

pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-

available documents and transcripts produced by the [Food and Drug Administration], which were

matters of public record directly relevant to the issue at hand") (internal citations omitted).

19.      "Federal courts have [] broad discretion to refuse requests for declaratory

judgment." *See Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991).  Specifically, when a

---

[14] The Debtors dispute the facts as detailed in the Complaint and reserve all rights to dispute such facts in any responsive or subsequent pleading.

Case 25-08008-sgj   Doc 21   Filed 08/06/25   Entered 08/06/25 14:03:50   Desc Main
Document     Page 17 of 35

contract's interpretation and legal import are unambiguous, courts regularly dismiss declaratory judgment actions that seek implausible interpretations. *See Strategy & Execution, Inc. v. Black Rifle Coffee Co., LLC*, No. SA-23-CV-135-FB, 2024 WL 1481433, at *10 (W.D. Tex. Mar. 28, 2024) (dismissing declaratory judgment claim seeking an order of entitlement under agreement where "the Court does not find the [a]greement ambiguous and finds the interpretations offered by [Defendant] reasonable and giving effect to the plain language of the contract.").[15]

20.     Burford's Complaint involves two straightforward legal assertions—either (a) as a matter of law the Agreement conveyed an interest to Burford that is senior to the secured ABL Lenders, the postpetition Debtors, and all unsecured creditors, or (b) the Debtors engaged in such severe misconduct that extraordinary equitable relief in favor of Burford is warranted.  In order to survive the Motion to Dismiss, then, Burford must (x) plead that there is a plausible legal interpretation of the Agreement that grants such a senior interest or (y) plead facts of Debtor misconduct that, if taken as true, could plausibly warrant such extraordinary equitable relief.

21.     With respect to Burford's legal interpretation of the Agreement, Burford asserts three positions: (a) the Agreement is a "grant of an undivided and/or beneficial interest in the [Claim Proceeds]," (b) the Agreement is an enforceable "subordination agreement," and (c) the Agreement establishes an express trust in favor of Burford.  *See* Complaint, ¶ 100.  With respect to Burford's equitable theories, Burford contends that it is entitled to a "constructive trust" or "equitable lien" due to the Debtors' "inequitable misconduct in which the [Debtors] have engaged

---

[15] *See also Cotton v. Texas Express Pipeline, LLC*, 2017 WL 3709093, at *8 and *11 (W.D. Tex. 2017) (dismissing claim for declaratory judgment, and noting "[b]ecause Defendants interpretation is the only reasonable interpretation of the contract, the undersigned recommends that it be found to apply as a matter of law") report and recommendation adopted, No. 6:16-CV-453-RP-JCM, 2018 WL 1419346 (W.D. Tex. 2018); *Sims v. Allstate Fire and Casualty Insurance Company*, F.Supp.3d 540, 545 (W.D. Tex. 2023) ("Determination whether a term is ambiguous is a legal question.").

by actively and deliberately seeking to impair [Burford's] rights" under the Agreement. *Id.* The Complaint fails to sufficiently allege each of these theories.[16]

## II.    Burford's Legal Interpretation of the Agreement is Implausible

22.    To survive the Motion to Dismiss, Burford must plead that the Agreement could have plausibly granted an interest that defeats both the security interests of the ABL Lenders and the interests of the Debtors as debtors in possession under the Bankruptcy Code pursuant to section 544(a)(i) thereof.  If either the Debtors or the ABL Lenders hold a senior interest in the Claim Proceeds, the Motion to Dismiss should be granted.  For the reasons set forth below, Burford's interpretation of the Agreement is implausible as a matter of law.

### A.    *The Agreement did not Grant an Interest in the Claim Proceeds that is Senior to the Postpetition Debtors' Interests*

23.    As a threshold matter, the Agreement neither provides for any assignment of the Claims or the Claim Proceeds nor grants any liens on such assets.  Indeed, there is not a single clause in the Agreement effecting such an assignment or grant.  Burford nonetheless asserts in various briefings before the Court that the Claim Proceeds sit outside of the bankruptcy estate in favor of Burford.  This assertion is contrary to the plain text of the Agreement and has no basis in law.  The Claim Proceeds by definition cannot sit outside the Debtors' estates in favor of Burford because such proceeds did not exist at execution of the Agreement or even on the Petition Date.[17] When the Debtors obtain Claim Proceeds postpetition, those proceeds are estate property and

---

[16] While Burford asserts additional claims for relief in the Complaint, all are derivative of the same fundamental question—the extent of Burford's interest in the Claim Proceeds.

[17] *See In re Reviss*, 628 B.R. 386, 396 (Bankr. E.D.N.Y. 2021) ("Both state and federal courts confirm this rule…[there] is no doubt that the assignment of a truly future … interest does not [effect] a present transfer of property. It does not because it cannot; no property yet exists."); *In re Andrade*, 2010 WL 5347535 at *2 (Bankr. E.D.N.Y. 2010) (citations omitted) ("[t]he assignment of the future proceeds of a lawsuit operates as a future lien which only comes into existence when a judgment is entered," and that lien "does not relate back to the date of the assignment.").

Burford would have, at most, an unsecured claim.[18]  The case law is clear—to the extent there was any assignment or grant of interests in the Claim Proceeds, it did not ripen prepetition.

24.     This is consistent with fundamental bankruptcy law principles as section 544 of the Bankruptcy Code granted the Debtors, on the Petition Date, an interest in the Debtors' property that is superior to all creditors other than those with security interests that are validly created and perfected before the Petition Date.  *See In re England Motor Co*., 426 B.R. 178, 193 (Bankr. N.D. Miss. 2010) ("Section 544 gives a trustee, as of the date of the bankruptcy filing, the status of a 'hypothetical judicial lien creditor' on all property of the debtor under state law. 11 U.S.C. § 544 … [T]his lien represents an interest superior to that of all creditors, except for those with security interests that are validly created and perfected before the date of the bankruptcy filing. In other words, an unperfected security interest [is] treated under § 544 the same as an unsecured interest."). As described above, Burford has not asserted that it has a security interest or that it took any steps to perfect such an interest (because it did not).

25.     Burford also argues that, if the Debtors do have interests in the Claim Proceeds, any assignment of interests in such proceeds (whether prepetition or postpetition) must be taken subject to Burford's interests.  *See* Burford DIP Supplement, ¶¶ 14–19.  In support of this position, Burford relies on the *Septembertide* case, which is (a) from another circuit and (b) easily distinguishable from the facts here.[19]  In *Septembertide*, one party agreed to assign to another party two-thirds of any future sublicensing proceeds in exchange for advance payments.  The court ruled

---

[18] *See In re Andrade*, 2010 WL 5347535 at *2–3 ("Pursuant to 541(a) of the Bankruptcy Code the bankruptcy estate consists of all legal or equitable interests of the debtor in property as of the commencement of the case and any interest in property that the estate acquires after the commencement of the case. 11 U.S.C §§ 541(a)(1), 541(a)(7). Thus, the proceeds of the [Lawsuits] became property of the respective bankruptcy estates when the debtors commenced their bankruptcy cases. As the [Cash Assignments] did not attach as liens until after [the debtors] filed for protection under Chapter 7 of the Bankruptcy Code, the [asserted interests] are deemed to be unsecured claims.").

[19] *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675 (2d Cir. 1989).

that any subsequent security interest in those proceeds provided to a third-party took subject to the one-third and two-third splits. *See Septembertide.*, 884 F.2d at 675, 681–82. Here, by Burford's own admission, there is no assignment of Claim Proceeds. Rather, Burford advanced funds to the Debtors and the Debtors agreed to repay such amounts plus a multiple with interest. Burford holds nothing more than an unsecured contractual claim.

26.    More importantly, the *Septembertide* case did not involve a counterparty who was a postpetition debtor and was not adjudicated in a bankruptcy process before a bankruptcy court. To the extent the Agreement was even analogous to the Septembertide assignment, there is bankruptcy court consensus that parties like Burford do not sit in a priority position to the Debtors.[20] For example, in *In re Andrade*, the assignment of litigation proceeds not yet in existence prepetition resulted in nothing more than a postpetition unsecured claim on the part of the prepetition assignee.[21] By contrast, in *In re Kuranda*, because the underlying litigation was reduced to a judgment or settlement prepetition, the prepetition assignment of proceeds was deemed a "fixed, present interest" by the court that attached postpetition.[22] Like in *In re Andrade*, Burford at best holds a breach of contract claim (like hundreds of other creditors in this case) that cannot be senior to the Debtors' interests pursuant to Section 544 of the Bankruptcy Code.

### B.    The Agreement is not a Subordination Agreement

27.    In the alternative, Burford argues that the Agreement subordinated the Debtors' interests in the Claim Proceeds and that such subordination is enforceable under section 510(a) of

---

[20] *See In re Reviss*, 628 B.R. at 396 ("[L]ike the assignment of accounts receivable where the assignor has no existing contract under which such accounts are to arise, the assignment of a right to receive income contingent upon the occurrence of a future event, does not convey a present interest to the assignee.").

[21] *In re Andrade*, 2010 WL 5347535 at *2–3; *see also Dunlap–McCuller v. Riese Org.*, 1995 WL 42241, at *1 (S.D.N.Y.1995); *MarketXT Holdings Corp.*, 336 B.R. 67, 71 (Bankr. S.D.N.Y. 2006).

[22] *In re Kuranda*, 466 B.R. 39, 47 (Bankr. E.D. Penn. 2012) (comparing the facts of *Kuranda* and *Andrade* regarding prepetition and postpetition receipt of litigation proceeds).

the Bankruptcy Code.  Burford DIP Objection, ¶¶ 12–14; Burford DIP Supplement, ¶ 20.  This position fails because the Agreement is neither facially nor substantively a subordination agreement, and in fact does not mention subordination even once.  Subordination agreements are agreements between creditors or interest holders whereby one creditor or interest holder agrees to subordinate its existing claim or interests against a debtor in favor of another.[23]  Every case cited by Burford in its briefing to date involves this same construct—multiple parties enter into a contract whereby each contracting party agrees to payment priority regarding claims or interests the contracting parties have against third-parties.[24]  None of the cases are analogous to the facts here where the Debtors have Claims against third-party defendants and Burford has claims against the Debtors but not the third-party defendants.  Further, none of Burford's cases provide that non-parties can be subject to subordination agreements.  Regardless, Burford cannot assert such rights against third-parties because it neither was assigned nor has a lien on any interests in the Claims or the Claim Proceeds.  The Agreement also includes none of the provisions one might typically see in a subordination agreement, *i.e.*, a subordination clause (or any reference to subordination) or a standstill provision blocking collection efforts by the subordinated creditor or interest holder.

---

[23] *In re Kors, Inc.*, 819 F.2d 19, 24 (2d Cir. 1987); *In re Lantana Motel*, 124 Bankr. 252, 255–56 (Bankr. S.D. Ohio 1990); *HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.)*, 364 F.3d 355, 361 (1st Cir. 2004) ("Subordination agreements are essentially intercreditor arrangements [and] typically provide that one creditor will subordinate its claim against the debtor (the putative bankrupt) in favor of the claim of another creditor [altering] normal priority").

[24] *In re Lehman Bros. Holdings Inc.*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010) (involving subordination agreement between swap counterparty and noteholders with respective interests in shared collateral); *In re Air Safety Int'l, L.C.*, 336 B.R. 843, 857 (S.D. Fla. 2005) (involving subordination agreement between equity holders and officers each with interests or claims in the debtor); *In re Erickson Ret. Communities, LLC*, 425 B.R. 309 (Bankr. N.D. Tex. 2010) (involving subordination agreement between multiple creditors of a debtor); *In re Amret, Inc.*, 174 B.R. 315 (M.D. Ala. 1994) (same); *Matter of Holly's, Inc.*, 140 B.R. 643 (Bankr. W.D. Mich. 1992) (same); *Bank of Chicago v. Park Nat. Bank*, 266 Ill. App. 3d 890 (1994) (involving subordination agreement between two lenders of a debtor); *D Legal Funding Partners, LP v. Powell*, No. A-4909-15T2, 2019 WL 3405136, at *8 (N.J. Super. Ct. App. Div. July 29, 2019) (involving subordination agreement between litigation funder and attorney of debtor regarding attorney's fees payable by debtor).

Instead, the Agreement includes a one sentence proposed waterfall to calculate amounts owed to Burford and certain payment direction provisions.[25]

28.      Notwithstanding the foregoing, Burford somehow extrapolates its case law to say that the Agreement is a subordination agreement that not only binds the Debtors to a subordination of their interests, but also the ABL Lenders and every single creditor of the Debtors (through a non-public agreement that Burford spent the first 75 days of these chapter 11 cases fighting to keep under seal). This extrapolation is illogical when (a) none of these cases involve a litigation finance agreement or analogous terms to those set forth in the Agreement and (b) the ABL Lenders and the Debtors' other creditors are not parties to the Agreement. Burford states an implausible legal interpretation of the Agreement to elevate its ordinary contract claim above all secured and general unsecured creditors. This interpretation is even more curious considering that Burford maintained that the Agreement should be kept secret from all stakeholders. It would be an entirely novel legal principle to hold that debtors could subordinate estate stakeholders with secret agreements.

29.      Rather than the unfounded interpretation presented by Burford, there is a straightforward and universal practice to contract for rights and relative priorities between multiple parties—the procurement of a lien and entry into an intercreditor agreement with any other lienholders. This universal practice is designed to be public so that all stakeholders have sufficient notice. Here, Burford provided financing via the Agreement while the Debtors already had secured financing in place. Burford knowingly chose not to take any action with respect to these interests even though it is a sophisticated party represented by counsel.

---

[25] *See* Agreement, §§ 2.2(b), 3.2. Burford also cites to the existence of a payment direction letter between the Debtors and their counsel (the "Payment Direction Letter," attached hereto as **Exhibit K**), as further evidence of the subordination. The Payment Direction Letter facially does not provide for any such subordination (unless Burford takes the position that all payment direction letters are subordination agreements).

30.     Furthermore, if Burford is correct that the terms of the Agreement alone are sufficient to create a subordination of rights enforceable against all third-parties (without any notice to such parties), then any agreement could constitute a subordination agreement so long as it vaguely references a waterfall, payment direction terms, and/or an agreement to split proceeds. Accordingly, parties could (a) contract around fundamental principles in the Uniform Commercial Code regarding how to perfect liens on the very assets at issue here—commercial tort claims[26]— and (b) invalidate the strong-arm powers of section 544 of the Bankruptcy Code.  For example, in such a scenario all credit agreements would include a "subordination agreement" as between a debtor and its lender(s) regarding entitlement to proceeds in commercial tort claims in order to sidestep both the Uniform Commercial Code and the Bankruptcy Code.  This would lead to absurd results, including ones in which third parties would not have notice of such subordination given the absence of the disclosure otherwise required by the Uniform Commercial Code.

### C.     The Agreement Does not Establish an Express Trust in Favor of Burford

31.     As a further alternative, Burford asserts that the Claim Proceeds must be held in express trust for Burford's benefit solely on the basis of a brief reference to a trust contained in the Agreement, which states that if any "[Claim] Proceeds are instead received by the [Debtors, they shall] (i) hold such [Claim] Proceeds in trust for the benefit of [Burford] . . . (ii) segregate such [Claim] Proceeds from all other funds and property; and (iii) forthwith pay or deliver such Proceeds to the Payment Agent."  Agreement, § 3.2(b); Burford DIP Supplement, ¶ 25.  Because there was no assignment or grant of any interests to Burford (as set forth herein), the Claim Proceeds cannot be the property of Burford held in trust.  Even if there was an assignment or grant,

---

[26] In order to perfect security interests in commercial tort claims, the granting documents must contain information sufficient to specifically describe the claim.  *See* U.C.C. § 9-108(e); *see also Polk 33 Lending LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021) (holding that security interest in "all commercial tort claims" was overgeneralized identification of collateral and failed to perfect interest under standards set forth under U.C.C. § 9-108(e)(1)).

Burford's argument is directly refuted by applicable law. Substantially identical language in

litigation finance arrangements has been held not to create a trust between the parties.[27]

32.     The mere reference to a trust in an agreement is not sufficient to establish an express

trust under New York law. *LFD Operating, Inc. v. Ames Department Stores, Inc.*, 2004 WL

1948754 at *3 (S.D.N.Y. 2004) ("Whether contracting parties have established an agency or trust

must be determined by the true character of their relationship rather than by the formal language

of a contract.").[28]   Moreover, where the interests of the public and the relative rights of estate

creditors are at issue, it is particularly important that substance not give way to form. *In re

Shulman Transp. Enters., Inc.*, 744 F.2d at 295 (citing *Pepper v. Litton*, 308 U.S. 295, 304–305,

(1939)).  Accordingly, a court "must look to the parties' actual business arrangement to determine

the status of the property at issue." *In re Ames Dept. Stores, Inc.*, 144 Fed. Appx. 900, 901

(2d Cir. 2005).  The Complaint does not reference any such arrangement or conduct because there

is none.  No Claim Proceeds arose prepetition that could have evidenced the creation of an express

trust and, at a minimum, the existence of the property in question is necessary to establish such an

express trust. *In re Doman*, 68 A.D.3d 862, 863 (2nd Dept. 2009) ("A valid express trust requires

. . . property sufficiently [] identified . . . [and] actual delivery of the [] property.").  Burford solely

relies on the language of the Agreement that as a matter of law cannot establish an express trust.

---

[27] *See In re MarketXT Holdings Corp*., 336 B.R. at 72 ("In § 8.1(a) of the Agreement, the parties apparently recognized
that EIF might be left as a possible creditor of a Seller upon the Seller's receipt of any litigation proceeds, and they
there purported to create a trust for the benefit of EIF to protect it against what happened here—a Seller's bankruptcy.
Section 8.1(a) of the Agreement provides that '[u]pon either Seller's receipt of any amounts or other property from
the collection, settlement or other disposition of any of the Claims, Sellers shall immediately notify EIF of the details
thereof,' and shall segregate the portion of the proceeds attributable to the Adjusted Interest, which 'shall be held by
such Seller in trust for EIF.' It is highly doubtful that this provision, alone, would [create a trust] in EIF's favor that
would overcome the rights of a bankruptcy representative.'").  The parties and the court in *MarketXT Holdings* did
not even entertain the idea that such language, standing alone, could create an express trust as it was not even sufficient
to establish a constructive trust.

[28] *See also In re Shulman Transp. Enters.*, 744 F.2d 293, 295 (2d Cir. 1984); *Carlson Inc. v. Commercial Disc. Corp.*,
382 F.2d 903, 905 (10th Cir.1967) (A "trust" is not established by a "trust clause" in a contract); *In re Einhorn Vacation
Planning Ctr.*, 59 B.R. 179, 184–185 (Bankr. E.D.N.Y. 1986).

As set forth in Section II(A) above, in the absence of any Claim Proceeds arising prepetition, at best Burford holds an ordinary contract claim.

> **D.** **_The Agreement did not Grant an Interest in the Claim Proceeds that is Senior to the ABL Lenders' Interests_**

33. Because there is no plausible legal theory in which the Agreement could grant Burford an interest that is senior to the postpetition Debtors, the Motion to Dismiss should be granted. While much of the Complaint focuses on the grant of liens in the Claims and Claim Proceeds in favor of the ABL Lenders and the timing thereof, this is a red herring. Whether or not the ABL Lenders have a senior interest in the Claims and Claim Proceeds has no impact on the relative interests in the Claim Proceeds as between the postpetition Debtors and Burford—as already stated herein, it is a question of law without a material factual dispute.

34. The Debtors acknowledge that the ABL Lenders' liens in the Claims and Claim Proceeds are subject to the challenge provisions in the Final DIP Order. Notwithstanding the foregoing, Burford's assertion that the ABL Lenders' interests must be junior to Burford's interest under all circumstances is wrong as a matter of law. As Burford concedes, the ABL Lenders took steps to validly perfect their interests in the Claims and the Claim Proceeds.[29] According to Burford, however, because the scheduling of the Claims by the ABL Lenders in their secured documents (the "Prepetition Secured Documents") occurred after the execution of the Agreement, the ABL Lenders' liens on the Claims and Claim Proceeds are invalid.[30] This assertion misstates fundamental principles regarding liens and the perfection thereof. The ABL Lenders were granted "all asset" liens six months prior to the execution of the Agreement.[31]

---

[29] _See_ Burford DIP Supplement, ¶ 3.

[30] _See id._

[31] _See_ **Exhibits C**, **E**, and **H**.

Thereafter, the Claims were scheduled in amendments to the Prepetition Secured Documents.[32] That scheduling granted and perfected the ABL Lenders' interests in the Claims and Claim Proceeds.[33] As already set forth above, Burford was never granted nor did it seek to perfect any liens in such assets, and therefore obtained no lien that could "invalidate" the ABL Lenders' perfected liens. Burford cites no case law in support of its novel legal theory. Indeed, it is axiomatic that the ABL Lenders' validly perfected security interest is senior to whatever unperfected interest Burford purports to hold.

35.    Even if the Agreement could have theoretically prevented the grant of these liens to the ABL Lenders under a "first in time" principle, the Agreement expressly permits the incurrence of such liens. *See* Agreement, <u>Exhibit A</u> ("'Permitted Lien' means . . . an all-assets lien pursuant to any bank loan agreement or similar credit facility of the [Debtors]."). Burford nonetheless argues that the Agreement prohibited the granting of first priority liens in the Claim Proceeds to the ABL Lenders. *See* Burford DIP Supplement, ¶¶ 12, 23–27. As noted above, the Agreement expressly permits such a grant. Burford instead attempts to claim that the Agreement only authorized all asset liens if they are *junior* to Burford. *See id*., ¶ 21, n. 24 ("The [Agreement] authorized the [Debtors] to grant an all-assets lien, including on the Claims and Claim proceeds, but not a senior lien on such collateral."). Not a single term of the Agreement is consistent with this interpretation and the definition of "Permitted Liens" is unambiguous. *See Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72 (1978) ("Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."); *Donohue v. Cuomo*, 38 N.Y.3d 1, 13 (2022) ("A contract's silence on an

---

[32] *See* **Exhibits C**, **D**, **F**, **G**, and **I**.

[33] *See* U.C.C. § 9-108(e)(1).

issue does not create an ambiguity which opens the door to the admissibility of extrinsic evidence to determine the intent of the parties . . . . An ambiguity never arises out of what was not written at all . . . .") (internal quotations omitted).

36.     Setting aside the foregoing, in support of its argument Burford cites *In re Mason*, which is entirely distinguishable.[34]  There, the bankruptcy court assessed whether the granting of a security interest in a debtor's partnership interest was valid when the underlying partnership agreement did not authorize such a grant without the consent of the other partners.  *See In re Mason*, 600 B.R. at 772–77.  It rendered that decision expressly pursuant to Delaware limited partnership law, which governs the very creation of the interest in question.[35]  Burford cites no analogous law applicable here—as there is none.  The Claims and Claim Proceeds were not created pursuant to the Agreement.  They are and always were the Debtors' property.  Additionally, the grant to the ABL Lenders was expressly permitted by the Agreement, which is akin to the partnership agreement from *Mason* expressly permitting an assignment of the partnership interests. Burford ignores these distinctions and instead points to clauses in the Agreement referencing the obligation to make payments to Burford.  *See* Burford DIP Supplement, ¶ 12.  Those provisions are nothing more than ordinary obligations pursuant to a prepetition contract as described herein.

37.     Accordingly, there is no plausible interpretation of the Agreement that elevates Burford's interests above the ABL Lenders' interests.

### III.   Burford Does Not Plead Facts That Could Plausibly Warrant Equitable Relief

38.     Without a plausible legal theory interpreting the plain meaning of the Agreement, Burford turns to the equitable powers of the Court to elevate its junior interest.  According to

---

[34] *See In re Mason*, 600 B.R. 765 (Bankr. E.D.N.C. 2019).

[35] *Id.* at 776.

Burford, it is entitled to both a constructive trust and an equitable lien on any Claim Proceeds. In order to survive the Motion to Dismiss on these equitable grounds, Burford must plead that (a) this equitable relief could plausibly be warranted by the facts as pled in the Complaint and (b) that this equitable relief also would place Burford's interest ahead of the postpetition Debtors' interests as a matter of law. The Complaint fails on all accounts.

### A.    *Burford's Constructive Trust Theory Fails as a Matter of Law*

39.    "[A] party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relation; (2) a promise, expressed or implied; (3) a transfer in reliance on that promise; and (4) unjust enrichment." *In re First Cent. Financial Corp.*, 269 B.R. 481, 500 (Bankr. E.D.N.Y. 2001). "The key factor . . . is unjust enrichment, not willfully wrongful conduct . . . ." *Id.* The imposition of a constructive trust, however, is an equitable remedy exercised by a court. *See In re Advent Management Corp*, 178 B.R. 480, 488 (B.A.P. 9th Cir. 1995) ("The inchoate nature of a constructive trust . . . is based on the fact that a constructive trust can only be established by litigation, and the litigation must be successful . . . [I]t is a remedy . . . ."); *In re Foos*, 183 B.R. 149, 159–160 (Bankr. N.D. Ill. 1995) ("A constructive trust is not a right of ownership, but an equitable remedy against unjust enrichment.").

40.    As such, the bankruptcy overlay is critical. Indeed, a constructive trust is so antithetical to the priority scheme underlying the Bankruptcy Code that imposition of a constructive trust in bankruptcy is highly disfavored. *See Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 436 (5th Cir. 1994) ("The remedy of a constructive trust is [] a potent one in bankruptcy because it gives the successful claimant 'priority over the defendant's unsecured creditors' to the extent of the property subject to the trust.") (citations omitted). As such, creditors like Burford "have every incentive to argue that their unsecured claims are eligible under state law for the

remedy of a constructive trust.  Because the constructive trust doctrine can wreak such havoc with the priority system ordained by the Bankruptcy Code, bankruptcy courts are generally reluctant 'to impose constructive trusts without a substantial reason to do so.'"  *Id.* (citation omitted); *In re Bailey Pontiac, Inc.*, 139 B.R. 629, 635 (N.D. Tex. 1992) ("A constructive trust is an equitable remedy that should not be imposed cavalierly, especially in the context of a bankruptcy proceeding."); *In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985) ("We necessarily act very cautiously in exercising such a relatively undefined equitable power [of imposing a constructive trust] in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws.") (citations omitted); *Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990) ("'Furthermore, the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion.'") (citations omitted).[36]

41.    Burford's assertion that a constructive trust is warranted fails for several reasons. First, the Complaint does not allege any misconduct of the type required to establish a constructive trust.  Burford only asserts that the Debtors took steps to impair Burford's rights under the Agreement.  That assertion, even taken at face value, is woefully insufficient.  Burford alleges a breach of an agreement, nothing more.  However, constructive trusts "should not be imposed merely to give effect to a prior agreement."[37]  The circumstances that Burford faces "are similar to those faced by nearly every other creditor in these cases, [failure] to receive payment from [] debtors."  *In re S & A Restaurant Corp.*, 2010 WL 3619779 at *10 (Bankr. E.D. Tex. 2010).

---

[36] Indeed, the imposition of a postpetition constructive trust is so disfavored that some bankruptcy courts hold that such a postpetition trust cannot be imposed under any circumstances.  *See In re Mandel*, 2013 WL 4829150 at *4 (Bankr. E.D. Tex. 2013) ("Some courts, including the Fourth and Sixth Circuits, have refused to impose constructive trusts post-petition. These courts hold that, unless a trust was either imposed upon the debtor's assets prior to the time of filing or some other statute requires such an imposition, a constructive trust may not be imposed post-petition.").

[37] *See In re Reviss*, 628 B.R. at 396.

42.    Burford's assertion also misunderstands the "unjust enrichment" prong at the center of constructive trust doctrine.  The argument that the Debtors "would be unjustly enriched absent the imposition of a constructive trust is unconvincing when made in the context of a bankruptcy proceeding." *In re Flanagan*, 503 F.3d 171, 182 (2d Cir. 2007).  The "equities of bankruptcy are not the equities of the common law." *In re Omegas Group, Inc.*, 16 F.3d at 1452.  "This is particularly true in the context of constructive trust law . . . the effect of a constructive trust in bankruptcy is to take the property out of the debtor's estate and to place the constructive trust claimant ahead of other creditors with respect to the trust res . . . It is therefore not the debtor who generally bears the burden of a constructive trust in bankruptcy, but the debtor's general creditors." *In re Flanagan*, 503 F.3d at 182.  "The Code recognizes that each creditor has suffered disappointed expectations at the hands of the [Debtors]; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement." *In re Omegas Group, Inc.*, 16 F.3d at 1452.  Burford makes no assertion how "the [Debtors'] bankrupt estate or, more to the point, [the Debtors'] general creditors, would be unjustly enriched." *In re Flanagan*, 503 F.3d at 182*.  Burford's interest is "indistinguishable from that of the other creditors, and that interest is [an] interest in the estate, which is represented by the [debtors in possession].").  *In re Foos*, 183 B.R. 149 at 160.

43.    Second, Burford's assertion of misconduct is implausible on its face.  To start, the asserted misconduct —granting of the liens in favor of the ABL Lenders—is expressly allowed by the Agreement.  *See* Section I(D), ¶ 35.  It cannot be the case, then, that the Debtors or their general unsecured creditors were unjustly enriched by taking actions that Burford's own Agreement

permits.[38]  Even if these liens were prohibited by the Agreement, the assertion of misconduct is still implausible.  The Debtors consummated ordinary course financing transactions with the ABL Lenders during an out-of-court restructuring process.  Those transactions were also public as the ABL Lenders filed updated financing statements to perfect their liens.  Moreover, even if the Court took Burford's assertion at face value regarding the Debtors' conduct, such an assertion does not imply unjust enrichment of the Debtors as debtors-in-possession representing the interests of their general creditors (as the Debtors' general creditors were not the receipts of the liens).

44.    Third, imposition of a constructive trust is also improper as a matter of law when no identifiable property subject to the trust existed prepetition.  *See Matter of Haber Oil Co., Inc.*, 12 F.3d at 436 ("The burden of establishing the existence of the constructive trust rests on the claimant, as does the burden of identifying or tracing the trust property."); *In re Emerald Oil Co.*, 807 F.2d 1234, 1238 (5th Cir. 1987) ("To profit from § 541(d), a party must demonstrate that state law impresses property that the debtor holds with an equitable interest in his favor that attached *prior to bankruptcy*.") (emphasis added).  Since no Claim Proceeds arose prepetition, the constructive trust cannot attach to any such property as none existed (the same as an express trust).

**B.    *Burford's Equitable Lien Theory Fails as a Matter of Law***

45.    "Equitable liens and constructive trusts share the same substantive basis; both are remedies in equity to redress unjust enrichment."  *In re Flanagan*, 503 F.3d at 183.  The traditional distinction between a constructive trust and an equitable lien is that the beneficiary of a constructive trust receives title to the asset whereas the holder of an equitable lien receives only a lien on the asset through which it may satisfy a money claim.  *See In re Markair, Inc.*, 172 B.R.

---

[38] Burford also asserts that the Debtors' postpetition conduct gives rise to unjust enrichment even though all of the Debtors' conduct postpetition related to the Claims and the Claim Proceeds has been pursuant to Court order and approval.  Accordingly, this assertion is without any plausible basis.

638, 643 (9th Cir. BAP 1994).  For the reasons stated above, imposition of an equitable lien is

entirely inappropriate under the facts set forth in the Complaint as no equitable relief is warranted.

46.    However, even if Burford pled sufficient facts to warrant equitable relief, Burford's

equitable lien theory fails as a matter of law.  First, an equitable lien will arise where "(a)n intention

to create such a charge clearly appear(s) from the language and the attendant circumstances."

*Cherno v. Dutch American Mercantile Corp.*, 353 F.2d 147, 153 (2d Cir. 1965) (quoting

*Pennsylvania Oil Products Refining Co., v. Willrock Producing Co.*, 267 N.Y. 427, 434-35, 196

N.E. 385, 387-88 (1935).  "New York law allows the imposition of an equitable lien if there is an

express or implied agreement 'that there shall be a lien on specific property.'"  *M & B Joint*

*Venture, Inc. v. Laurus Master Fund, Ltd.*, 12 N.Y.3d 798, 800 (Ct. App. 2009) (citation omitted).

The doctrine is further limited to situations where a secured creditor is prevented from perfecting

its interest by an uncooperative debtor.  *See In re Trim-Lean Meat Products, Inc.*, 10 B.R. 333,

335 (D. Del. 1981); *In re O.P.M. Leasing Servs.*, Inc., 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982).

Burford does not plead any such facts, and has expressly stated that the Agreement does not

constitute a secured loan to which a lien was supposed to attach.

47.    Second, as a matter of law any such equitable lien would sit behind the Debtors'

interests pursuant to section 544(a)(i) of the Bankruptcy Code.  *See In re IYS Ventures, LLC*, 662

B.R. 336, 345 (Bankr. N.D. Ill. 2024) ("Even if the court imposed an equitable lien, it would be

treated as unperfected. Therefore, pursuant to 11 U.S.C. § 544, it would be subordinated to the

debtor-in-possession's status as a hypothetical lien creditor."); *In re Ajax Integrated, LLC*,

2016 WL 1178350, at *6 (Bankr. N.D.N.Y. 2016) ("The legislative history of the Bankruptcy

Code makes clear that Article 9 of the Uniform Commercial Code treats equitable liens as

unperfected security interests which the trustee can in any case set aside.") (quotation omitted);

*In re Bonner*, 2014 WL 890477, at \*6 (B.A.P. 9th Cir. 2014) ("Even if [creditor] was entitled to an equitable lien and was granted one by the bankruptcy court, it would still be subordinate to [the debtor's] interest as a hypothetical judgment lien creditor and avoidable . . . .  Therefore, a trial on this issue would serve no purpose.").  The Uniform Commercial Code also expressly states this principle.  *See* U.C.C. § 9-301(3).  Accordingly, the Complaint does not plead facts that could plausibly give rise to an equitable lien as a matter of law.

48.     For these reasons, the Debtors respectfully request that the Court grant the Motion to Dismiss and grant all other relief to which the Debtors are justly entitled.


*[Remainder of the page intentionally left blank.]*

25

Dated: August 6, 2025
Dallas, Texas

_/s/ Ryan Fink_

**SIDLEY AUSTIN LLP**
Rakhee V. Patel (00797213)
Chelsea McManus (24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        rpatel@sidley.com
              cmcmanus@sidley.com

_and_

Stephen Hessler (admitted _pro hac vice_)
Anthony R. Grossi (admitted _pro hac vice_)
Jon Muenz (admitted _pro hac vice_)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        shessler@sidley.com
              agrossi@sidley.com
              jmuenz@sidley.com

_and_

Jason L. Hufendick (admitted _pro hac vice_)
Ryan Fink (admitted _pro hac vice_)
Daniela Rakowski (admitted _pro hac vice_)
One South Dearborn
Chicago, Illinois 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jhufendick@sidley.com
              ryan.fink@sidley.com
              drakowski@sidley.com

_Attorneys for the Debtors_
_and Debtors in Possession_

## **Certificate of Service**

I certify that on August 6, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Ryan Fink*
Ryan Fink