# **Exhibit A**

**Capital Provision Agreement**

# **Exhibit A**

**Capital Provision Agreement**

*Execution Version*

**PRIVATE & CONFIDENTIAL**

**ATTORNEY WORK PRODUCT**

**SUBJECT TO CONFIDENTIALITY AGREEMENT**

**PROTECTED FROM DISCLOSURE BY APPLICABLE PRIVILEGES**

**This document contains protected attorney work product and discloses through its structure and terms the mental impressions of counsel.  Access to this document is restricted by confidentiality agreement and professional privilege.**

**Dated as of December 21, 2022**

---

**Capital Provision Agreement**

---

**between**

**Each Counterparty named in Annex I hereto**

**and**

**The Capital Providers, as defined in the introductory paragraph hereof**

{10853723:5 }

DocuSign Envelope ID: E19883FF-384D-4432-AA6A-8BC62680997E

# CONTENTS

| SECTION | | | PAGE |
|---|---|---|---|
| 1. | Definitions | | 2 |
| 2. | Capital Provision Obligations and Capital Providers' Entitlement | | 2 |
| | 2.1 | Capital Amounts | 2 |
| | 2.2 | Capital Providers' Entitlement | 2 |
| 3. | Payment Obligations of the Counterparty | | 3 |
| | 3.1 | Payments | 3 |
| | 3.2 | Proceeds to Payment Agent, etc. | 4 |
| 4. | Payments Generally | | 5 |
| | 4.1 | Place and Account for Payment | 5 |
| | 4.2 | Interest on Overdue Amounts | 5 |
| | 4.3 | Waiver of Right of Set-Off | 5 |
| 5. | Covenants | | 5 |
| | 5.1 | Covenants of Each Party | 5 |
| | 5.2 | Covenants of the Capital Providers | 6 |
| | 5.3 | Covenants of the Counterparty | 6 |
| 6. | Representations and Warranties | | 9 |
| | 6.1 | Representations and Warranties of Each Party | 9 |
| | 6.2 | Representations and Warranties of the Counterparty | 10 |
| 7. | Confidentiality | | 12 |
| | 7.1 | Exclusive Ownership of Information by Disclosing Party | 12 |
| | 7.2 | Non-Disclosure of Information | 13 |
| | 7.3 | Confidentiality Procedures | 13 |
| | 7.4 | Judicial and Official Disclosure Requests | 13 |
| 8. | Legal Privilege | | 14 |
| | 8.1 | Common Interest Privilege Applies | 14 |
| | 8.2 | Information Subject to Privilege Protection | 15 |
| | 8.3 | Information Subject to Work Product Protection | 15 |
| | 8.4 | No Obligation to Provide Privileged Information | 15 |

9.      Exculpation; Reinstatement; Indemnification......................................................... 15

10.     Remedy Events ...................................................................................................... 16

    10.1    Failure to Pay or Deliver ................................................................. 17

    10.2    Breach or Repudiation ..................................................................... 17

    10.3    Misrepresentation ............................................................................ 17

    10.4    Bankruptcy ...................................................................................... 17

    10.5    Reorganization Without Assumption ............................................... 18

11.     Remedies................................................................................................................ 18

    11.1    Available Remedies ......................................................................... 18

    11.2    Remedy upon Failure to Opt-Out of Class Settlements.................... 19

    11.3    Remedies Cumulative ...................................................................... 19

12.     Enforcement of Claim Resolution ......................................................................... 19

13.     Limitations on Transfer, Successors and Assigns; Third Party
    Beneficiaries .......................................................................................................... 19

14.     Tax Withholding .................................................................................................... 20

15.     Anti-Corruption; Data Protection .......................................................................... 20

16.     Notices .................................................................................................................. 22

    16.1    Effectiveness of Notices .................................................................. 22

    16.2    Change of Details ............................................................................ 22

17.     Amendments .......................................................................................................... 22

18.     Entire Agreement ................................................................................................... 22

19.     Counterparts .......................................................................................................... 23

20.     Survival of Obligations ......................................................................................... 23

21.     No Waiver .............................................................................................................. 23

22.     Severability ........................................................................................................... 23

23.     Expenses ................................................................................................................ 24

24.     Relationship of Parties ........................................................................................... 24

25.     Governing Law ...................................................................................................... 25

26.     Dispute Resolution ................................................................................................ 25

27.     Administrative Agent ............................................................................................ 27

28.     Rules of Construction ............................................................................................ 28

CAPITAL PROVISION AGREEMENT, dated as of December 21, 2022 (this "*Agreement*"), between Hamilton Meat, L.L.C., Harvest Meat Company, Inc., Harvest Sherwood Food Distributors, Inc., Sherwood Food Distributors, L.L.C., and Western Boxed Meat Distributors, Inc., each an entity organized or formed under the laws of the jurisdictions identified in Annex I (collectively, and jointly and severally, the "*Counterparty*"), on the one hand, and each of Blakemore Investments LLC, a limited liability company, and Milwaukee Investments LP, a limited partnership, in each case formed under the laws of the jurisdiction identified on Annex I ("*Capital Provider No. 1*" and "*Capital Provider No. 2*", respectively, and each of them, severally but not jointly, a "*Capital Provider*", and collectively, the "*Capital Providers*"), on the other hand.

WHEREAS, the Counterparty, before interacting with the Capital Providers in regard to the matters described herein and without any influence from the Capital Providers, decided to pursue one or more legal claims identified on Annex II to this Agreement;

WHEREAS, the Counterparty has consulted and sought advice from an Affiliate of the Capital Providers about the value of the Claim(s);

WHEREAS, the Counterparty has provided or may provide confidential materials protected by the attorney work product doctrine and/or other existing law protecting such materials from disclosure, to the Capital Providers and their Affiliates, subject to a non-disclosure and in reliance on the work product doctrine and other existing law protecting such materials from disclosure;

WHEREAS, the Capital Providers or their Affiliates have conducted research and analysis and communicated views and opinions both internally and to the Counterparty, all in reliance on the work product doctrine and other existing law protecting such research, analysis and communications from disclosure;

WHEREAS, the Capital Providers are each passive providers of external capital and have not become owners of, partners in or parties to the Claims or any part thereof or acquired any rights as to their control or resolution; consequently, while the Capital Providers will receive certain information with respect to the Claims and consult with the Counterparty thereon, the Counterparty remains in full control of the assertion and resolution of the Claims; and

WHEREAS, the Counterparty is sophisticated and is entering into this Agreement freely and entirely of its own volition following independent legal advice from experienced counsel, and does not believe that this Agreement or the transactions it contemplates are inconsistent with any relevant law or public policy.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

{10853723:5 }

## 1.  DEFINITIONS

Certain capitalized terms used herein have the meanings assigned thereto in <u>Exhibit A</u>. Capitalized terms used but not otherwise defined in <u>Exhibit A</u> have the respective meanings assigned to such terms elsewhere in this Agreement.

## 2.  CAPITAL PROVISION OBLIGATIONS AND CAPITAL PROVIDERS' ENTITLEMENT

### 2.1  Capital Amounts

The Capital Providers shall provide capital to the Counterparty as set forth below.

(a)  <u>Capital Amounts</u>. Thirty-five Million United States Dollars (US$35,000,000), within three (3) Business Days from the Closing Date and no later than December 31, 2022, unless such date is mutually extended by the parties hereto in writing.

(b)  <u>Allocation of Funding</u>.  All Capital Amounts shall be provided by the Capital Providers in accordance with the following allocation:

(i)  Capital Provider No. 1: 75.00%

(ii)  Capital Provider No. 2: 25.00%

(c)  <u>Transaction Costs</u>.  The Capital Providers will retain Fifty Thousand Dollars (US$50,000) from the Capital Amounts in connection with their closing and other costs.

### 2.2  Capital Providers' Entitlement

In consideration of their agreement to provide the Capital Amounts, the Capital Providers shall be entitled to receive the amounts set forth under clause (a) below, in accordance with the order of priority of payment set forth under clause (b) below.

(a)  <u>Amount of Capital Providers' Entitlement</u>. The Capital Providers' Entitlement shall be:

(i)  a first dollar return of the following:

(A)  an amount equal to the Invested Amount <u>plus</u>

(B)  a "***Preferred Return***" equal to 1.0x the Invested Amount <u>plus</u>

(ii)  a 10% rate of return, accruing daily and compounding annually, on any unpaid portion of the sum of (A) Invested Amount, and (B) Preferred Return, beginning on the three-year anniversary of the Closing Date and ending on the earlier of (A) the date that the Capital Providers'

Entitlement is paid in full and (B) the date of the Capital Providers' receipt of the last tranche of Proceeds awarded in any Claim Resolution from which Proceeds are payable towards the Capital Provider's Entitlement.

(b)    <u>Waterfall</u>.  Proceeds shall be distributed in the following amounts and order of priority:

(i)    *first*, the Invested Amount shall be paid to the Capital Providers;

(ii)    *second*, until the Capital Providers receive the Capital Providers' Entitlement in full, the remaining Proceeds shall be allocated 50% to the Capital Providers and 50% to the Counterparty.

(c)    <u>Allocation of Entitlement</u>.  Capital Provider No. 1 and Capital Provider No. 2 shall each be entitled to a *pro rata* portion of the Capital Providers' Entitlement based on the respective Capital Amounts provided by each of them.

## 3.    PAYMENT OBLIGATIONS OF THE COUNTERPARTY

### 3.1    Payments

(a)    <u>Non-Recourse Agreement</u>. The Capital Amounts are provided to the Counterparty on a non-recourse basis, and the Capital Providers' Entitlement is derived from, computed on the basis of and paid from Proceeds, provided, however, that the Counterparty may, at its sole discretion, prepay any or all of the Capital Providers' Entitlement from funds other than Proceeds. If there are no Proceeds, the Counterparty shall not have any obligation to pay the Capital Providers' Entitlement (including any repayment of the Invested Amount).

(b)    <u>Notice.</u>  If at any time Proceeds arise, the Counterparty shall promptly notify the Capital Providers of the amount of such Proceeds and the Claim to which such Proceeds relate.

(c)    <u>Due Date for Payment of Entitlement</u>. Except as otherwise set forth in Section 3.2(a)(ii), within two (2) Business Days of the Payment Agent's receipt of any Proceeds, the Payment Agent shall pay such Proceeds to the Capital Providers in accordance with and subject to Section 2.2 until the Capital Providers' Entitlement has been paid in full.  Such payment obligation shall be absolute and unconditional and shall not under any circumstances be delayed, suspended, or avoided.  The only basis for not making such payment directly to the Capital Providers in accordance with the timeframe set forth in this clause (c) shall be pursuant to Section 26(c) (regarding a dispute about the payment).

DocuSign Envelope ID: E19883FF-2949-4432-AA6A-8BC62680997E

**3.2     Proceeds to Payment Agent, etc.**

(a)     <u>Payment and Delivery of Proceeds</u>.

    (i)     Prior to any payment or delivery of Proceeds, if such Proceeds shall be delivered in cash or by check or other instrument, then the Counterparty shall direct the payor to pay or deliver such Proceeds <u>not</u> to the Counterparty but rather directly to the Payment Agent (with proper endorsements if by check or other instrument).

    (ii)     If all or a portion of Proceeds consist of property other than cash, then the Capital Providers shall be entitled to receive an undivided interest in any such non-cash Proceeds in the amount of the Capital Providers' Entitlement, whereupon the Counterparty shall (1) diligently take any and all such actions as are necessary to receive and monetize such property in a commercially reasonable manner at prevailing market rates, that has been approved by the Capital Providers, and (2) cause the prompt payment of the Capital Providers' Entitlement in accordance with and subject to Section 2.2 from the cash realized from such monetization in accordance with this Agreement. Any dispute regarding any non-cash portion of the Proceeds (or the value of any non-cash portion of the Proceeds), or the application of this Section, shall be resolved pursuant to Section 26 of this Agreement concerning Dispute Resolution.

(b)     <u>Proceeds Held in Trust, etc</u>.  If, notwithstanding Section 3.2(a), any Proceeds are instead received by the Counterparty or a third party other than the Payment Agent on the Counterparty's behalf, the Counterparty shall, or shall direct such third party to, (i) hold such Proceeds in trust for the benefit of the Capital Providers in the amount to which the Capital Providers are entitled under this Agreement; (ii) segregate such Proceeds from all other funds and property; and (iii) forthwith pay or deliver such Proceeds to the Payment Agent in accordance with clauses (i) and (ii) of Section 3.2(a).

(c)     <u>Capital Providers' Right to Change Payment Agent</u>.  The Capital Providers shall have the right to require at any time that an independent third party escrow agent be designated as Payment Agent in place of the Nominated Lawyers. In the event the Capital Providers wish to do so, they shall notify the Counterparty in writing and give the Counterparty the opportunity to discuss the same.  Upon a final determination by the Capital Providers that such a change should be made, the parties shall cooperate to agree upon a mutually satisfactory escrow agent and to negotiate and execute an escrow agreement with such escrow agent on reasonable and customary terms, on a timely basis.  Promptly upon the execution and delivery of such an agreement, the Counterparty shall issue a written letter to the Nominated Lawyers, in a form approved by the Capital Providers (such approval not to be unreasonably withheld), notifying the Nominated Lawyers of the designation of a replacement Payment Agent.

DocuSign Envelope ID: E19883FF-284D-4432-AA6A-8BC62680997E

### 4.    PAYMENTS GENERALLY

### 4.1    Place and Account for Payment

Each payment to a party required under this Agreement shall be made (<u>a</u>) to the payment account for such party (or the Payment Agent, as the case may be) specified on <u>Annex II</u>; (<u>b</u>) in the currency specified in Section 2; (<u>c</u>) on the due date for value on that date in the place where such account is located; (<u>d</u>) unless otherwise agreed in writing, by wire transfer of freely transferable and immediately available funds; and (e) otherwise in the manner customary for payments in the specified currency.

### 4.2    Interest on Overdue Amounts

If the Counterparty is late in the performance of any payment obligation under this Agreement, the Counterparty shall on demand pay interest (before as well as after judgment, if applicable) at the Default Rate on the overdue amount to the Capital Providers for the period from (and including) the original due date for payment to (but excluding) the date of actual payment.

### 4.3    Waiver of Right of Set-Off

Each amount that the Counterparty is obligated to pay under this Agreement shall be paid without set-off, deduction or counterclaim.

### 5.    COVENANTS

### 5.1    Covenants of Each Party

The Counterparty, on the one hand, and each Capital Provider, on the other hand, agrees that, so long as such party has or may have any obligation to the other under this Agreement or any other Transaction Document:

(a)    it shall preserve and maintain its corporate existence, except to the extent that the failure to do so would not have a Material Adverse Effect;

(b)    it shall use all reasonable efforts to maintain in full force and effect all consents, approvals, actions, authorizations, exceptions, notices, filings and registrations of or with any Governmental Authority that are required to be obtained by it with respect to this Agreement or any other Transaction Document and shall use all reasonable efforts to obtain any that may become necessary in the future; and

(c)    it shall comply with all applicable laws and orders of any Governmental Authority to which it may be subject if failure to so comply would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

DocuSign Envelope ID: E19B83FF-3B4D-4432-AA6A-8BC62689997E

## 5.2    Covenants of the Capital Providers

With respect to each Claim, each Capital Provider agrees with the Counterparty that:

(a)    such Capital Provider is not, and shall not by virtue of entering into this Agreement or any other Transaction Document become, a party to such Claim; and

(b)    without limiting the obligations of the Counterparty under Sections 5.3(a) or the rights granted to the Capital Providers under Section 11.1, such Capital Provider shall not be entitled to control or direct the conduct of such Claim, or to require settlement thereof.

## 5.3    Covenants of the Counterparty

The Counterparty agrees with the Capital Providers that, so long as the Counterparty has or may have any obligation under this Agreement or any other Transaction Document:

(a)    with respect to each Claim, the Counterparty:

   (i)    shall use all commercially reasonable efforts to: (<u>A</u>) pursue such Claim and all of the Counterparty's legal and equitable rights arising in connection with such Claim; (<u>B</u>) bring about the reasonable monetization of such Claim or other reasonable commercial arrangement that generates Proceeds through a Claim Resolution; and (<u>C</u>) collect and enforce any settlement, final judgment or award;

   (ii)    shall at its own expense (taking into account the Capital Amounts) and in a timely manner: (<u>A</u>) retain and remunerate the applicable Nominated Lawyers to prosecute such Claim vigorously in a commercially reasonable manner in order to bring about the reasonable monetization of such Claim through a Claim Resolution; (<u>B</u>) cooperate with the applicable Nominated Lawyers in all matters pertaining to such Claim (including providing documents and information, appearing and causing others within the Counterparty's power to appear for examinations and hearings), including promptly authorizing and discharging all fees, expenses, and other payment obligations necessarily or reasonably recommended or incurred in association with pursuing such Claim to a Claim Resolution; (<u>C</u>) take all actions necessary or appropriate to collect and enforce any settlement, final judgment or award (the costs and expenses of doing all of the foregoing described in clauses (A) – (C), "***Claim Costs***"); and (<u>D</u>) actively manage the incurrence of Claim Costs with the goal of achieving a Claim Resolution, and the collection and enforcement thereof, efficiently and cost-effectively;

   (iii)    subject to Section 8.4, shall itself, or cause the applicable Nominated Lawyers to, within the five (5) Business Days preceding the end of each calendar quarter, (A) provide the Capital Providers with a report containing

the information described on <u>Exhibit B</u> (each, a "***Quarterly Report***") and (B) with respect to items (1) and (2) thereon, provide a copy to the Nominated Lawyers unless such items were prepared by the Nominated Lawyers;

(iv)    subject to Section 8.4, shall itself, or cause the applicable Nominated Lawyers to, (A) keep the Capital Providers fully and promptly apprised of each material development in relation to such Claim and (B) respond fully and promptly to any request by the Capital Providers, their Affiliates, or Representatives for any information regarding such Claim;

(v)    shall provide immediate notice by email to the Capital Providers of any settlement offer made by any Adverse Party and shall in good faith give the Capital Providers an opportunity to discuss such settlement offer prior to accepting or rejecting it;

(vi)    shall provide immediate notice by email to the Capital Providers of a Claim Resolution or any receipt of any Proceeds, or of any event that is expected to generate a Claim Resolution or the receipt of any Proceeds;

(vii)    shall not do anything to prejudice any benefits, rights or causes of action sought or advanced in connection with, or the general pursuit of, such Claim in a manner that contradicts Section 5.3(a)(i);

(viii)    other than Permitted Liens, or with the prior written consent of the Capital Providers, shall not dispose of, transfer, encumber or assign, nor otherwise create, incur, assume or permit to exist any Adverse Claim with respect to, all or any portion of such Claim (or any interest therein) or any Proceeds thereof (or any right to such Proceeds);

(ix)    shall not set off or agree to set off any amounts against such Claim unless the amount of any such set off is calculated and documented and the full amount of such set off is included within the definition of Proceeds and the Capital Providers receive the Capital Providers' Entitlement from such amount of Proceeds;

(x)    shall not, prior to a Claim Resolution with respect to all Claims, agree to settle or otherwise resolve any separate action, claim, suit or arbitration brought by or against any Adverse Party or any of an Adverse Party's Affiliates, except for the settlement of a Pork Claim, Chicken Claim or Beef Claim ("***Agreed Settlements***"), in a manner that would adversely impact any of (A) the Counterparty's performance of its covenants in clauses (i) or (ii) of this Section 5.3(a), (B) a potential Claim Resolution of one or more Claims and/or (C) the Capital Providers' Entitlement; and

DocuSign Envelope ID: E19883FF-28AD-4432-AA6A-8BC62680997E

    (xi)   shall at its sole cost maintain in place an effective, enforceable agreement, in a form satisfactory to Capital Providers, with the Payment Agent;

    (xii)  shall timely opt out of any proposed class settlement with any Adverse Party in such Claim.

(b)    Within two (2) Business Days after the Counterparty knows or has reason to believe that any of the following has occurred or is likely to occur, the Counterparty shall deliver to the Capital Providers a notice describing the same in reasonable detail and, together with such notice or as soon thereafter as possible, a description of any action that the Counterparty has taken or proposes to take with respect thereto:

    (i)   any Potential Remedy Event or Remedy Event;

    (ii)  any action, suit or proceeding of the kind described in Section 6.2(b) has been or shall be brought; or

    (iii)  a material failure by the Counterparty, or the Nominated Lawyers on the Counterparty's behalf, to pay when due any undisputed amounts owing to any litigation services providers (e.g., experts) retained in connection with a Claim (after giving effect to any applicable notice requirement or grace period).

(c)    The Counterparty shall not, without the Capital Providers' prior written consent, directly or indirectly, permit any amendments to the economic terms or scope of representation set forth in any Engagement Agreement.

(d)    If the Nominated Lawyers cease to act as the Counterparty's legal counsel for a Claim for any reason (including the Counterparty's decision to replace the Nominated Lawyers, which decision the Counterparty is free to make at any time), or the Counterparty needs to retain new legal counsel for a Claim outside the scope of the Engagement Agreement(s) with such Nominated Lawyers, then the Counterparty shall, subject to the Capital Providers' prior written consent (with respect to which the Capital Providers shall be free to apply their own experience and subjective judgment, but which consent shall not unreasonably be withheld), appoint successor attorneys or new attorneys to act as its counsel who have a similar level of quality and reputation as such Nominated Lawyers. The Counterparty shall not grant successor attorneys or any new attorneys economic compensation associated with a Claim that, standing alone or when considered together with any economic compensation to which current Nominated Lawyers would remain entitled, is superior to the compensation set forth in the Engagement Agreement(s) with such current Nominated Lawyers without the Capital Providers' prior written consent, which shall not be unreasonably withheld or delayed. The Counterparty will promptly deliver to the Capital Providers a copy of any Engagement Agreement with any successor or new attorney. If such successor attorneys or any new attorney, as applicable, are appointed, all references to "Nominated Lawyers"

DocuSign Envelope ID: E19983FF-3840-4432-AA6A-88C62680997E

will be deemed to refer to and include such successor, replacement or additional counsel. If the current Nominated Lawyers were acting as Payment Agent at the time of their resignation or cessation as counsel for a Claim, then in conjunction with the appointment of replacement counsel, the Counterparty will provide to such replacement counsel irrevocable instructions in substantially the same form as the irrevocable instructions provided to the Nominated Lawyers in a form approved by the Capital Providers, cause such replacement counsel to agree to such instructions, and deliver a copy of such instructions to the Capital Providers, as executed by the Counterparty and such replacement counsel.

(e)     No later than thirty (30) days following the Closing Date, the Counterparty shall file a direct action proceeding in the Beef Claim.

## 6.     REPRESENTATIONS AND WARRANTIES

### 6.1    Representations and Warranties of Each Party

On each Representation Date, the Counterparty, on the one hand, and each Capital Provider, on the other hand, represents and warrants to the other as follows:

(a)     It (i) is duly organized or formed and validly existing under the laws of the jurisdiction of its organization or formation and, if relevant under such laws, in good standing, (ii) is qualified to do business in each jurisdiction in which the nature of its business so requires except to the extent failure to do so would not have a Material Adverse Effect, and (iii) has not filed any certificates of dissolution or liquidation, or any certificates of domestication, transfer or continuance in any jurisdiction.

(b)     It has the power to execute this Agreement and the other Transaction Documents to which it is a party, to deliver this Agreement and the other Transaction Documents it is required by this Agreement to deliver, and to perform its obligations under this Agreement and the other Transaction Documents; and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not and shall not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other Governmental Authority applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets (including, with respect to the Counterparty, the Engagement Agreement(s) and any provisions therein).

(d)     All consents, approvals, actions, authorizations, exceptions, notices, filings and registrations that are required to have been obtained by it with respect to this Agreement or any other Transaction Document have been obtained and are in full force and effect, and all conditions of any such consents, approvals, actions,

DocuSign Envelope ID: E19983FF-3B4D-4432-AA6A-8BC62680997E

authorizations, exceptions, notices, filings and registrations have been complied with.

(e)    This Agreement and the other Transaction Documents constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization or similar laws and to general equitable principles).

(f)    It is acting for its own account, and it has made its own independent decisions to enter into this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, and as to whether this Agreement and the other Transaction Documents and such transactions are appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.

(g)    No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby.

(h)    It is capable of assessing the merits of and understanding (on its own behalf or through independent professional legal advice), and understands and accepts, the terms, conditions and risks of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby.

## 6.2    Representations and Warranties of the Counterparty

On each Representation Date (except as otherwise specifically provided below), the Counterparty represents and warrants to the Capital Providers as follows:

(a)    No Remedy Event or Potential Remedy Event has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any other Transaction Document.

(b)    No litigation or other proceedings before any court or other Governmental Authority, official, tribunal or arbitrator that would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, have been commenced by or against the Counterparty.

(c)    It is able to pay its debts when due (except to the extent failure to do so does not materially impact its ability to perform obligations under this Agreement), not insolvent, is not in the zone of insolvency, and has no insolvency proceedings threatened or outstanding against it.

(d)     It is not materially overdue in the filing of any Tax return nor overdue in the payment of any material amount in respect of Tax, except to the extent that this would not have a Material Adverse Effect.

(e)     As of the date of this Agreement, it has entered into the Engagement Agreement(s) in respect of each Claim as described on <u>Annex II</u>.  True and complete copies of all Engagement Agreement(s) have been provided to the Capital Providers.

(f)     With respect to each Claim:

     (i)     it is the sole legal and beneficial owner of, has good title to, and possesses sole control of, such Claim, free and clear of any Adverse Claim other than Permitted Liens;

     (ii)     (A) as of the date of this Agreement, it has not received any payments in connection with such Claim other than the payment resulting from a settlement with Amick Farms in the Chicken Claim, and (B) any payments in connection with such Claim received after the date of this Agreement have been disclosed to the Capital Providers in accordance herewith;

     (iii)     it has full power and authority to bring such Claim and has obtained all necessary corporate and other authorizations to do so;

     (iv)     it has taken all commercially reasonable steps to preserve the value of the Claim,

     (v)     other than Permitted Liens, it has not disposed of, transferred, encumbered or assigned all or any portion of such Claim (or any interest therein) or any Proceeds thereof, whether by way of security, subrogation, assignment to an insurer or otherwise;

     (vi)     it has not set off or agreed to set off any amounts against such Claim, and there exist no rights of set-off or similar rights against the Counterparty that could permit any set-off of or counterclaim against such Claim;

     (vii)     (A) other than Agreed Settlements, it has not taken any steps or executed any documents which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; (B) it has disclosed to the Capital Providers in accordance with its reporting obligations hereunder any instances in which anyone else has done or purported to do so; and (C) it has disclosed to the Capital Providers in accordance with its reporting obligations hereunder any asserted or unasserted claim, lien or judgment against it which would reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect;

DocuSign Envelope ID: E19883FF-284D-4432-AA6A-8BC62680997E

(viii)  subject to Section 8, it has disclosed to the Capital Providers all information (in any and all media) in the knowledge, possession, or control of the Counterparty or any of its Representatives that is or is likely to be material to the Capital Providers' assessment of such Claim (including the enforcement and collection of any related settlement, award, or judgment); any and all such information has been provided to the Capital Providers in its true, complete and correct form and is, to the knowledge of the Counterparty, accurate; the Counterparty believes (and does not have, and has not been informed by any of its Representatives of, any belief to the contrary) that such Claim is meritorious;

(ix)  on the date of this Agreement, the Counterparty has not been advised by the Nominated Lawyers or any other legal counsel or litigation funder that the Claim is unlikely to succeed; and

(x)  it has not engaged, nor otherwise agreed to pay any compensation to, any agent or broker in connection with the transactions contemplated by this Agreement.

(g)  It is not relying on any communication (written or oral) of any Capital Provider or any of their respective Affiliates as legal advice or as a recommendation to enter into this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby, it being understood that information and explanations related to the terms and conditions of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, shall not be considered legal advice or as such a recommendation.

(h)  It has filed a direct action proceeding in each of the Pork Claim and Chicken Claim and as of the date of this Agreement has filed timely notices to opt out of any proposed class settlement with any Adverse Party in such Claims.

## 7.  CONFIDENTIALITY

### 7.1  Exclusive Ownership of Information by Disclosing Party

Each recipient of Confidential Information hereunder (the "***Recipient***") agrees that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the other party (the "***Disclosing Party***"), or any of its Affiliates or contract counterparties, as the case may be; and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such information, or any aspect or embodiment thereof.  Neither the execution of this Agreement or any other Transaction Document, nor the furnishing of any Confidential Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel or otherwise, any license to distribute or title to any patent, trademark, copyright, service mark, business and trade secret or other proprietary right, title or interest in or to such Confidential Information, or to use such Confidential Information for any purpose

other than as specified in this Agreement or any other Transaction Document, or to constitute a waiver of any attorney-client privilege or work product protection.

## 7.2    Non-Disclosure of Information

(a)    Other than pursuant to Section 7.4, the Recipient shall not for any reason, (i) until the later of (A) the seventh (7th) anniversary of the date of this Agreement, or (B) the second (2nd) anniversary of a Claim Resolution (of all Claims, if the Confidential Information is not specific to a particular Claim; or with respect to the applicable Claim, if the Confidential Information is specific to a particular Claim), disclose, reveal, report, publish, transfer or make available, directly or indirectly, to any Person other than its Representatives authorized pursuant to Section 7.3, nor use for any purpose other than the fulfillment of its obligations hereunder (collectively, "***Disclose***"), any Confidential Information (other than Protected Material, which is addressed in the following clause (ii)) provided to it by the Disclosing Party; nor (ii) in perpetuity, Disclose any Protected Material provided to it by the Disclosing Party.

(b)    Moreover, notwithstanding any other provision of this Agreement, at no time shall the Recipient knowingly Disclose any Confidential Information or Protected Material to an Adverse Party or any other adversary, potential adversary or conduit to an adversary of the Counterparty, and the Recipient shall treat such materials in a manner that does not substantially increase the likelihood that any of the foregoing shall come into possession of it.

(c)     Notwithstanding the foregoing clauses (a) and (b), the Capital Providers shall be free (i) following a Claim Resolution, to disclose publicly their involvement in the applicable Claim, <u>provided</u> that such disclosure does not directly or indirectly reveal the identity of the Counterparty; and (ii) at any time, to make such disclosures as are necessary pursuant to any public reporting obligations.

## 7.3    Confidentiality Procedures

The Recipient shall ensure that the Confidential Information it receives is not Disclosed except to its Representatives who have a "need to know" such information. The Recipient shall procure its Representatives' compliance with this Section 7.3 and shall be responsible for their failure to so comply.

## 7.4    Judicial and Official Disclosure Requests

(a)    If a Recipient receives a request, including in any judicial, arbitral or administrative proceeding or by any Governmental Authority, to disclose any Confidential Information (a "***Disclosure Request***"), then such Recipient shall, before complying with such Disclosure Request if legally permitted, promptly provide written notice of such Disclosure Request, including a copy of such Disclosure Request, to the

Disclosing Party, sufficiently in advance so that the Disclosing Party may contest the Disclosure Request. If, upon such notice, the Disclosing Party elects to contest the Disclosure Request (all such contests being at the Disclosing Party's expense and under its control; _provided_ that the Disclosing Party shall consult with the Recipient about such contests), to the extent legally permitted the Recipient shall not Disclose any Confidential Information until such time as a final, non-appealable or non-stayed order has been entered compelling such Disclosure, and the Recipient shall cooperate with the Disclosing Party in its contest.

(b)     If any such Disclosure Request seeks disclosure of this Agreement or any other Transaction Document, any terms hereof or thereof, the identities of the Capital Providers or any communications between the Counterparty and the Capital Providers, then the Recipient shall (i) notify the Capital Providers promptly; (ii) object to such Disclosure on all applicable bases, including work product doctrine, common interest privilege and relevance, as applicable; and (iii) manage such Disclosure Request in a manner consistent with all reasonable instructions of the Capital Providers with respect to the management of such objections and requests for confidential treatment, including using counsel nominated by the Capital Providers with experience in addressing the same for that narrow purpose.

(c)     Should the Disclosing Party not contest the Disclosure Request, the Recipient shall not have any obligation to do so; the Recipient may, however, contest the Disclosure Request even if the Disclosing Party elects not to do so.

(d)     In the event that a Disclosure Request is made to a party other than a Recipient hereunder (a "**_Third Party CI Holder_**"), and such Third Party CI Holder is a Representative of the Recipient of the Confidential Information requested in the Disclosure Request or has a contractual or familial relationship with such Recipient, then, upon becoming aware of the issuance of such Disclosure Request such Recipient shall use commercially reasonable efforts to cause such Third Party CI Holder to take the actions described in clauses (a) and (b) of this Section 7.4 as obligations of the Recipient.

(e)     Notwithstanding anything herein to the contrary, the obligations of the Recipient in connection with Disclosure Requests shall not apply with respect to requests made by a regulatory or self-regulatory body having jurisdiction over the Recipient when such disclosures are required by law as a matter of general or routine examinations in which no specific request is made for Confidential Information relating to the Disclosing Party or any Claim.

## 8.    LEGAL PRIVILEGE

## 8.1    Common Interest Privilege Applies

The parties hereto agree that the Counterparty, the Capital Providers and the Capital Providers' Affiliates have a "common legal interest" in each Claim and its successful

prosecution, this Agreement and the other Transaction Documents, and any discussion, evaluation and negotiation and other communications and exchanges of information relating thereto.

## 8.2    Information Subject to Privilege Protection

Notwithstanding any contrary provision of this Agreement, the parties hereto agree that any Protected Material shall at all times remain subject to all applicable Privileges, it being the express intent of the parties hereto and their Affiliates to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all Privileges to which Protected Material, or any part of it, is, may be or may in the future become subject.  It is the good faith belief of the Disclosing Party that Privileges, including the common interest privilege, attach to the Protected Material and disclosure of Protected Material is made in reliance on that good faith belief.

## 8.3    Information Subject to Work Product Protection

The parties hereto agree that without limiting the foregoing, any materials prepared in anticipation of litigation by or for the Counterparty, the Capital Providers, any of their respective Affiliates or any of their respective Representatives shall remain subject to work product protection.   The Capital Providers and their Affiliates shall be considered "representatives" of the Counterparty given that the Counterparty requested assistance and advice from them regarding the plausibility of the Counterparty's obtaining external capital to finance its legal claims.   Moreover, the parties hereto agree that information shared between the Counterparty and the Capital Providers is shared pursuant to a common interest and non-disclosure agreement, and the exchange of such information does not increase the risk of disclosure, inadvertent or otherwise, to the Adverse Party or any other adversary and does not lessen or waive the protection secured under work product doctrine. Disclosure of work product is made in reliance on that good faith belief.

## 8.4    No Obligation to Provide Privileged Information

Notwithstanding other provisions of this Agreement, the Counterparty is not obliged to provide to the Capital Providers any information that is subject to attorney-client privilege.

## 9.    EXCULPATION; REINSTATEMENT; INDEMNIFICATION

(a)    Other than its obligations to provide the Capital Amounts to the Counterparty, no Capital Provider shall have any obligation to fund any fees, expenses or other sums in relation to any Claim, and all such fees, expenses or other sums shall be the sole responsibility of the Counterparty.  Without limiting the generality of the foregoing, no Capital Provider shall have any obligation to pay any sums awarded against, or penalties incurred by, the Counterparty, including any costs orders, awards, interest, damages, expenses or penalties against the Counterparty, nor to fund any legal fees or any other costs whatsoever incurred as a result of defending any counterclaim

DocuSign Envelope ID: E19883FF-3940-4432-AA6A-8BC62680997E

brought against the Counterparty in relation to any Claim or defending any enforcement or other proceedings against the Counterparty.

(b)    The liability of each Capital Provider under this Agreement and the other Transaction Documents (and the transactions contemplated hereby and thereby) is equal to the aggregate of all sums committed by such Capital Provider as set forth in this Agreement (US$35,000,000 in total), except in the event of any fraud or gross negligence of such Capital Provider, or reckless activity of such Capital Provider amounting to fraud or gross negligence. This limitation of liability is absolute and applies to liability for (without limitation) breach of contract and negligence, and for any damages that may constitute compensatory damages, lost profit, expenses, costs, losses or charges, or consequential, exemplary or punitive damages or otherwise. This limitation of liability extends to each Capital Provider and its Representatives.

(c)    To the extent any payment received by the Capital Providers, or obligation incurred by the Counterparty pursuant to any of the Transaction Documents, is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid in whole or in part by the Capital Providers or paid over to a trustee, receiver or any other entity, whether under any bankruptcy law, insolvency, fraudulent transfer law or otherwise (any such payment or obligation being hereinafter referred to as a "***Challenged Item***"), then the obligations of the Counterparty pursuant to this Agreement with respect to such Challenged Item shall (i) be fully reinstated and revived, as the case may be, notwithstanding such payment or incurrence, and (ii) to the extent of each such Challenged Item, remain effective and continue in full force and effect as if said Challenged Item had not occurred or been made.

(d)    The Counterparty agrees to indemnify, defend and hold each Capital Provider and its Affiliates (each, a "***Capital Provider Indemnitee***") harmless from any and all losses, costs, charges, damages and expenses (including reasonable attorneys' fees) that are  incurred by a Capital Provider Indemnitee as a result of any failure by the Nominated Lawyers to comply with instructions given it by the Counterparty to pay the Capital Providers any amounts in connection with this Agreement, including any failure to pay such an amount by the date instructed or incurred in connection with any discovery request, subpoena or similar related legal proceeding relating to any Transaction Document or any Claim.   This indemnification obligation is separate from and in addition to all other payment obligations of the Counterparty hereunder.

## 10.    REMEDY EVENTS

The occurrence at any time with respect to the Counterparty of any of the following events constitutes a "***Remedy Event***":

DocuSign Envelope ID: E19883FF-3840-4433-AA6A-8BC62680997E

### 10.1    Failure to Pay or Deliver

The Counterparty fails to make, when and where due, any payment owing to a Capital Provider hereunder.

### 10.2    Breach or Repudiation

Other than the obligation referenced in Section 10.1, which is governed by such section, the Counterparty fails to comply with or perform any of its obligations in accordance with this Agreement, or any other Transaction Document if (a) such failure, if remediable by the Counterparty, is not remedied within (subject to the following two sentences) fifteen (15) Business Days after written notice thereof is given to the Counterparty and (b) (i) such failure would reasonably be expected to have a Material Adverse Effect or (ii) the Counterparty or any of its Representatives disaffirms, disclaims, repudiates or rejects in writing, in whole or in part, or challenges the validity of, this Agreement, or any other Transaction Document. If the failure to cure a Remedy Event described in this Section 10.2 within fewer than 15 Business Days would be reasonably likely to result in a material adverse effect on a Claim due to exigencies of the litigation or arbitration process, then, upon notice to the Counterparty, the Capital Providers may shorten the cure period to the extent necessary to avoid or minimize such likelihood.

### 10.3    Misrepresentation

A representation by the Counterparty under Section 6 of this Agreement proves to have been inaccurate or misleading in any material respect when made or deemed to have been made, if such inaccurate or misleading representation would reasonably be expected to have a Material Adverse Effect.

### 10.4    Bankruptcy

Any of the following occurs with respect to the Counterparty: (a) the voluntary or involuntary commencement of a case or proceeding by or against it under any applicable bankruptcy, insolvency or similar law affecting creditors' rights now or hereafter in effect, or any other procedure under any law of any jurisdiction having a similar or analogous nature or effect, and such case, proceeding or procedure is not dismissed or otherwise terminated within sixty (60) days of its commencement; or entry of a decree or order by a court of competent jurisdiction, appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or similar official having powers over it or all or a substantial part of its property; (b) the inability or failure generally, or admission in writing of its inability, to pay its debts as they become due (except to the extent the inability or failure to do so does not materially impact its ability to perform obligations under this Agreement) ; (c) dissolution (other than pursuant to a consolidation, amalgamation or merger); or (d) the adoption of any resolution or other authorization, or the taking of any action in furtherance of, or indicating its consent or intent to consent to, approval of, or acquiescence in, any of the foregoing by its board of directors (or similar governing body) or any committee thereof or by its equityholders entitled to vote on and authorize the same.

DocuSign Envelope ID: E19883FF-2840-4432-AA6A-8BC62680997E

### 10.5    Reorganization Without Assumption

The Counterparty consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, reincorporates, reconstitutes or divides into or as, another entity (or other entities) and, as a direct or indirect result of such consolidation, amalgamation, merger, transfer, reorganization, reincorporation, reconstitution or division, (<u>a</u>)   no single resulting, surviving or transferee entity (a "***Counterparty Successor***") has assumed all the obligations of the Counterparty under this Agreement and/or the other Transaction Documents; or (<u>b</u>) any assets against which the Capital Amounts have been committed are no longer held by such a Counterparty Successor.

### 11.    REMEDIES

### 11.1    Available Remedies

If at any time a Remedy Event has occurred with respect to one or more Claims, the Capital Providers shall be entitled to (except as otherwise provided in this Section 11) exercise one or more of the following remedies (in each case without thereby relieving the Counterparty of any of its obligations under Section 3) until such time as the Capital Providers have received the Capital Providers' Entitlement in full:

(a)    with respect to those Claim(s) to which the Remedy Event relates, the Capital Providers may take any and all actions on behalf of the Counterparty that the Capital Providers may reasonably deem necessary or advisable in order to prosecute the Claim(s) to bring about the monetization thereof through a Claim Resolution and to collect and enforce any settlement, final judgment or award; and, in connection therewith, the Counterparty hereby (i) irrevocably appoints Capital Provider No. 1 as the Counterparty's attorney-in-fact, with full authority in the place and stead of the Counterparty and in the name of the Counterparty or otherwise, from time to time following the date such Remedy Event occurred, in Capital Provider No. 1's discretion, to take any such actions to the extent consistent with the Counterparty's interests in the Claim, including to settle or compromise the Claim or to appoint new Nominated Lawyers, and (ii) agrees to, and to cause its Affiliates and its and their Representatives to, cooperate fully with the Capital Providers and counsel in all matters pertaining to the Claim(s), including producing necessary documents, submitting to examination for the preparation of written statements and subscribing to the same under oath if required, consulting with counsel and its designees as they require for purposes of prosecuting such Claim(s) and enforcing any award, and appearing at any hearings in connection with such statements or such Claim(s) generally; <u>provided</u>, <u>however</u>, that the Counterparty shall have the right to participate with counsel selected by the Counterparty in any and all such actions taken by the Capital Providers, subject to the Capital Providers' right to control such actions, and the fees and disbursements of such counsel of the Counterparty shall be at the expense of the Counterparty; and

DocuSign Envelope ID: E19883FF-2840-4432-AA6A-8BC62680997E

(b)      subject to the provisions of Section 26, the Capital Providers may pursue all other legal and equitable remedies available to the Capital Providers under applicable law in connection with the enforcement of its rights under this Agreement and the other Transaction Documents.

## 11.2    Remedy upon Failure to Opt-Out of Class Settlements

If the Counterparty fails to comply with Section 5.3(a)(xii) or Section 5.3(e), then in addition to any other remedies that the Capital Providers may have under the Transaction Documents, the proceeds from the applicable class settlement shall be included under Proceeds.

## 11.3    Remedies Cumulative

Except as provided otherwise in this Agreement, the rights, powers, remedies and privileges provided in this Agreement and the other Transaction Documents are cumulative; may be exercised singularly, concurrently or successively at the Capital Providers' option; and may be exercised or enforced without constituting a bar to the exercise or enforcement of any other such rights, powers, remedies and privileges.

## 12.    ENFORCEMENT OF CLAIM RESOLUTION

If, by the date that is one hundred twenty (120) days after the date of any Claim Resolution, any portion of a judgment, award or settlement payment owing to the Counterparty as a result thereof remains unsatisfied and the Capital Providers' Entitlement has not been satisfied in full, the Capital Providers shall, at their option and upon notice to the Counterparty, be entitled to engage judgment enforcement professionals of their own choosing (including those affiliated with the Capital Providers) to pursue enforcement of the same.  In the event the Capital Providers elect to do so, (a) they shall pay their designated judgment enforcement professionals their reasonable and customary fees and expenses, and (b) the Capital Providers' Entitlement shall be increased by an amount equivalent to any fees and expenses incurred pursuant to this Section. The Capital Providers shall efficiently and cost-effectively manage the incurrence of all costs associated with engagement of judgment enforcement professionals pursuant to this Section.

## 13.    LIMITATIONS ON TRANSFER, SUCCESSORS AND ASSIGNS; THIRD PARTY BENEFICIARIES

(a)      Neither this Agreement nor any other Transaction Document, nor any right or obligation in or under this Agreement or any other Transaction Document, may be transferred (whether by way of security or otherwise) or delegated by the Counterparty without the prior written consent of the Capital Providers, except that upon written notice to the Capital Providers, the Counterparty may (without prejudice to any other right or remedy of the Capital Providers under Section 10 or 13) make a transfer of all (but not less than all) of its rights and obligations under this Agreement and the other Transaction Documents pursuant to a consolidation

DocuSign Envelope ID: E19883FF-3940-4432-AA6A-8BC62680997E

or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity other than an Adverse Party or an Affiliate of an Adverse Party, _provided_ that such transfer would not cause a Material Adverse Effect. Each Capital Provider may assign its rights and obligations under this Agreement and the other Transaction Documents, in whole or in part, to another Person without the consent of the Counterparty. Any purported transfer that is not in compliance with this provision shall be void.

(b)    Without limiting the generality of the foregoing, the Capital Providers shall be entitled, in their sole discretion, to cause one or more Affiliates to become additional Capital Providers hereunder by joinder to this Agreement.

(c)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(d)    No Person other than the parties hereto (and any permitted transferee hereunder) shall have any rights under this Agreement.

## 14.    TAX WITHHOLDING

The Counterparty shall make all payments under or in connection with this Agreement without any deduction or withholding for or on account of any Tax, save only as may be required by applicable law. If any such deduction or withholding is required by law to be made, the Counterparty shall (a) promptly notify the applicable Capital Providers upon becoming aware that it must make such a deduction or withholding; (b) pay to the relevant authorities (within the time allowed) the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by the Counterparty to the applicable Capital Providers under clause (d) of this Section 14); (c) promptly provide an official receipt (or a certified copy or such other evidence reasonably acceptable to the applicable Capital Providers) evidencing the relevant withholding and payment to such authorities; and (d) pay to the applicable Capital Providers such additional amounts as are necessary to ensure that (after making any such withholdings or deductions) the net amount actually received by such Capital Providers in respect of the payment due from the Counterparty equals the amount which such Capital Providers would have received if no such withholdings or deductions had been required.

## 15.    ANTI-CORRUPTION; DATA PROTECTION

(a)    The Counterparty acknowledges that the Capital Providers seek to comply with all applicable anti-money laundering, sanctions, anti-corruption and anti-bribery laws and regulations (collectively, "***Anti-Corruption Rules***"). In furtherance of these efforts, the Counterparty represents and warrants as follows:

(i)    To the best of its knowledge, it is not the target of any economic or financial sanctions with respect to the United States Government (including the U.S. Department of Treasury Office of Foreign Assets Control), the United

Nations Security Council, the United Kingdom or the European Union; and

(ii) it has undertaken and will continue to undertake commercially reasonable efforts to ensure that neither it, nor any of its Affiliates, nor to its knowledge anyone acting on its behalf:

(A) violates, or engages in any activity, practice or conduct which would violate, any applicable Anti-Corruption Rule;

(B) uses funds or assets for any unlawful contribution, gift, entertainment or other unlawful expense, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment; or

(C) directly, or indirectly through its agents, Representatives or any other Person authorized to act on its behalf, offers, promises, pays, gives, or authorizes the payment or giving of money or anything else of value to any government official or other Person while knowing or having reason to believe that some portion or all of the payment or thing of value will be offered, promised, or given, directly or indirectly, to a government official or another Person for the purpose of influencing any act or decision of such government official or such Person in his/her or its official capacity, including a decision to do or omit to do any act in violation of his/her or its lawful duties or proper performance of functions or inducing such government official or such Person to use his/her or its influence or position with any Government Authority or other Person to influence any act or decision, in each case in order to obtain or retain business for, direct business to, or secure an improper advantage for, the Counterparty or any of its Affiliates.

(b) The Counterparty agrees to undertake commercially reasonable efforts to ensure that it does not engage in any business or other activities, including through agents or subcontractors, that would cause a Capital Provider to be in direct or indirect violation of any applicable Anti-Corruption Rule. In the event the Counterparty's payment to a Capital Provider of any amounts owed hereunder would cause such Capital Provider to be in direct or indirect violation of an applicable Anti-Corruption Rule, the Counterparty shall in good faith cooperate with such Capital Provider and/or its Affiliates to identify a payment mechanism that would not violate any such rule.

(c) The Counterparty acknowledges and agrees that, notwithstanding anything to the contrary, the Capital Providers shall have no obligation to make or receive any payment or take any other action if the Capital Providers conclude in good faith that making or receiving such payment or taking such action would violate any applicable Anti-Corruption Rule.

(d)     Each of the Counterparty and the Capital Providers will undertake commercially reasonable efforts to comply with all applicable data protection laws, as required. Each will undertake commercially reasonable efforts to safeguard all data, including implementing appropriate security measures, as required under applicable data protection laws.   If requested by the Capital Providers, the Counterparty shall undertake commercially reasonable efforts to provide further assurances with respect to compliance with applicable data protection laws.

## 16.    NOTICES

### 16.1    Effectiveness of Notices

Any notice or other communication in respect of this Agreement shall be in writing and may be given in any manner described below to the address or number provided for the recipient in Annex I and shall be deemed effective as indicated:

(a)     if delivered in person or by courier, on the date it is received;

(b)     if sent by certified or registered mail or the equivalent (return receipt requested), on the date it is received; or

(c)     if sent by email, on the date sent in the absence of any immediate automated response indicating the message was not received or would not be timely read, and if such an immediate automated response is received by the sender, on the date the sender receives an acknowledgement from the recipient,

unless the date of receipt is not a Business Day or the communication is received after the close of business on a Business Day, in which case such communication shall be deemed given and effective on the first following day that is a Business Day.   Notices to the Counterparty shall be copied to the Nominated Lawyers, and the time of effectiveness of each such notice shall be the effective time of receipt by either the Counterparty or the Nominated Lawyers, whichever occurs earlier.

### 16.2    Change of Details

Either party may by notice to the other in accordance with Section 16.1 change the address or email details at which notices or other communications are to be given to it.

## 17.    AMENDMENTS

No amendment, modification or waiver in respect of this Agreement shall be effective unless in writing and executed by the Counterparty and the Capital Providers.

## 18.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties hereto relating to the subject matter hereof and is the final and complete expression of their intent.   The parties

DocuSign Envelope ID: E19883FF-384D-4432-AA6A-8BC62680997E

hereto represent and warrant that no prior or contemporaneous negotiations, promises, agreements, covenants or representations of any kind or nature, whether made orally or in writing, have been made or relied upon by them, whether in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated herein; it being the intention of the parties hereto that in the event of any subsequent litigation, controversy or dispute concerning the terms and provisions of this Agreement, no party shall be permitted to offer or introduce oral or extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing.

## 19. COUNTERPARTS

This Agreement and the other Transaction Documents (and each amendment, modification and waiver in respect thereof) may be executed and delivered in counterparts (including by facsimile or digital transmission), each of which shall be deemed an original.

## 20. SURVIVAL OF OBLIGATIONS

With respect to each Claim, the rights and obligations of the parties hereto under Sections 3, 4, 6, 7, 8, 9 and 11 through 28 in relation to such Claim shall survive any Claim Resolution or the exercise by the Capital Providers of any remedies with respect to such Claim pursuant to Section 11 until such point when the Capital Providers' Entitlement has been paid in full and all other obligations in this Agreement have been satisfied.

## 21. NO WAIVER

A failure or delay in exercising any right, power or privilege in respect of this Agreement or any other Transaction Document shall not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege shall not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

## 22. SEVERABILITY

If any term of this Agreement or any other Transaction Document, or the application thereof to either party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms, modified by the deletion of the unenforceable, invalid or illegal portion, shall continue in full force and effect, and such unenforceability, invalidity, or illegality shall not otherwise affect that of the remaining terms, so long as this Agreement and the other Transaction Documents as so modified continues to express, without material change, the original intentions of the parties hereto as to the subject matter hereof and the deletion of such portion of this Agreement or any other Transaction Document shall not substantially impair the respective expectations or reciprocal obligations of the parties hereto or the practical realization of the benefits that would otherwise be conferred upon the parties hereto. The parties hereto shall endeavour in good faith negotiations to replace any prohibited or

unenforceable provision with a valid provision the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

### 23. EXPENSES

(a)     Except as otherwise expressly provided in this Agreement or any other Transaction Document, each party shall bear its own expenses in connection with the negotiation, execution, delivery and performance of this Agreement and the other Transaction Documents.

(b)     The Counterparty shall, on demand, indemnify and hold harmless the Capital Providers for and against all reasonable out-of-pocket expenses, including legal fees and disbursements, incurred by the Capital Providers by reason of the enforcement and protection of their rights under this Agreement or any other Transaction Document, including costs of collection and of the enforcement of this Section 23(b).

(c)     The Capital Providers shall, on demand, indemnify and hold harmless the Counterparty for and against all reasonable out-of-pocket expenses, including legal fees and disbursements, incurred by the Counterparty by reason of its enforcement and protection of its rights under this Agreement or any other Transaction Document, including costs of collection and of the enforcement of this Section 23(c).

### 24. RELATIONSHIP OF PARTIES

(a)     The Capital Providers and certain of their Affiliates are engaged in a capital provision and advisory business principally focused on assets connected to litigation, arbitration or mediation; one or more other Affiliates focus on investment in assets connected to litigation, arbitration or mediation.  The Capital Providers and their Affiliates are not law firms and are not engaged in the practice of law with respect to any Claim or the Counterparty.  The Counterparty may not, and shall not, rely on any of the Capital Providers or their Affiliates for legal advice.

(b)     Nothing in this Agreement or any other Transaction Document shall give rise to or be construed to create a fiduciary, lawyer-client, lender-borrower, agency or other non-contractual relationship between the Counterparty and any Capital Provider.

(c)     Neither this Agreement nor any other Transaction Document creates any partnership, joint venture or any other type of affiliation between the Counterparty and any Capital Provider, nor does this Agreement or any other Transaction Document create a joint interest in any Claim for any purpose, including for U.S. federal, state and local income tax purposes. The Capital Providers are not partners, nor are they engaged in any partnership or joint venture with one another.

DocuSign Envelope ID: E19883FF-394D-4432-AA6A-8BC62680997E

## 25.    GOVERNING LAW

Except as set forth otherwise in Section 26, this Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York (without reference to any conflict of law principles or choice of law doctrine that would have the effect of causing this Agreement to be construed in accordance with or governed by the law of any other jurisdiction).

## 26.    DISPUTE RESOLUTION

(a)    Any and all of the following shall (to the exclusion of any other forum except as set forth herein) be referred to and finally resolved by arbitration under the LCIA Arbitration Rules (2014) of the London Court of International Arbitration (the "*Rules*" and the "*LCIA*"), which Rules are deemed to be incorporated by reference into this clause: any dispute, controversy or claim arising out of or in connection with (i) this Agreement (including this Section 26); (ii) any other Transaction Document; (iii) any relationship or interaction between the Counterparty, on the one hand, and any Capital Provider(s), on the other hand; or (iv) a claim or assertion by any other Person of any right arising out of or in connection with this Agreement (including this Section 26) or any other Transaction Document, including, as to all such disputes, claims and controversies, any question regarding (x) the existence, arbitrability, validity or termination of this Agreement (including this Section 26) or any other Transaction Document, (y) any relationship or interaction between the above identified parties, or (z) the obligation of any Person to arbitrate any such dispute.

(b)    Except as otherwise specifically provided in this Agreement (including this Section 26) or any other Transaction Document, (i) the arbitral tribunal (the "*Tribunal*") shall have the exclusive power to grant any remedy or relief that it deems appropriate, whether provisional or final, including but not limited to emergency relief, injunctive relief and/or any other interim or conservatory measures or other relief permitted by the Rules (collectively, "*Conservatory Measures*"), and any such measures ordered by the Tribunal shall, to the extent permitted by applicable law, be deemed to be a final award on the subject matter of such measures and shall be enforceable as such in any court of appropriate jurisdiction; and (ii) prior to the formation or expedited formation of the Tribunal (under Article 5 or 9A of the Rules), the provisions of Article 9B of the Rules shall apply to any request for Conservatory Measures.

(c)    The referral of a dispute to arbitration shall not suspend or interfere with the Counterparty's (or the Payment Agent's) obligation to make timely payment to the Capital Providers of the Capital Providers' Entitlement (or any portion thereof); provided that if the Counterparty disputes its (or the Payment Agent's) obligation hereunder to pay any amount to the Capital Providers, the Counterparty must (or, as applicable, cause the Payment Agent to) (i) commence an arbitral proceeding

DocuSign Envelope ID: E19983FF-384D-4432-AA6A-8BC62680997E

pursuant to this Section 26 within five (5) Business Days after the date such amount was (but for the dispute) due, (ii) make timely payment to the Capital Providers of any undisputed amounts and (iii) immediately deposit any and all disputed amounts in a dedicated account with the LCIA as fund holder, which amounts shall be released, including any interest thereon, as directed in writing by the Tribunal in any award, order or decision, unless the parties expressly agree otherwise in writing.

(d)     Any request for arbitration or response thereto submitted to the LCIA may be delivered by any means (including email) set forth in Section 16 (Notices) or any other means that is reasonably likely to achieve actual service.

(e)     The number of arbitrators shall be three.  Subject to Article 8 of the Rules, each party to the arbitration shall nominate one arbitrator and the two arbitrators nominated by the parties shall, within ten (10) days of the nomination of the second party-nominated arbitrator, agree upon and nominate a third arbitrator who shall act as Chairman of the Tribunal.  If no agreement is reached within ten days or at all, the LCIA Court shall select and appoint a third arbitrator to act as Chairman of the Tribunal.

(f)     The seat, or legal place, of arbitration shall be New York, New York. Notwithstanding the terms of Section 25 (Governing Law), the U.S. Federal Arbitration Act shall govern the interpretation, application and enforcement of this Section 26 and any arbitration proceedings conducted hereunder. The language to be used in the arbitral proceedings shall be English.

(g)     In addition to the confidentiality requirements imposed on the parties by Article 30 of the Rules, each party is obligated to keep confidential the existence and content of any arbitral proceedings initiated hereunder and any rulings or award except (i) to the extent that disclosure may be required of a party to fulfill a legal duty, protect or pursue a legal right, or enforce or challenge an award in *bona fide* legal proceedings before a state court or other judicial authority, (ii) with the consent of all parties, (iii) where needed for the preparation or presentation of a claim or defense in such arbitral proceedings, (iv) where such information is already in the public domain other than as a result of a breach of this clause (g), or (v) by order of the Tribunal upon application of a party.

(h)     In addition to the authority conferred upon the Tribunal by the Rules, the Tribunal shall have the authority to order production of documents in accordance with the IBA Rules on the Taking of Evidence in International Arbitration as current on the date of the commencement of the arbitration. No other form of disclosure or discovery shall be permitted.  All contentions that a document or communication is privileged and, as such, exempt from production in the arbitration, shall be resolved by the Tribunal in accordance with Article 9 of the IBA Rules on the Taking of Evidence in International Arbitration.

(i)       The judgment of any court of appropriate jurisdiction shall be entered upon any award made pursuant to an arbitration conducted pursuant to the terms of this Section 26.

(j)       Any attempt by the Counterparty, a Capital Provider, or any other Person subject to this Section 26 to seek relief or remedies in any forum that contravenes this Section 26 shall constitute a breach of this Agreement and entitle the non-breaching party to damages, equitable relief and full indemnification against all costs and expenses incurred in connection therewith.

(k)      The Counterparty, being a sophisticated commercial entity with access to counsel, irrevocably waives and forever and unconditionally releases, discharges and quitclaims any claims, counterclaims, defenses, causes of action, remedies and/or rights that it has or may have in the future arising from any doctrine, rule or principle of law or equity that this Agreement or any other Transaction Document, or any of the relationships and transactions contemplated hereby or thereby, (i) are against the public policy of any relevant jurisdiction; (ii) are unconscionable or contravene any laws relating to consumer protection; (iii) are usurious or call for payment of interest at a usurious rate; (iv) were entered into under duress; (v) were entered into as a result of actions by a Capital Provider that violated its obligations of good faith and/or fair dealing; (vi) constitute illegal gambling or the sale of unregistered securities; (vii) constitute malicious prosecution, abuse of process or wrongful initiation of litigation; or (viii) constitute champerty, maintenance, barratry or any impermissible transfer, assignment or division of property or choses in action. The parties specifically agree that any issues concerning the scope or validity of the foregoing waiver shall be within the exclusive jurisdiction of the Tribunal.

## 27.    ADMINISTRATIVE AND COLLATERAL AGENT

(a)      Capital Provider No. 2 hereby appoints Capital Provider No. 1 as administrative and collateral agent for the Capital Providers hereunder. As such, Capital Provider No. 1 is hereby authorized to act on behalf of Capital Provider No. 2 for the purpose of (i) giving and receiving notices, waivers, consents, approvals and instructions; (ii) acquiring, holding and enforcing any and all liens on collateral granted by the Counterparty to secure the Capital Providers' rights hereunder; (iii) enforcing any other rights of the Capital Providers under this Agreement and any other Transaction Document, including filing and proving a claim for the aggregate amount of the Counterparty's obligations to the Capital Providers hereunder in the event of any bankruptcy or insolvency proceeding relating to the Counterparty; and (iv) taking such other actions as Capital Provider No. 1 deems appropriate to administer this Agreement and the other Transaction Documents; in each case together with such powers and discretion as are reasonably incidental thereto.

(b)      The use of the term "agent" or any similar or equivalent term in connection with the foregoing appointment is not intended to imply any fiduciary or other duties

arising under legal principles governing agency relationships.  Capital Provider No. 1 shall not have any duties or obligations in its capacity as administrative and collateral agent except those expressly set forth herein, and its appointment and all rights and duties of it as an agent hereunder shall be ministerial and administrative in nature.  Notwithstanding the appointment of Capital Provider No. 1 as administrative and collateral agent, Capital Provider No. 1 shall have the same rights and powers in its capacity as a Capital Provider hereunder as Capital Provider No. 2, and Capital Provider No. 1 may exercise all such rights and powers as though it were not administrative or collateral agent.  The provisions of this Section 27 are for the benefit of the Capital Providers; no other party shall have any rights as a third party beneficiary of any provision of this Section 27, provided that the Counterparty shall be entitled to rely on any notices, waivers, consents, approvals or instructions provided to it by Capital Provider No. 1 as being on behalf of all the Capital Providers.

(c)     Capital Provider No. 1 may perform any and all of its duties and exercise its rights and powers as administrative and collateral agent hereunder by or through any one or more sub-agents or servicing entities appointed by it.  The exculpatory provisions in the following clause (d) shall apply to any such sub-agent or servicing entity.

(d)     Capital Provider No. 1 shall not be liable for any action taken or not taken by it (i) with the consent or at the request of Capital Provider No. 2, (ii) as Capital Provider No. 1 believed in good faith was necessary under the circumstances or (iii) in the absence of its own gross negligence or willful misconduct.   In its capacity as administrative and collateral agent, Capital Provider No. 1 shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.

## 28.    RULES OF CONSTRUCTION

Unless the context otherwise clearly requires: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (d) the word "shall" shall be construed to have the same meaning and effect as the word "will"; (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein); (f) any reference herein to any Person shall be construed to include such Person's successors and assigns; (g) the phrase "to its knowledge" and phrases of similar import shall be construed to mean the best knowledge, after due inquiry, of any director, officer, manager, member, partner, principal or employee of the entity to which the phrase refers; (h) the words "herein", "hereof" and "hereunder", and words of similar

import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; (i) all references herein to Sections, Annexes, Exhibits and Schedules, as applicable, shall be construed to refer to Sections of, and Annexes, Exhibits and Schedules to, this Agreement, and the same are incorporated herein as part of this Agreement; and (j) the headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

*[Remainder of this page intentionally left blank.]*

DocuSign Envelope ID: E19883FF-3940-4432-AA6A-8BC62680997E

<u>Signature page to Capital Provision Agreement – 1 of 2</u>

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Capital Provision Agreement as of the date first written above.

**Capital Provider No. 1**:

BLAKEMORE INVESTMENTS LLC

By: _____
       Name:
       Title: Authorized Signatory

**Capital Provider No. 2**:

MILWAUKEE INVESTMENTS LP

By: Madison GP Limited,
     Its General Partner
By: _____
       Name:
       Title: Director

{10853723:5 }

Signature page to Capital Provision Agreement – 2 of 2

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Capital Provision Agreement as of the date first written above.

**Counterparty**:

HAMILTON MEAT, L.L.C.

By: _____

Name: Karl Berger

Title: CEO

HARVEST MEAT COMPANY, INC.

By: _____

Name: Karl Berger

Title: CEO

HARVEST SHERWOOD FOOD
DISTRIBUTORS, INC.

By: _____

Name: Karl Berger

Title: CEO

SHERWOOD FOOD DISTRIBUTORS, L.L.C.

By: _____

Name: Karl Berger

Title: CEO

WESTERN BOXED MEAT DISTRIBUTORS,
INC.

By: _____

Name: Karl Berger

Title: CEO

{10853723:5 }

## EXHIBIT A

### Defined Terms

"*Adverse Claim*" means, with respect to any Claim or any interest therein or any Proceeds thereof, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or affecting such Claim or any interest therein or any Proceeds thereof, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Claim or any interest therein or any Proceeds thereof, (iii) any purchase option, call or similar right of a third party with respect to such Claim or any interest therein or any Proceeds thereof and (iv) any other claim that a claimant has an interest in such Claim or any interest therein or any Proceeds thereof or that it is a violation of the rights of the claimant for another person to hold, transfer or deal with such Claim or any interest therein or any Proceeds thereof.

"*Adverse Party*" means, with respect to any Claim, individually and collectively, the Person(s) named as defendants or counterclaim defendants in such Claim, as set forth on Annex II, and any other Person added or joined to such Claim from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened even if such Person is not named or served, and in each case their respective Affiliates and successors.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For this purpose, "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Agreed Settlements*" has the meaning set forth in Section 5.3(a)(x).

"*Anti-Corruption Rules*" has the meaning set forth in Section 15.

"*Beef Claim*" has the meaning set forth on Annex II.

"*Business Day*" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in New York.

"*Capital Amounts*" means the amounts set forth as such in Section 2.1.

"*Capital Providers*", "*Capital Provider No. 1*" and "*Capital Provider No. 2*" have the meanings set forth in the introductory paragraph of this Agreement.

"*Capital Providers' Entitlement*" means all amounts payable to the Capital Providers pursuant to Section 2.2(a).

"*Capital Provider Indemnitee*" has the meaning set forth in Section 9.

"*Challenged Item*" has the meaning set forth in Section 9.

"*Chicken Claim*" has the meaning set forth on Annex II.

"*Claim*" means any of the claims described on Annex II.

"*Claim Costs*" has the meaning set forth in Section 5.3(a).

"*Claim Resolution*" means either full and final settlement of a Claim or the entry of a final, non-appealable and enforceable award or judgment, in either case resolving with prejudice all aspects and elements of such Claim. In circumstances where a final, non-appealable and enforceable award or judgment does not automatically come into being upon the rendering of a dispositive decision, a Claim Resolution shall be deemed to have occurred on the date that is sixty (60) days following such dispositive decision in the absence of any subsequent challenge thereto.

"*Closing Date*" means the date of this Agreement.

"*Confidential Information*" means any non-public, confidential or proprietary information relating to: (i) a Capital Provider and its Affiliates and Representatives, information provided by them about their business and operations or the structures and economic arrangements they use in their business, including the nature, terms and existence of this Agreement and the other Transaction Documents, the existence of any relationship between the Counterparty and a Capital Provider or any of its Affiliates or Representatives, and the discussions and negotiations related thereto; (ii) any Claim, including the names of the parties and potential other parties to such Claim; the factual, legal, technical, economic and financial background of such Claim; and the procedural status, theories, strategies and tactics for the prosecution or defense of such Claim; (iii) billing arrangements, rates, financial or fee arrangements; (iv) any financial statements, accounts or other similar information or materials; (v) business or financial information, business plans and relationships, marketing or product data; (vi) algorithms, computer databases, computer programs, computer software and systems, intellectual property, trade secrets and trademarks; (vii) research, scientific data, specifications, technical data, techniques and technology; and (viii) other proprietary or non-public, information, data or material; in all cases regardless of whether such information is (A) written or oral, irrespective of the form or storage medium, or (B) specifically identified as "Confidential". Notwithstanding the foregoing, Confidential Information does not include information that (x) was or becomes generally available to the public other than as a result of a disclosure by the Recipient; (y) was available to the Recipient on a non-confidential basis prior to its disclosure; or (z) was developed independent of the information derived from the Confidential Information.

"*Conservatory Measures*" has the meaning set forth in Section 26.

"*Counsel Entitlement*" means any and all amounts due and payable to the Nominated Lawyers pursuant to their Engagement Agreements.

"*Counterparty*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Counterparty Successor*" has the meaning set forth in Section 10.5.

 "*Default Rate*" means a rate per calendar month of 1.5%, compounded monthly, or the maximum rate permitted by law, whichever is lower.

"*Disclose*" has the meaning set forth in Section 7.2(a).

"*Disclosure Request*" has the meaning set forth in Section 7.4(a).

"*Disclosing Party*" has the meaning set forth in Section 7.1.

"*Engagement Agreement*" means any engagement, retainer or similar agreement between the Counterparty and the Nominated Lawyers (including any successor or new Nominated Lawyers designated in accordance with Section 5.3(d)) governing or purporting to govern the terms of the representation of the Counterparty by such legal counsel with respect to a Claim, in each case as set forth on Annex II and as provided to the Capital Providers.  In the case of any Engagement Agreements amended or entered into after the date hereof, Annex II shall be deemed amended to include such agreements upon the Capital Providers' approval under Section 5.3(c), respectively, of the relevant amendments in accordance with Section 5.3(c) or of the retention of the successor or new counsel in accordance with Section 5.3(d).

"*Governmental Authority*" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Invested Amount*" means (i) the sum of all amounts actually paid to the Counterparty by the Capital Providers hereunder plus (ii) Transaction Costs withheld.

"*LCIA*" has the meaning set forth in Section 26.

"*Material Adverse Effect*" means, with respect to any event or circumstance and either party, one or more of (i) the material impairment of its ability to perform any of its obligations under this Agreement or any other Transaction Document and (ii) the material impairment of the rights or remedies available under this Agreement or any other Transaction Document to the other party and (iii) solely in the case of the Counterparty, an adverse effect on any Claim or the value or collectability thereof. For the avoidance of doubt, the Agreed Settlements shall not deem to be a Material Adverse Effect.

DocuSign Envelope ID: E19983FF-384D-4432-AA6A-8BC62680997E

"*Nominated Lawyers*" means, with respect to any Claim, the Person or Persons identified as such on Annex II and/or any successor or new legal counsel appointed as described herein.

"*Payment Agent*" means, with respect to any Claim, the Nominated Lawyers, provided they have agreed to act in such capacity and have accepted irrevocable instructions from the Counterparty to remit the Capital Providers' Entitlement to the Capital Providers (or to deposit Proceeds with the LCIA, if applicable pursuant to Section 26, and not otherwise divert Proceeds). In the event the Nominated Lawyers are at any time unwilling to serve as Payment Agent, or the Capital Providers determine that the Nominated Lawyers shall be replaced as per Section 3.2(c), the Counterparty shall promptly appoint, at its sole expense (and without any indemnity from or other recourse to the Capital Providers), an escrow agent satisfactory to the Capital Providers to act as Payment Agent. The Payment Agent as of the date hereof with respect to each Claim is identified as such on Annex II.

"*Permitted Lien*" means any of the following: (i) a lien or other rights in favor of the Nominated Lawyers securing or otherwise entitling Nominated Lawyers to the Counsel Entitlement or (ii) an all-assets lien pursuant to any bank loan agreement or similar credit facility of the Counterparty.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership or other entity or Governmental Authority.

"*Pork Claim*" has the meaning set forth on Annex II.

"*Potential Remedy Event*" means any event which, with the giving of notice or the lapse of time or both, would constitute a "Remedy Event".

"*Preferred Return*" has the meaning set forth in Section 2.2(a).

"*Privileges*" has the meaning set forth in the definition of "Protected Material".

"*Proceeds*" means, collectively: (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value recovered by or on behalf of (or reduced to a debt owed to) the Counterparty on account or as a result or by virtue (directly or indirectly) of a Claim, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, or otherwise; and includes all of the Counterparty's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise and whether arising in connection with a direct action or a class action; (ii) any consequential, rescissionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, and attorneys' fees and other fees and costs awarded or recovered on account thereof; (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of a Claim; (iv) without limiting any of the foregoing, any value conveyed to any Person in connection with a Claim or the resolution or termination thereof;

and (v) the amount of any reduction in the amount of any award by reason of a set-off for any reason, including counterclaims and third party claims, or as a result of a costs order against the Counterparty or as result of any other quantifiable order; and (vi) solely in the event the Counterparty fails to comply with Section 5.3(a)(xii) or Section 5.3(e), then the proceeds from the applicable class settlement, <u>provided that</u> Proceeds shall not include (i) portions of any recoveries due to the Nominated Lawyers as attorneys' fees or for reimbursement of litigation expenses under the Engagement Agreement or (ii) the prior payment resulting from a settlement with Amick Farms in the Chicken Claim, received by the Counterparty and as disclosed to the Capital Providers under Section 6.2(f). All of the foregoing constitute Proceeds in any form, including cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, prospective price reductions, volume purchase commitments, exclusive dealing arrangements and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments.

"***Protected Material***" means any Confidential Information that is the work product of qualified legal advisers and/or attorney work product, protected by the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege and/or litigation or arbitral privilege, or that is protected by any rules of professional secrecy in any jurisdiction (collectively, "***Privileges***"), including: (i) information prepared by a party to a Claim or any of its Affiliates or their counsel, advisors, consultants or agents; or (ii) information prepared by a Capital Provider or any of its Representatives in connection with the review of a Claim, including legal and factual memoranda, case analyses and evaluations.

"***Quarterly Report***" has the meaning set forth in Section 5.3(a).

"***Recipient***" has the meaning set forth in Section 7.1.

"***Remedy Event***" has the meaning set forth in Section 10.

"***Representation Date***" means (i) the date hereof, (ii) each date on which the parties hereto agree to cause any Claim to become subject to this Agreement, and (iii) each date on which the Capital Providers are obligated to or do make any payment of Capital Amounts and (iv) in the case of the Counterparty, each date on which a Quarterly Report is delivered (provided that, in the event of a failure to deliver any Quarterly Report by its due date, the Representation Date shall instead be such due date); <u>provided</u> that, for the avoidance of doubt, even though an agreement or payment referred to in clause (ii) or (iii) above relates to a specific Claim, a "Representation Date" shall be deemed to occur with respect to each Claim that is then subject to this Agreement.

"***Representatives***" means, with respect to any person or entity, as applicable, its Affiliates and its and their directors, officers, managers, members, partners, principals, employees, shareholders and participants (or potential shareholders and participants), related entities,

agents, assignees (or potential assignees), reinsurers, lawyers, accountants, consultants, advisors, auditors and independent contractors.

"***Rules***" has the meaning set forth in Section 26.

"***Tax***" means any tax, duty, contribution, impost, withholding, levy or other charge or withholding of a similar nature (including use, sales and value added taxes), whether domestic or foreign, and any fine, penalty, surcharge or interest in connection therewith.

"***Third Party CI Holder***" has the meaning set forth in Section 7.4(d).

"***Transaction Documents***" means, collectively, this Agreement, the Irrevocable Instructions to the Nominated Lawyers and any other agreements, documents, instruments or certificates entered into or delivered in connection with this Agreement.

"***Tribunal***" has the meaning set forth in Section 26.

DocuSign Envelope ID: E19983FF-3940-4432-AA6A-8BC62680997E

**EXHIBIT B**

**Form of Quarterly Report**

| Item: | Response: |
|---|---|
| 1. Description of the status of each Claim and any meaningful developments during the preceding calendar quarter, including copies of any pleadings, court filings or similar documents. | |
| 2. The accrued expenses of the Nominated Lawyers attributable to the Counterparty and any Claim-related fees and expenses paid by the Counterparty to any other Person for the preceding calendar quarter. | |
| 3. Any noncompliance by the Counterparty with its obligations to the Nominated Lawyers under any Engagement Agreement. | |

# ANNEX I

**Counterparty: HAMILTON MEAT, L.L.C.**

| 1. | Type of Entity: | Limited liability company |
|---|---|---|
| 2. | Jurisdiction of Organization or Formation: | California |

**Counterparty: HARVEST MEAT COMPANY, INC.**

| 3. | Type of Entity: | Corporation |
|---|---|---|
| 4. | Jurisdiction of Organization or Formation: | Delaware |

**Counterparty: HARVEST SHERWOOD FOOD DISTRIBUTORS, INC.**

| 5. | Type of Entity: | Corporation |
|---|---|---|
| 6. | Jurisdiction of Organization or Formation: | Delaware |

**Counterparty: SHERWOOD FOOD DISTRIBUTORS, L.L.C.**

| 7. | Type of Entity: | Limited liability company |
|---|---|---|
| 8. | Jurisdiction of Organization or Formation: | Michigan |

**Counterparty: WESTERN BOXED MEAT DISTRIBUTORS, INC.**

| 9. | Type of Entity: | Corporation |
|---|---|---|
| 10. | Jurisdiction of Organization or Formation: | Oregon |

DocuSign Envelope ID: E19883FF-3B4D-4432-AA6A-8BC62680997E

**Each Counterparty**

| 11. Notice Information: | Harvest Sherwood Food Distributors, Inc.<br><br>Address:<br>12499 Evergreen Rd.<br>Detroit, MI 48228<br><br>Attention:  General Counsel<br>Email: legal@harvestsherwood.com<br><br>with a copy to<br><br>sgangel@harvestsherwood.com |
|---|---|
| 12. Notice Information for<br>    Nominated Lawyers: | Address:<br>Cadwalader, Wickersham & Taft, LLP<br>200 Liberty Street<br>New York, NY 10281<br><br>Attention: Philip Iovieno<br>Email: Philip.Iovieno@cwt.com |

**Capital Provider No. 1: Blakemore Investments LLC**

| 1.  Type of Entity: | Limited liability company |
|---|---|
| 2.  Jurisdiction of Organization or<br>     Formation: | State of Delaware |
| 3.  Notice Information: | Blakemore Investments LLC<br>251 Little Falls Drive<br>Wilmington, DE 19808<br>Email Address: info@litfinsolutions.com<br>Attn: Manager |

**Capital Provider No. 2: Milwaukee Investments LP**

| 4. Type of Entity: | Limited partnership |
|---|---|
| 5. Jurisdiction of Organization or Formation: | Cayman |
| 6. Notice Information: | Milwaukee Investments LP<br>89 Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9009<br>Cayman Islands<br>Email Address: info@litfinsolutions.com<br>Attn: General Partner |

**ANNEX II**

| 1. Description of the Claims: | A portfolio of the following litigation claims: |
|---|---|
| | • the Counterparty's pork opt-out direct action filed in *Sherwood Food Distributors, LLC, et. al. v. Agri Stats, Inc., et al*, Case No. 21-cv-06329 (E.D.N.Y.) and *In re Pork Antitrust Litigation*, Case. No. 18-cv-01776 (D. Minn.) (the "***Pork Claim***"); |
| | • the Counterparty's beef opt-out direct action to be filed in *In re Cattle and Beef Antitrust Litigation*, Case No. 0:22-md-03031 (D. Minn.) (the "***Beef Claim***"); and |
| | • the Counterparty's broiler chicken opt-out direct action filed in *Sherwood Food Distributors, LLC et al v. Tyson Foods, Inc.*, Case No. 19-cv-00354 (N.D. Ill.) and *In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-08637 (N.D. Ill.), excluding claims against Amick Farms (the "***Chicken Claim***"); and |
| | any other action(s) filed by the Counterparty (or in which the Counterparty is a class member) arising out of or related to the aforementioned claims. |
| | The Claims also include any variations or expansions of the above claims by the addition of any claims and/or parties from time to time, as well as the following: |
| | (i) any and all related pre- and post-trial proceedings or processes (or pre- and post-hearing proceedings or processes, where applicable) in or in connection with such claims, including the pursuit of costs or post-judgment or post-arbitral award remedies; |
| | (ii) all proceedings seeking to appeal, challenge, confirm, enforce, modify, correct, vacate or annul a judgment or award arising out of or related to the acts or occurrences alleged in such claims, as well as proceedings on remand or retrial or rehearing; |
| | (iii) all ancillary, parallel or alternative dispute resolution proceedings and processes arising out |

DocuSign Envelope ID: E19883FF-284D-4432-AA6A-8BC62689997E

| | | |
|---|---|---|
| | | of or related to the acts or occurrences alleged in such claims (including conciliation or mediation or court filings seeking discovery for or filed in aid of a contemplated or pending arbitration); |
| | (iv) | re-filings or parallel filings of such claim(s), and any other legal, diplomatic or administrative proceedings or processes founded on the same or related underlying facts giving rise to or forming a basis for such claims; |
| | (v) | ancillary or enforcement proceedings related to the facts or claims alleged from time to time or that could have been alleged in such claims at any time; |
| | (vi) | all arrangements, settlements, negotiations, or compromises made between the Counterparty and any adverse party having the effect of resolving any of the Counterparty's claims against any adverse party that are or could be or could have been brought in such claims; and |
| | (vii) | all rights of the Counterparty to collect any damages or awards or otherwise exercise remedies in connection with any of the foregoing. |
| 2. | Payment account of the Counterparty: | To be provided in writing. |
| 3. | Payment accounts of each of Capital Provider Nos. 1 and 2: | To be provided in writing. |
| 4. | Identity of the Adverse Party: | **Pork Claim**: Agri Stats, Inc.; Clemens Food Group, LLC; The Clemens Family Corporation; Hormel Foods Corporation; Hormel Foods, LLC; JBS USA Food Company; Seaboard Foods LLC; Smithfield Foods, Inc.; Triumph Foods, LLC; Tyson Foods, Inc.; Tyson Prepared Foods, Inc.; and Tyson Fresh Meats, Inc. |
| | | **Beef Claim**: Cargill, Inc; Cargill Meat Solutions Corporation; JBS Packerland, Inc.; J.B.S. S.A.; JBS S.A.; JBS USA Food Company; JBS USA Food Company Holdings; Mafrig |

| | | |
|---|---|---|
| | | Global Foods, S.A.; National Beef Packing Company; Swift Beef Company; Tyson Foods, Inc.; and Tyson Fresh Meats, Inc.<br><br>**Chicken Claim**:<br>Tyson Foods, Inc.; Tyson Chicken, Inc.; Tyson Breeders, Inc.; Tyson Poultry, Inc.; Pilgrim's Pride Corporation; Koch Foods, Inc.; JCG Foods of Alabama, LLC; JCG Foods of George, LLC; Koch Meat Co., Inc.; Sanderson Farms, Inc.; Sanderson Farms, Inc. (Food Division); Sanderson Farms, Inc. (Production Division); Sanderson Farms, Inc. (Processing Division); House of Raeford Farms, Inc.; Mar-Jac Poultry, Inc.; Mar-Jac Poultry MS, LLC; Mar-Jac Poultry AL, LLC; Mar-Jac AL/MS, Inc.; Mar-Jac Poultry, LLC; Mar-Jac Holdings, Inc.; Perdue Farms, Inc; Perdue Foods, LLC; Wayne Farms, LLC; Fieldale Farms Corp.; George's Inc.; George's Farms, Inc.<br>Simmons Foods, Inc.; Simmons Prepared Foods, Inc.; O.K. Foods, Inc.; O.K. Farms, Inc.; O.K. Industries, Inc.; Peco Foods, Inc.; Harrison Poultry, Inc.; Foster Farms, LLC; Foster Poultry Farms; Norman W. Fries, Inc. d/b/a Claxton Poultry Farms, Inc.; Mountaire Farms, Inc.; Mountaire Farms, LLC; Mountaire Farms of Delaware, Inc.; and Agri-Stats, Inc. |
| 5. | Identity of the Nominated Lawyers: | **Pork Claim**:<br>Cadwalader, Wickersham & Taft LLP<br><br>**Beef Claim**:<br>Cadwalader, Wickersham & Taft LLP<br><br>**Chicken Claim**:<br>Cadwalader, Wickersham & Taft LLP |
| 6. | Payment Agent: | **Pork Claim**:<br>Cadwalader, Wickersham & Taft LLP<br><br>**Beef Claim**:<br>Cadwalader, Wickersham & Taft LLP<br><br>**Chicken Claim**:<br>Cadwalader, Wickersham & Taft LLP |

| 7. Engagement Agreement(s): | **Pork Claim**:<br>Engagement Agreement dated July 14, 2021<br><br>**Beef Claim**:<br>Engagement Agreement dated July 14, 2021<br><br>**Chicken Claim**:<br>Engagement Agreement dated January 18, 2021 |
|---|---|