

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 13, 2025**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANNKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | Chapter 11 |
| HARVEST SHERWOOD FOOD | § | |
| DISTRIBUTORS, INC., *et al.* | § | Case No. 25-80109 (SGJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

_____

| | | |
|---|---|---|
| BLAKEMORE INVESTMENTS LLC, | § | |
| MILWAUKEE INVESTMENTS LP, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adv. Pro. No. 25-08008-sgj |
| | § | |
| HAMILTON MEAT, LLC, HARVEST MEAT | § | |
| COMPANY, INC., HARVEST SHERWOOD | § | |
| FOOD DISTRIBUTORS, INC., SHERWOOD FOOD | § | |
| DISTRIBUTORS, L.L.C., WESTERN BOXED MEAT | § | |
| DISTRIBUTORS, INC., DEL MAR HOLDING, LLC, | § | |
| DEL MAR ACQUISITION INC., SURFLINER | § | |
| HOLDINGS, INC., LAMCP CAPITAL, LLC, | § | |
| CASCADE FOOD BROKERS, INC., SFD | § | |
| ACQUISITION LLC, SFD TRANSPORTATION | § | |
| CORP., SFD COMPANY LLC, and JPMORGAN | § | |
| CHASE BANK, N.A., as AGENT. | § | |
| | § | |
| Defendants. | § | |

**1**

## MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO DISMISS LITIGATION FUNDER'S DECLARATORY JUDGMENT ACTION

## I.    INTRODUCTION

The above-referenced adversary proceeding was filed by ***a litigation funder.*** The litigation funder, prepetition, provided $35 million of funds to certain of the Debtors.[1] The litigation funder seeks a declaratory judgment regarding the validity, priority, and extent of interests that it and certain other parties may have in the proceeds of certain antitrust litigation being pursued by the chapter 11 debtors, as plaintiffs.[2] *See* Fed. R. Bankr. P. 7001(2), (9). The Antitrust Claims (herein so called) are prepetition in nature. The proceeds of the Antitrust Claims ("Antitrust Claims Proceeds") are postpetition in nature. The parties in this adversary proceeding (the "Declaratory Judgment Action") are set forth below.

Plaintiffs/Litigation Funder. The plaintiffs in this Declaratory Judgment Action are litigation funders known as Blakemore Investments LLC and Milwaukee Investments LP (collectively referred to herein as "Burford" or "Plaintiffs").[3]

Defendants/Debtors. The Defendants include the 13 Debtors that filed Chapter 11 bankruptcy cases on May 5, 2025, and whose cases are administratively consolidated ("Debtors" or "Harvest"). Prior to filing bankruptcy, the Debtors were the largest independent wholesale food distributor in the United States with approximately $4 billion of annual revenue. They shipped

---

[1] The Debtors in these chapter 11 cases are: Del Mar Holding LLC, Del Mar Acquisition Inc., Surfliner Holdings, Inc., Harvest Sherwood Food Distributors, Inc., Harvest Meat Company, Inc., LAMCP Capital, LLC, Western Boxed Meats Distributors, Inc. ("Western Boxed"), Cascade Food Brokers, Inc., Hamilton Meat, LLC ("Hamilton"), SFD Acquisition LLC, SFD Transportation Corp., Sherwood Food Distributors, L.L.C., and SFD Company LLC.

[2] The plaintiffs filed their complaint initiating this adversary proceeding on July 10, 2025. Adversary Complaint [Dkt. No. 1] (hereinafter the "Complaint").

[3] Blakemore Investments LLC ("Blakemore") is a Delaware limited liability company ("LLC") that is party to the Capital Provision Agreement further discussed below. Milwaukee Investments LP ("Milwaukee") is a Cayman limited partnership that also is party to the Capital Provision Agreement. Blakemore and Milwaukee are affiliated companies under common control with Burford Capital LLC, a Delaware LLC that is, indirectly, wholly owned by Burford Capital Limited, a publicly held corporation registered in Guernsey. The Plaintiffs and certain of their affiliates represent that they are engaged in a capital provision and advisory business principally focused on assets connected to litigation, arbitration or mediation.

over 32 million pounds of food per week to protein and perishable food producers, independent food retailers, regional and national retail chains, cruise lines, and food service customers throughout the United States. Prepetition, Burford entered into a "Capital Provision Agreement" ("CPA") dated December 21, 2022, with five of the Debtors. The CPA set forth terms for providing litigation funding to those five Debtors who were pursuing the Antitrust Claims.[4]

The Defendant/Lender. Also included as a Defendant in this Declaratory Judgment Action is JPMorgan Chase Bank, N.A. ("JPM"), as agent for the Debtors' secured lenders ("Lenders"). JPM and the Lenders were the providers of asset-based lending to the Debtors both prepetition ("Prepetition Credit Agreement") and postpetition ("Postpetition Credit Agreement"). Specifically, on June 17, 2022, certain of the Debtors entered into that certain Prepetition Credit Agreement, which initially provided for up to a $350 million revolving credit facility. The Prepetition Credit Agreement was amended, restated, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 1 to Credit Agreement, dated as of October 10, 2024 (the "First Amendment"), and that certain Amendment No. 2 to Credit Agreement, dated as of March 18, 2025 (the "Second Amendment").[5] The Prepetition Credit Agreement was originally secured (pursuant to a security agreement and UCC filings) by liens on substantially all of the Debtors' personal property and other assets (including after-acquired property), but not by commercial torts. Under the Prepetition Credit Agreement with the Lenders, the Debtors were prevented from incurring "Indebtedness," with certain specified exceptions.[6] Later, when the Debtors began facing financial distress, the Lenders demanded an increase in the collateral securing their loans, as permitted pursuant to their Section 4.4 of their Security Agreement, and the Antitrust Claims

---

[4] The CPA was filed at Dkt. No. 21-1 in this Declaratory Judgment Action.
[5] The Prepetition Credit Agreement and Amendments were filed at Dkt. No. 21-2 in this Declaratory Judgment Action.
[6] *Id.* at Section 6.01.

became part of their perfected collateral package. First, the two Debtors known as Sherwood and Harvest granted a lien in their Antitrust Claims in favor of JPM, as Agent, pursuant to the First Amendment on October 10, 2024. Later, the Debtors known as Western Boxed and Hamilton granted a lien in their Antitrust Claims in favor of JPM, as Agent, pursuant to the Second Amendment on March 18, 2025. To be clear, originally, commercial tort claims were not part of the collateral package of JPM and the Lenders. However, with amendments in 2024 and 2025, it is undisputed that the Lenders demanded an increase in the collateral securing their loans, as permitted pursuant to their Section 4.4 of their Security Agreement, and the Antitrust Claims became part of their perfected collateral package. It is undisputed that the Antitrust Claims were listed on schedules to the First Amendment and Second Amendment and were the subject of UCC financing statements.[7] Finally, postpetition, the Court approved $105 million of senior secured superpriority debtor-in-possession financing, dated as of May 5, 2025 (the "Postpetition Credit Agreement"), among JPM, as Agent, and the Lenders, on the one hand, and the Debtors, on the other hand. Tort claims were part of the collateral for such postpetition lending.

The Intervenor. The Official Committee of Unsecured Creditors ("UCC") appointed in these chapter 11 cases was granted leave by the court to intervene in this Declaratory Judgment Action.

---

[7] The Prepetition Secured Documents, including applicable Uniform Commercial Code filings were attached to the Debtors' motion to dismiss. Dkt. No. 21-2. Schedule 1 to the First Amendment contains descriptions of the Antitrust Claims which, Burford concedes in its Complaint, "[are] sufficient under NYUCC Section 9-108 for [the Debtors] Sherwood and Harvest to grant a lien on to [sic] JPM, as Agent." *See* Complaint, ¶ 68. Schedule 1 to the Second Amendment contains descriptions of the Antitrust Claims which appear to be sufficient under NYUCC Section 9-108 for the **additional Debtors Western Boxed and Hamilton** to have also granted a lien to JPM, as Agent. However, Burford does not concede anything as to the Debtors Western Boxed and Hamilton, since the Second Amendment was effectuated during the 90-day preference period. The court interprets this to mean that they are reserving their rights to take the position that the Second Amendment may have given rise to a preference to JPM and the Lenders (if meritorious, this would be a cause of action that would belong to the bankruptcy estate).

## II.    WHAT ARE THE ANTITRUST CLAIMS?

The Debtors, as plaintiffs, hold claims in various antitrust and price-fixing lawsuits against several pork, chicken, and beef producers. In total, the Debtors have asserted over $1.1 billion in damages (excluding treble damages) in these lawsuits.

Chicken Claims. On January 17, 2019, certain of the Debtors commenced an action entitled *Sherwood Food Distributors, L.L.C., et al. v. Tyson Foods, Inc.*, 19 Civ. 00354, in the United States District Court for the Northern District of Illinois against various chicken producers, alleging that the producers agreed to, and did, restrain trade and impose supra-competitive chicken prices from at least 2008 through at least 2016. The case was reassigned as a case related to *In re Broiler Chicken Antitrust Litig.*, 16 Civ. 08637, pending in the same district. These Antitrust Claims ("Chicken Claims") remain pending.

Pork Claims. On November 15, 2021, certain Debtors commenced an action, entitled *Sherwood Food Distributors, L.L.C., et al. v. Agri Stats, Inc.*, 21 Civ. 06329-PKC, in the United States District Court for the Eastern District of New York against various pork producers, alleging that they entered into an ongoing conspiracy from around 2008 or early 2009 to fix the price of pork. By transfer order entered on December 7, 2021, this action was transferred to the United States District Court for the District of Minnesota to be centralized with other cases in *In re Pork Antitrust Litig.*, 21 MD 02998-JRT, and was then consolidated for pre-trial purposes with a series of earlier filed, similar pork price-fixing cases under the lead caption, *In re Pork Antitrust Litig.*, 18 Civ. 01776-JRT. These price-fixing claims, as amended (the "Pork Claims"), remain pending, although the Debtors recently reached, and this Court approved, a $13,322,083 settlement with one of the Pork Claims.[8]

---

[8] *See* Dkt. No. 192, 409 in the Primary Bankruptcy Case. The Primary Bankruptcy Case may be found at *In re Harvest Sherwood Food Distributors, Inc.*, No. 25-80109, (Bankr. N.D. Tex. July 15, 2025).

The Beef Claims. On March 7, 2023, certain of the Debtors commenced an action, entitled *Sherwood Food Distributors, L.L.C., et al. v. Cargill, Inc.*, 23 Civ. 01749-BMC, in the United States District Court for the Eastern District of New York against various meat processing and packing companies, alleging that they conspired to limit supply and fix prices of beef from at least January 1, 2015 through the filing of the complaint. The case was transferred to the United States District Court for the District of Minnesota and centralized in MDL No. 3031. These beef antitrust claims remain pending.

## III.    HOW DOES THE LITIGATION FUNDER BURFORD FIT INTO THIS?

As noted above, on or about December 21, 2022, Burford and the five Debtors that were pursuing the Antitrust Litigation Claims entered into the CPA, wherein Burford agreed to provide to the Debtors on a "non-recourse basis," a total of $35 million in funds, no later than December 31, 2022. For purposes of the timeline, this was ***after*** the JPM/Lenders' Prepetition Credit Agreement was executed, but ***before*** amendments that later specifically added tort claims to their collateral package. In any event, what was the exact nature of this relationship? This Court is well aware that litigation funding agreements come in a variety of shapes and sizes. Was the CPA a loan? If so, was a security interest granted to Burford in the Antitrust Claims or Antitrust Claims Proceeds? Was it an equity investment by Burford? Was it an acquisition or assignment of the Antitrust Claims, or a portion of the claims, or of after-acquired proceeds thereof? Was it a sharing of contingency fees of a law firm? Burford answers "no" to all of this. But what are the other options? There is, obviously, no chance it was a gift.

Well, Burford calls the CPA a subordination agreement—although (a) that is not the title of the agreement, (b) the word subordination is not used in the CPA, (c) no creditor signed the document to effectuate a subordination of its rights, and (d) the document was not recorded in any public

record. Burford states further that the CPA is "a payment subordination to the Debtors in favor of" Burford and it is also "a grant of an interest in proceeds, and it's also a grant of an equitable lien on the proceeds, a beneficial interest in the proceeds, such that when the proceeds come in, if they don't go to the Payment Agent and aren't paid in accordance with this, they are subject to an express trust and a constructive trust."[9] We turn now to the terms of the CPA.

For starters, the various "Whereas" clauses at the beginning of the CPA state that the Debtors decided to pursue one or more of its legal claims "without any influence from" Burford (1st Whereas); that Burford may have received confidential materials from the Debtors that was subject to "work product doctrine and other existing law protecting such materials from disclosure" (3rd Whereas); that Burford was a "passive producer of external capital" and had "not become owners of, partners in or parties to the Claims or any part thereof or acquired any rights to their control or resolution" (5th Whereas). The CPA goes on to provide that Burford "shall provide capital to" the Debtors in the amount of $35 million within three business days (retaining $50,000 as an upfront transaction cost), and that Burford's "Entitlement" in consideration for this was: (a) a first dollar return of an amount equal to the "Invested Amount" (which would be $35 million), plus (b) a "Preferred Return" equal to 1.0x the "Invested Amount" (which would be another $35 million), plus (c) a 10% rate of return on any unpaid portion of the "Invested Amount" and of the "Preferred Return," beginning on the three year anniversary of the closing date of the CPA (thus, potentially 10% accruing on $70 million, if there were to be no receipt of any funds to Burford by year three). *See* CPA § 2.2. A "Waterfall" in the same section of the CPA states that future litigation proceeds shall be distributed as follows to cover the $70 million-plus "Entitlement": (i) first to Burford until repayment of the "Investment Amount" (i.e., Burford would get the first $35 million); and (ii)

---

[9] Hr'g Tr. 79:8-16 [Dkt. No. 402], Primary Bankruptcy Case.

second, Burford and the Debtors would share a 50-50 split of all future litigation proceeds coming

in above that first $35 million until Burford received the full "Entitlement" (i.e., until receiving

the full $70 million plus 10% accrual). The CPA had a provision requiring the Debtors to direct

payment of any future litigation proceeds to a "Payment Agent" and, if Debtors instead received

them, Debtors should hold them in trust, segregate them, and forthwith deliver them to the Payment

Agent. *See* CPA § 3.2(a)–(b). The CPA has certain covenants requiring Debtors to keep Burford

informed of the status of its litigation such as through quarterly reports; to respond promptly to

information requests of Burford; and to provide immediate notice by email to Burford of any

settlement offer made to Debtors and "an opportunity to discuss such settlement offer prior to

accepting or rejecting it." *See* CPA § 5.3(a)(iii)–(v). The Debtors agreed that they would not

"dispose of, transfer, encumber or assign" its litigation claims other than with a "Permitted Lien"

(with a "Permitted Lien" defined as, among others, "an all-assets lien pursuant to a bank loan

agreement or similar credit facility of the" Debtors.) *See* CPA § 5.3(a)(viii) and Exhibit A. Section

24 of the CPA states, among other things, that Burford and its affiliates are "engaged in capital

provision and advisory business principally focused on assets connected to litigation, arbitration

or mediation," and that nothing in the CPA "shall give rise to or be construed to create a fiduciary,

lawyer-client, lender-borrower, agency or other non-contractual relationship" between Debtors and

Burford. The CPA is governed by New York law.[10] *See* CPA § 25. On April 5, 2025, just a few

weeks before the Debtors' bankruptcy case was filed, Burford sent a Notice of Remedy Event to

---

[10] Note that Texas courts "permit choice-of-law agreements and the default position is that they are enforceable."
*Cardoni v. Prosperity Bank,* 805 F.3d 573, 581 (5th Cir. 2015).

the Debtors and their counsel asserting that Burford had taken full control of the Antitrust Litigation Assets for its own benefit.[11]

The Debtors, JPM, and the UCC each filed Rule 12(b)(6) motions to dismiss this Declaratory Judgment Action for Burford's alleged failure to state a claim upon which relief can be granted.[12] After considering the motions, briefs, and argument of counsel at a hearing held on September 9, 2025, the Court orally granted these motions to dismiss. This Memorandum Opinion and Order memorializes that oral ruling.

## IV.    PROCEDURAL HISTORY

### A.  The Specific Causes of Action in the Complaint

Burford asserted four causes of action in this Declaratory Judgment Action:

- *First Cause of Action*: Declaratory judgement against all Defendants that Burford has a valid, first priority interest in the Antitrust Claims Proceeds in accordance with the terms of the CPA—a CPA that was entered into, again, in December 2022 (after the Prepetition Credit Agreement, but before the First and Second Amendments thereto, pursuant to which JPM, as Agent, was given a security interest in the Antitrust Claims);

- *Second Cause of Action*: Enforcement, against all Defendants, of an alleged subordination agreement arising under the terms of the CPA pursuant to Bankruptcy Code § 510 and Bankruptcy Rule 7001(b), subordinating the interests of the Defendants in and to the Antitrust Claims Proceeds to the interest of Burford in and to the Antitrust Claims Proceeds;

- *Third Cause of Action*: Preliminary and permanent injunction against the Debtors, enjoining them "from continuing to take actions to eradicate, impair and/or undermine [Burford's] rights under the [CPA]"; and,

- *Fourth Cause of Action*: Asserted in the alternative and as to JPM only, Declaratory Judgment that, in the event that JPM is granted a first-priority lien on the Antirust Claims Proceeds, such lien should be to the extent of no more than the amount of any postpetition credit extended under the Postpetition Credit Agreement.

---

[11] *See* Ex. J [Dkt. No. 21-10]. The Debtors denied that any such remedy event occurred and that Burford was entitled to take any action regarding the Antitrust Litigation Assets. Decl. Erik Kaup [Dkt. No. 14], ¶ 50, in Primary Bankruptcy Case.

[12] JPM also joined in the Debtors' motion to dismiss [Dkt. No. 22], and the UCC also joined in both the Debtors' and JPM's motions to dismiss [Dkt. No. 27].

### B.  The Motions to Dismiss

#### 1.  Debtors' Motion to Dismiss

The Debtors filed their motion to dismiss and brief in support on August 6, 2025, seeking a dismissal with prejudice of the entire adversary proceeding pursuant to Rule 12(b)(6). [Dkt. No. 20–21]. The Debtors argue that the Complaint fails to plausibly state a claim that Burford possesses a "valid, first-priority interest" in the Antitrust Claims Proceeds pursuant to the CPA, even after taking the facts pled in the Complaint as true and viewed in a light most favorable to Burford.[13] The Debtors argue that the Complaint should be dismissed at this stage of the proceedings because (1) "[n]o amount of time to further litigate or issue discovery could change th[e] reality" that (a) Burford holds a mere unsecured claim against the Debtors' estates that is *pari passu* with all of the Debtors' other unsecured creditors; (2) the CPA is not a "subordination agreement"; (3) the CPA did not establish an express trust in favor of Burford; (4) the facts do not warrant equitable relief in the nature of imposition of a constructive trust or recognition of an equitable lien; (5) the CPA did not grant an interest in the Antitrust Claims Proceeds that is senior to the Lenders' pre-petition and postpetition interests; and (6) Burford's counsel has acknowledged that the extent of their interest in the Antitrust Claims Proceeds is a question of law based on the plain text of the CPA. The Debtors specifically noted that they filed their motion to dismiss with the support of the other major constituents in the bankruptcy case—namely JPM and the UCC.

#### 2.  JPM's Motion to Dismiss and Joinder

JPM filed its own motion to dismiss and joinder to the Debtors' motion to dismiss on August 6, 2025. [Dkt. No. 22]. As noted above, it was named as a defendant as to Counts I, II and IV, two

---

[13] The "plausibility" standard applies, for dismissal under Rule 12(b)(6) for failure to state a claim, as set forth in the Supreme Court cases of *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)—often referred to as the *Iqbal/Twombly* plausibility standard.

of which are subject to the same priority analysis that results in the same conclusion reached by the Debtors: Burford has an unsecured claim that is inferior to JPM's perfected security interest in the Antitrust Claims Proceeds. In addition to the Debtors' arguments with respect to Count II—that the CPA did not constitute a subordination agreement at all—JPM also argues that Burford cannot enforce an alleged subordination agreement arising under the terms of the CPA as against JPM or any other party that was not and never has been a party to the CPA. JPM argues that Burford's claims "are all based on a false premise" that Burford somehow has an interest in the Antitrust Claims Proceeds with priority over those of JPM's, which is a secured creditor with a "perfected security interest in the [Antitrust] Claims Proceeds."

   3.   *The UCC's Motion to Dismiss and Joinder*

On August 15, 2025, the UCC filed its own motion to dismiss and a supporting brief in addition to joining in the Debtors' and JPM's motions to dismiss. [Dkt. No. 27–28]. The UCC focused its brief on the following arguments: (1) Burford's allegations that the Antitrust Claims Proceeds are subject to either an express trust or a constructive trust fail to state a cognizable claim because Burford has not alleged (neither can it allege) the existence of an express trust and its constructive trust claim is defective; and (2) the CPA cannot, as a matter of law, be construed to affect the rights of unsecured creditors of the Debtors.

   4.   *Burford's Response in Opposition to Motions to Dismiss*[14]

Burford, naturally, opposes the motions to dismiss and argues that the Debtors, JPM, and UCC seek to deprive Burford of being heard on its claim for a declaratory judgment concerning the validity, priority and extent of Burford's interests in the Antitrust Claims Proceeds, a controversy that has already arisen several times in this bankruptcy case—in connection with the Debtors' post-

---

[14] *See* Burford's Resp. [Dkt. No. 33] (the "Response").

petition DIP financing and a motion to approve a settlement of one of the Pork Claims, and that resolving such controversies that involve core bankruptcy matters "is precisely what Bankruptcy Rule 7001 and the Declaratory Judgment Act exist to facilitate." Burford argues that the Debtors and other movants apply the incorrect standard for dismissal of claims for declaratory relief in applying the *Iqbal/Twombly **plausibility*** standard and that the proper standard in determining whether to dismiss a declaratory judgment action is simply a ***justiciability standard***—"if there is a justiciable controversy involving a matter over which the Court has authority to grant declaratory relief and doing so would not interfere with another forum's jurisdiction, then the Court decides it."[15] In other words, Burford takes the position that, if the court determines that a particular matter constitutes a justiciable case or controversy under Article III of the U.S. Constitution, the court must hear and decide the declaratory judgment action, ***whether the plaintiff states a plausible claim for relief under the Declaratory Judgment Act or not.*** Burford argues that, under the justiciability standard, its Complaint should not be dismissed but also argues that, even if the plausibility standard is applied here, it has stated plausible claims for relief as to the First, Second, and Third Causes of Action. In its Response, Burford fails to respond to or address the motions to dismiss as to its Fourth Cause of Action.

5. *Replies in Support of Motions to Dismiss*

The movants each filed replies to Burford's Response on September 8, 2025.[16] They defend and support the applicability of the plausibility standard in deciding motions to dismiss under Rule 12(b)(6) in the context of an action under the Declaratory Judgment Act. Movants acknowledge

---

[15] Response, ¶ 4. Burford goes on to argue that the Fifth Circuit uses the seven factors identified in *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994) "'to guide a court's exercise of discretion' in deciding whether to dismiss an action under the Declaratory Judgment Act." Response, ¶ 27 (citing *Sherwin Williams Co. v. Holmes Cnty.*, 343 F.3d 383, 390 (5th Cir. 2003)).
[16] *See* Dkt. No. 38–39, 45.

that the *Trejo* factors guide a court's exercise of its **discretion** to not hear a claim for declaratory relief under the Declaratory Judgment Act. *See* note 15, *supra*. But movants argue that discretionary dismissal under *Trejo* is **prudential** (addressing whether a court should self-impose a limit on its jurisdiction and refrain from hearing certain matters for policy reasons or otherwise). The cases in the Fifth Circuit that are cited by Burford that cite *Trejo* do not address the more fundamental question of whether a complaint presents a justiciable controversy under Article III of the U.S. Constitution—a fundamental analysis that federal courts must go through under Rule 12(b)(6) to determine if a Complaint must be dismissed for failure to state a plausible claim for relief. The movants point out that the logical conclusion of Burford's suggestion is that the mere fact that they have filed a complaint seeking a declaratory judgment somehow renders their Complaint immune from dismissal on plausibility grounds. The Court agrees with movants that this cannot be the correct analysis. The Court, after making a determination that it has jurisdiction over this controversy, including that it is a justiciable controversy, must apply the *Iqbal/Twombly* plausibility standard to determine whether Burford's causes of action—whether for declaratory relief, equitable relief, or any other kind of relief—state a plausible claim for relief, and, if not, the claims should be dismissed under Rule 12(b)(6).

## V.    RULING

### A.   *Jurisdiction*

Bankruptcy subject matter jurisdiction exists in this Declaratory Judgment Action pursuant to 28 U.S.C. § 1334(b), and this is a "core" matter under 28 U.S.C. § 157(b)(2)(A), (K), and (O). The parties have consented to this Court's adjudication of this action. The Declaratory Judgment Action presents a justiciable controversy.

### B.  Legal Standard with respect to the Rule 12(b)(6) Motions

"To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[17] To meet this standard, a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully."[18] The Court must accept well-pleaded facts as true and view them in the light most favorable to the plaintiff, however, the Court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions."[19] A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[20]

In ruling on a Rule 12(b)(6) motion, a court may consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'"[21] Second, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'"[22] Third, "[i]n deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record."[23]

---

[17] *Crutchfield v. Match Grp., Inc.,* 529 F. Supp. 3d 570, 587 (N.D. Tex. 2021) (quoting *Twombly,* 550 U.S. at 570).
[18] *Id.* (quoting *Iqbal*, 556 U.S. at 678).
[19] *Id.* (quoting *Ferrer v. Chevron Corp.,* 484 F.3d 776, 780 (5th Cir. 2007)).
[20] *Id.* (quoting *Twombly*, 550 U.S. at 555).
[21] *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).
[22] *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)).
[23] *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also, e.g., Funk v. Stryker Corp.,* 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that "the district court took appropriate judicial notice of publicly-available documents and transcripts produced by the [Food and Drug Administration], which were matters of public record directly relevant to the issue at hand").

Federal courts have broad discretion to refuse requests for declaratory judgment.[24] Specifically, when a contract's interpretation and legal import are unambiguous, courts regularly dismiss declaratory judgment actions that seek implausible interpretations.[25]

Burford's Complaint involves two assertions that go to the heart of the CPA—either (a) as a matter of law, the CPA conveyed an interest to Burford that is senior to JPM/the Lenders, the postpetition Debtors, and all unsecured creditors; or (b) that the extraordinary equitable relief of a trust in favor of Burford is warranted. In order to survive the motions to dismiss, then, Burford must (x) plead that there is a plausible legal interpretation of the CPA that grants such a senior interest or (y) plead facts or circumstances that, if taken as true, could plausibly warrant such extraordinary equitable relief. With respect to Burford's legal interpretation of the CPA, Burford asserts three positions: (a) the CPA is a "grant of an undivided and/or beneficial interest in the [Antitrust Claim Proceeds]," (b) the CPA is an enforceable "subordination agreement," and (c) the CPA establishes an express trust in favor of Burford. *See* Complaint ¶ 100. With respect to Burford's equitable theories, Burford contends that it is entitled to a "constructive trust" or "equitable lien" due to the Debtors' "inequitable misconduct in which the [Debtors] have engaged by actively and deliberately seeking to impair [Burford's] rights" under the Agreement. *Id.* The Complaint fails to sufficiently allege each of these theories.

---

[24] *See Torch, Inc. v. LeBlanc,* 947 F.2d 193, 194 (5th Cir. 1991).

[25] *See Strategy & Execution, Inc. v. Black Rifle Coffee Co., LLC,* No. SA-23-CV-135-FB, 2024 WL 1481433, at *10 (W.D. Tex. Mar. 28, 2024) (dismissing declaratory judgment claim seeking an order of entitlement under agreement where "the Court does not find the [a]greement ambiguous and finds the interpretations offered by [Defendant] reasonable and giving effect to the plain language of the contract."); *Cotton v. Texas Express Pipeline, LLC,* 2017 WL 3709093, at *8, *11 (W.D. Tex. 2017) (dismissing claim for declaratory judgment, and noting "[b]ecause Defendants interpretation is the only reasonable interpretation of the contract, the undersigned recommends that it be found to apply as a matter of law") report and recommendation adopted, No. 6:16-CV-453-RP-JCM, 2018 WL 1419346 (W.D. Tex. 2018); *Sims v. Allstate Fire and Casualty Insurance Company*, 650 F. Supp. 3d 540, 545 (W.D. Tex. 2023) ("Determination whether a term is ambiguous is a legal question.").

15

### C. *The Complaint Fails to State a Plausible Claim that Burford Possesses a Valid, First-Priority Interest in the Antitrust Claims and Antitrust Claims Proceeds*

The Court now returns to its earlier question. What was the exact nature of this relationship? What does it mean to "***provide***" capital? The term "provide" seems a little obtuse in the context of a $35 million transaction. Willfully obtuse?

### *1.  Did the CPA Create a Loan? No.*

Burford is defined in the CPA as "Capital Providers" (conspicuously, not "Lenders" or "Investors"), and the Debtors are defined as "Counterparties" (conspicuously, not "Borrowers"). Still, did Burford, in essence, actually make a loan—and a secured loan at that, at a 110% interest rate? No. The CPA is definitely not called a loan (there might be a problem under usury laws if it was).[26] Additionally, there is no security agreement, nor were any UCC financing statements filed by Burford. Burford does not take the position in this Declaratory Judgment Action that it was a lender. Moreover, Section 24(b) of the CPA states that "Nothing in this Agreement . . . shall give rise to or be construed to create a fiduciary, lawyer-client, ***lender-borrower***, agency or other non-contractual relationship between the Counterparty and any Capital Provider" (emphasis added). The Court also notes that the Prepetition Credit Agreement, which was already in place at the time the CPA was executed, prohibited further "Indebtedness" and "Liens" or "Encumbrances"—with certain exceptions that would not be applicable here. *See* Prepetition Credit Agreement §§ 6.01–02.

### *2.  Did the CPA Memorialize an Acquisition or Assignment of the Antitrust Claims or Antitrust Claims Proceeds (or a Portion Thereof)? No.*

If not a loan, did the CPA constitute an acquisition by or assignment to Burford of the Antitrust Claims, or a portion of the claims or proceeds? The CPA is not worded as such.

---

[26] *See generally* N.Y. Gen. Oblig. Law §§ 5-501 to -531; N.Y. Penal Law § 190.40.

The CPA states that "the Capital Providers are each passive providers of external capital and *have not become owners of*, partners in or parties to the Claims or any part thereof or acquired any rights as to their control or resolution." CPA, p. 1 (emphasis added). Burford further covenanted that "such Capital Provider is not, and shall not by virtue of entering into this Agreement or any other Transaction Document become a party to such Claim." CPA § 5.2. The parties to the CPA further agreed that "[n]either this Agreement nor any Transaction Document creates any partnership, joint venture or any other type of affiliation . . . nor does this Agreement or any other Transaction Document create a joint interest in any Claim for any purpose . . . ." *See* CPA § 24(c). Indeed, if the CPA constituted a sale or assignment, the CPA might be vulnerable to attack under New York champerty laws.[27] Moreover, if the CPA constituted a sale or assignment of the Antitrust Claims Proceeds, that sale or assignment would be cut off by the Debtors' bankruptcy filing under both New York and bankruptcy law.[28]

---

[27] *See generally* N.Y. Jud. Law, § 489.

[28] *See In re Minor*, 482 B.R. 80, 84 (Bankr. W.D.N.Y. 2012) ("First, in order to avoid a violation of [personal injury champerty laws], PSF took not an assignment of any cause of action, but only an assignment of proceeds. Under New York law, such a contract 'will take effect as an equitable assignment.' With respect to litigation proceeds, therefore, PSF acquired only an equitable lien. . . . Outside bankruptcy, PSF might have little reason to fear the existence of a competing legal right . . . . But bankruptcy creates an estate by operation of law. . . . [PSF's] equitable rights are unenforceable as against the superior legal interest of a bankruptcy estate. . . . [A] bankruptcy trustee [supersedes] the interest of a creditor claiming a mere equitable lien.") (citation omitted). Indeed, it is black letter law that an equitable lien is junior to a debtor in possession's interest pursuant to section 544(a)(1) of the Bankruptcy Code. *See also In re Reviss*, 628 B.R. 386, 396 (Bankr. E.D.N.Y. 2021) ("Both state and federal courts confirm this rule. . . . [T]here is no doubt that the assignment of a truly future . . . interest does not [effect] a present transfer of property. It does not because it cannot; no property yet exists."); *In re Andrade,* 2010 WL 5347535, at *2 (Bankr. E.D.N.Y. 2010) ("The assignment of the future proceeds of a lawsuit operates as a future lien which only comes into existence when a judgment is entered. . . . [T]he lien does not relate back to the date of the assignment.") (citations omitted). As some support of its positions in this adversary action, Burford relies on *Septembertide Pub., B.V. v. Stein & Day, Inc.,* 884 F.2d 675 (2d Cir. 1989). In *Septembertide*, a hard-copy book publisher, which had a license with an author of a book, entered into a sublicense with a paperback publisher regarding the author's book and agreed with the author that the author would get two-thirds of any future royalties generated from that sublicensing arrangement. The court ruled that a subsequent security interest given by the hardcopy publisher to a lender, in the contracts and accounts receivable of the hardcopy book publisher, was subject to the two-thirds royalty stream that the hardcopy publisher had agreed to pay the author. *See Septembertide,* 884 F.2d at 675, 681–82. Among other things, the court determined that the author was a third-party beneficiary of the sublicense agreement (not surprising, since it dealt with the author's creative work). The analogy to these facts seems weak—is Burford really analogous to an author whose work is being sublicensed? In any event, by Burford's own admission, there was no assignment of the Antitrust Claims Proceeds. Burford has distanced itself from any such interpretation. Most importantly, the *Septembertide* case did not involve a counterparty who was a postpetition debtor. *Compare In re Reviss*, 628 B.R. at 396 ("[L]ike the assignment of accounts

*3.   What about Fee Sharing? No.*

So, if not a loan, and if not an assignment or acquisition of the Antitrust Claims or Antitrust Claims Proceeds, was the CPA perhaps a sharing of the contingency fees of a law firm? Once again, the CPA is not worded as such. The only reference to a law firm is a defined term "Nominated Lawyers," defined in the CPA as the "Person or Persons identified as such on Annex II and/or any successor or new legal counsel appointed as described herein." *See* CPA Exh. A. Annex I and II of the CPA identified the law firm Cadwalader, Wickersham & Taft LLP as the "Nominated Lawyers" and "Payment Agent," but these lawyers were not parties to the CPA and nowhere in the CPA is there a suggestion that the law firm has agreed to any sort of fee sharing arrangement with Burford. In any event, Burford answers "no" to any suggestion of fee sharing.

**D.   The CPA is Not a Subordination Agreement**

Burford's primary argument is that the CPA is a subordination agreement. Burford argues that the CPA, under section 510(a) of the Bankruptcy Code, is enforceable in bankruptcy. Thus, Burford says, it is entitled to an order subordinating the interest of the Debtors' (and, accordingly, all of its creditors') in the Antitrust Claims Proceeds, in favor of the claimed interest of Burford. *See* Complaint ¶¶ 103–09.

The term "subordination agreement" is not a defined term in the Bankruptcy Code. A subordination agreement has been defined in jurisprudence as follows:

---

receivable where the assignor has no existing contract under which such accounts are to arise, the assignment of a right to receive income contingent upon the occurrence of a future event, does not convey a present interest to the assignee.") (quoting *Don King Prods., Inc. v. Thomas,* 945 F.2d 529, 534 (2d Cir. 1991)), *and In re Andrade,* 2010 WL 5347535 at *2–3 (the assignment of litigation proceeds not yet in existence prepetition resulted in nothing more than a postpetition unsecured claim on the part of the prepetition assignee), *and Dunlap–McCuller v. Riese Org.,* 1995 WL 422141, at *1 (S.D.N.Y. July 18, 1995) (an assignment of "all rights to the proceeds of the lawsuit" operates only as a future lien, which comes into existence only when the judgment is entered), *and MarketXT Holdings Corp.,* 336 B.R. 67, 71 (Bankr. S.D.N.Y. 2006), *with In re Kuranda,* 466 B.R. 39, 47 (Bankr. E.D. Penn. 2012) (here, because the underlying litigation was reduced to a judgment or settlement prepetition, the prepetition assignment of proceeds was deemed to be a "fixed, present interest" by the court that attached postpetition).

> [A] contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor. . . . Unless the specific terms of the contract provide otherwise, the contract's effects run between the subordinated creditor and the senior creditor, i.e., the subordination of the junior creditor's right to payment until after the senior creditor has been paid.[29]

The CPA, of course, is not entitled "Subordination Agreement" nor "Intercreditor Agreement."[30] Further, no creditor signed the document to effectuate a subordination of its rights,[31] and the document was not recorded in any public record.[32] Moreover, the CPA contains a defined term "Permitted Lien" which "means any of the following: (i) a lien or other rights in favor of the Nominated Lawyers securing or otherwise entitling Nominated Lawyers to the Counsel Entitlement (with "Counsel Entitlement" separately defined as "any and all amounts due and payable to the Nominated Layers pursuant to their Engagement Agreements") or (ii) "*an all-assets lien pursuant to any bank loan agreement or similar credit facility of*" the Debtors. *See* CPA Exh.

---

[29] *Matter of Holly's Inc.,* 140 B.R. 643, 668 (Bankr. W.D. Mich 1992) (citations omitted); *see also In re Lehman Bros. Holdings Inc.,* 422 B.R. 407, 421 (Bankr. S.D.N.Y. 2010) ("a subordination agreement is an 'agreement by which one who holds an otherwise senior interest agrees to subordinate that interest to a normally lesser interest.'") (citing BLACK'S LAW DICTIONARY (8th ed. 2004)); *In re Air Safety Int'l, L.C.,* 336 B.R. 843, 857 (S.D. Fla. 2005) ("Case-law defines a subordination agreement as one in which 'a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior.'") (citing *In re Env't. Aspecs, Inc.*, 235 B.R. 378, 396 (Bankr. E.D.N.C. 1999)); *Env't Aspecs*, 235 B.R. at 395 ("A subordination agreement is an agreement by which a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior." (quoting *In re Lantana Motel,* 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990)).

[30] *See HSBC Bank USA v. Branch (In re Bank of New Engl. Corp.)*, 364 F.3d 355, 361 (1st Cir. 2004) ("Subordination agreements are essentially intercreditor arrangements [and] typically provide that one creditor will subordinate its claim against the debtor (the putative bankrupt) in favor of the claim of another creditor [altering] normal priority").

[31] A subordination agreement cannot bind those who did not sign it. *See In re George P. Schinzel & Son, Inc.*, 16 F.2d 289, 290 (S.D.N.Y. 1926) (holding that the agreement between post-petition suppliers and certain unsecured creditors that debtor would pay supplier's claims before signing unsecured creditors did not affect non-signatory creditors; "the supplying creditors were content with the bankrupt's promise that it would take care of them first, a promise good as against others who signed, but bad as against outsiders. Had they intended anything more, they should have secured it by some lien known to the law. The result is that the petitioner here has a priority only as against those creditors who joined in the agreement.").

[32] Interestingly, Burford spent the first 75 days of these chapter 11 cases fighting to keep the CPA under seal. In any event, *see Ulster Savings Bank v. Freytes*, 16 N.Y.S.3d 110, 114 (N.Y. Sup. Ct. 2015) (holding that, where no subordination agreement existed between the creditors, priority was determined by recordation of security interest and the court could not compel a creditor under equitable principles to execute a subordination agreement to alter their priority).

A (emphasis added). Thus, the Debtors were permitted, under the terms of the CPA, to enter into an ABL credit facility, with nothing requiring the subordination of the rights of an ABL lender in such event.

Nevertheless, Burford has represented that the CPA is "a payment subordination to the Debtors in favor of" Burford—suggesting that ***it is the Debtors*** who are subordinating ***their rights*** in the Antitrust Claims and Antitrust Claims Proceeds to the rights of Burford. How could this be—in the face of no public lien, no UCC financing statement, and no other public filing that might put the universe on notice of this? Burford elaborates that the CPA also constitutes "a grant of an interest in proceeds,"[33] and it's also a "grant of an equitable lien on the proceeds, a beneficial interest in the proceeds, such that when the proceeds come in, if they don't go to the Payment Agent and aren't paid in accordance with this, they are subject to an express trust and a constructive trust."[34] Essentially, Burford is arguing that the proceeds sit outside of the bankruptcy estate. Without a doubt, the CPA provides for Burford to receive a "first dollar" return from any Antitrust Claims Proceeds until it has been paid a defined amount. The CPA references a waterfall, payment direction terms, and/or an agreement to split proceeds of the Antitrust Claims as they might materialize in the future. But were these concepts enough to create more than simply a promise or set of promises? Did this create a trust immune from bankruptcy's "property of the estate" and priority rules? This Court concludes no, as set forth below.

### E.  Burford Has Not and Cannot Allege the Existence of an Express Trust

First, it is axiomatic that a trust creates a fiduciary relationship and, as earlier stated, Section 24(b) of the CPA expressly negates such a relationship by stating: "Nothing in this Agreement . . . shall give rise to or be construed to create a ***fiduciary***, lawyer-client, lender-borrower, agency or

---

[33] A grant of an interest in proceeds? Wouldn't that be an assignment—which Burford meanwhile denies?
[34] Hr'g Tr. 79:8-16 [Dkt. No. 402], Primary Bankruptcy Case.

other non-contractual relationship between the Counterparty and any Capital Provider" (emphasis added).

In any event, the CPA is governed by New York law. Under New York law, an express trust requires the following: (a) a designated beneficiary; (b) a designated trustee who is not a beneficiary; (c) an identifiable trust res; and (d) actual delivery or assignment of the trust res with the intent of vesting legal title as trustee.[35] Additionally, there must be a duty to segregate assets.[36] Burford's Complaint does not plead each of these requirements.

First, who is the "designated trustee who is not a beneficiary"? The CPA contemplates that Antitrust Claim Proceeds should be paid, not to the Debtors, but to a designated "Payment Agent" (i.e., certain "Nominated Lawyers," who might be changed by Burford to an independent third-party escrow agent). *See* CPA § 3.2(a)–(c). Here now is the pivotal language that Burford points to: the CPA states that if any Antitrust Claims Proceeds are instead received by a Debtor or a third-party other than the Payment Agent, then the Debtor or that other third-party shall hold such proceeds "in trust" for the benefit of Burford "in the amount to which [Burford] is entitled under" the CPA; segregate such Proceeds; and forthwith deliver them to Burford. *See* CPA § 3.2(b). Burford's Complaint alleges that this establishes "an express trust arrangement in the event Proceeds were to bypass the Payment Agent," with the Debtors as the trustee of the alleged express trust. Complaint ¶ 80 and ¶ 100 (sixth bullet point, p. 31). However, the Debtors do not satisfy the designated trustee requirement, because the Debtors would, in certain scenarios, be entitled to a portion of the Antitrust Claims Proceeds and, therefore, would also be beneficiaries.[37]

---

[35] *See In re Suprema Specialties, Inc.,* 370 B.R. 517, 530 (S.D.N.Y. 2007).

[36] *In re Dreier LLP,* 544 B.R. 760, 768 (Bankr. S.D.N.Y. 2016) ("The 'crucial factor' in determining whether a trust is formed is the presence of a duty to segregate assets.").

[37] It should also be noted that the mere reference to a trust in an agreement is not sufficient to establish an express trust under New York law. *LFD Operating, Inc. v. Ames Department Stores, Inc.*, 2004 WL 1948754 at *3 (S.D.N.Y. 2004) ("Whether contracting parties have established an agency or trust must be determined by the true character of their relationship rather than by the formal language of a contract."). *See also In re Shulman Transp. Enters.*, 744 F.2d 293,

Second, the Complaint fails to allege an "actual delivery or assignment of the trust res with the intent of vesting legal title as trustee." This is fatal to Burford's argument, as funds that have not actually been delivered to the trustee cannot form part of a res of an express trust. As the court stated in *Suprema Specialties*, an agreement cannot establish an express trust where there is no actual delivery of the res—rather there are only terms attempting to extend the trust fund label to payments that have not yet been made, received, or become due.[38] Furthermore, the actual delivery requirement presumes that the settlor of the trust—here, allegedly Burford—is the party that delivers the trust res to the trustee, as the trust res must be delivered with the intent of vesting legal title with the trustee, which only the settlor can intend. Since the Antitrust Claims Proceeds here were or will be paid by the plaintiffs (or their insurers) in the Antitrust lawsuits, the payors cannot be deemed to have delivered or will deliver the Antitrust Claims Proceeds to the Debtors, as trustees for the benefit of Burford, a litigation funder of which the payors may have had no knowledge. In any event, Burford does not allege that the payors delivered Antitrust Claims Proceeds to the Debtors for its benefit.[39]

### F.  *Burford Has Not and Cannot Allege the Existence of a Constructive Trust.*

Nevertheless, Burford presses the "trust" theory—by arguing that a ***constructive trust*** exists, if not an ***express*** one, stating: "In addition to the express provisions, the Capital Provision Agreement forged a relationship of trust and confidence between the parties concerning the Claims in other respects." Complaint ⁋ 54. The Court begins this analysis by remembering certain words of the Fifth Circuit several years ago, explaining that the imposition of a constructive trust in

---

295 (2d Cir. 1984); *Carlson Inc. v. Commercial Disc. Corp.*, 382 F.2d 903, 905 (10th Cir. 1967) (A "trust" is not established by a "trust clause" in a contract); *In re Einhorn*, 59 B.R. 179, 184–85 (Bankr. E.D.N.Y. 1986).

[38] *Suprema Specialties*, 370 B.R. at 530–31.

[39] Burford seems to suggest that its delivery of $35 million to the Debtors satisfies the actual delivery or assignment Requirement. But the $35 million provided to the Debtors is not the same as the alleged trust res, i.e., it is not the funds over which Burford seeks the imposition of a constructive trust.

bankruptcy is a "potent remedy" that gives the successful claimant priority over the debtor's unsecured creditors and, therefore, should not be imposed "cavalierly."[40] The Fifth Circuit has further opined that a constructive trust is so antithetical to the priority scheme underlying the Bankruptcy Code that imposition of a constructive trust in bankruptcy is highly disfavored.[41]

In any event, according to Burford, any Antitrust Claims Proceeds delivered to the Debtors are the subject of a constructive trust in its favor because (a) the CPA gave rise to a confidential relationship between the parties; (b) the Debtors expressly promised Burford a "first dollar return" and that the Debtors would not take any actions to impair Burford's rights; (c) in reliance on the Debtors' promise, Burford delivered $35 million to the Debtors; and (d) the Debtors would be unjustly enriched at Burford's expense if they are allowed to make other use of the Antitrust Claims Proceeds. *See* Complaint at p. 31. These allegations do not give rise to a plausible constructive trust argument.

First, as an initial matter, a constructive trust is a remedy, not a standalone claim.[42] A constructive trust is a remedy that is sought in conjunction with an unjust enrichment claim.[43] Where a plaintiff fails to plead a claim for unjust enrichment, and instead purports to assert a claim for constructive trust, the claim should be dismissed.[44] Here, the Complaint fails to mention unjust

---

[40] *Matter of Southmark Corp.*, 49 F.3d 1111, 1118 (5th Cir. 1995).

[41] *See Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 436 (5th Cir. 1994) ("The remedy of a constructive trust is [] a potent one in bankruptcy because it gives the successful claimant 'priority over the defendant's unsecured creditors' to the extent of the property subject to the trust.") (citations omitted).

[42] *See In re Chowaiki & Co. Find Art Ltd.*, 593 B.R. 699, 718 (Bankr. S.D.N.Y. 2018).

[43] *See id.; see also Amusement Indus. v. Stern*, 693 F. Supp. 2d 327, 357 (S.D.N.Y. 2010) ("[A constructive trust] is not an independent cause of action but a device by which property may be recovered if the person holding the property was unjustly enriched."); *In re Foos*, 183 B.R. 149, 159–60 (Bankr. N.D. Ill. 1995) ("A constructive trust is not a right of ownership, but an equitable remedy against unjust enrichment.") (citations omitted).

[44] *See In re Celsius Network LLC*, 664 B.R. 85, 102 (Bankr. S.D.N.Y. 2024) (given plaintiff's failure to plead a claim for unjust enrichment, dismissing claim for constructive trust, which is a remedy for unjust enrichment, not a standalone claim); *Blank v. TriPoint Global Equities, LLC*, 338 F. Supp. 3d 194, 220 (S.D.N.Y. 2018) (because constructive trust is a remedy and not a basis for a separate cause of action, constructive trust claim was dismissed); *Stewart v. Stewart*, No. 1:18-cv-201, 2018 WL 11365079, at *21 (W.D.N.Y. Nov. 29, 2018) (same).

enrichment. Therefore, Burford's assertion that the Court should find that the Antitrust Claims Proceeds are the subject of a constructive trust necessarily fails and must be dismissed.

Burford's inclusion of its improper constructive trust "claim" in a claim for declaratory judgment does not change the ultimate outcome. A declaratory judgment claim is not the proper procedural mechanism to seek the imposition of a constructive trust.[45] The Court cannot declare whether Burford has a valid, first priority interest in the Antitrust Claims Proceeds unless and until it imposes a constructive trust, which circles back to the requirement that there must be an unjust enrichment claim to support the imposition of a constructive trust, which Burford has not pled.[46]

In addition to these problems, Burford has a timing problem. A constructive trust arises when disputed funds are transferred, and it is at that time that the person claiming an equitable ownership under a constructive trust becomes a lien creditor with respect to the trust res.[47] Here, any transfer of the Antitrust Claims Proceeds to the Debtors has occurred, or will occur, postpetition—well after JPM and the Lenders perfected their interests in the commercial tort claims from which the Antitrust Claims Proceeds flow. *See* Complaint ¶¶ 70–76.

Next, the mere existence of the CPA alone negates the viability of Burford's argument that the Antitrust Claims Proceeds are the subject of a constructive trust. New York law generally requires that a party seeking a constructive trust establish four elements: (a) a confidential or fiduciary relationship; (b) an express or implied promise; (c) a transfer made in reliance on that promise;

---

[45] *See In re Chowaiki & Co. Find Art Ltd.*, 593 B.R. at 718.

[46] *See id.* (explaining that until a constructive trust is affirmatively impressed, both the legal and equitable interests in property are held by the debtor and, therefore, a declaratory ruling would not by itself grant the plaintiff an equitable interest in the disputed funds).

[47] *See Marathon Mach. Tools, Inc. v. Davis-Lynch, Inc.,* 400 S.W.3d 133, 137 (Tex. App.—Houston [4th Dist.] 2013). This case's holding as to the timing of an interest arising from a constructive trust is based on the Texas UCC's definition of lien creditor, which is virtually identical to the NY UCC's definition. *See* N.Y. UCC § 9-102(52) (defining lien creditor as a creditor that has acquired a lien on the property involved by judicial processes).

and (d) unjust enrichment.[48] Burford has not adequately pled that these elements are met in this case.

The fourth element—unjust enrichment—is the most important, as "the purpose of the constructive trust is prevention of unjust enrichment."[49] The existence of a written contract, however, precludes a finding of unjust enrichment, which is a quasi-contract claim, including in the context of constructive trusts.[50] That is because "a constructive trust is an equitable remedy intended to be 'fraud-rectifying' rather than 'intent-enforcing.'"[51] A constructive trust is not an appropriate mechanism to enforce the intention of the parties as allegedly reflected in the CPA, as Burford seeks to do by the Complaint.[52]

But even ignoring the issue of there being a written contract (i.e., the CPA), that would preclude an unjust enrichment argument, Burford, again, has not alleged unjust enrichment. It has not used the words unjust enrichment. And the absence of unjust enrichment is fatal to a request for a constructive trust.[53]

"Unjust enrichment exists where 'the acts of the parties or others have placed in the

---

[48] *See Bankers Sec. Life Ins. Soc. v. Shakerdge*, 406 N.E.2d 440, 440 (N.Y. 1980).).
[49] *In re First Cen. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (quoting *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978)).
[50] *See id.; Sea Tow Servs., Int'l, Inc. v. Tampa Bay Marine Recovery, Inc.*, 20-CV-2877, 2021 WL 11726667, at *6 (E.D.N.Y. July 20, 2021) (holding that an unjust enrichment claim and, therefore, a constructive trust remedy were precluded by the existence of a written agreement governing the dispute, as plaintiff had an adequate legal remedy); *Brenner v. Heller*, No. 1:11-CV-481, 2011 WL 6011786, at *3 (N.D.N.Y. Nov. 30, 2011) (holding that a written contract between the parties establishes the absence of unjust enrichment, which is the required fourth element of a constructive trust); *Petrello v. White*, 412 F. Supp. 2d 215, 232–33 (E.D.N.Y. 2006) (holding that the existence of a written agreement precludes a finding of unjust enrichment and, therefore, constructive trust remedy, and collecting cases); *Lantau Holdings, Ltd. v. Gen. Pac. Grp. Ltd.*, 163 A.D.3d 407, 410 (N.Y. App. Div.1st Dep't 2018) (holding that an unjust enrichment claim must be dismissed where there is a valid and enforceable written contract between the parties, precluding recovery in quasi-contract).
[51] *In re Firs Cen. Fin. Corp.*, 377 F.3d at 216 (quoting *Bankers Sec. Life Ins. Soc. v. Shakerdge*, 406 N.E.2d at 441).
[52] *Id.*
[53] *See In re Chowaiki & Co. Fine Art Ltd.*, 593 B.R. at 722.

possession of the defendant money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it.'"[54] Notably, because the Debtors are in bankruptcy, it is the ***unsecured creditors rather than the Debtors*** that will bear the consequences of a constructive trust.[55] Thus, Burford must demonstrate that the Debtors' general unsecured creditors would be unjustly enriched, and the Complaint cannot be construed to satisfy this pleading requirement.[56] At most, the Complaint complains about the alleged unfairness of the Antitrust Claims Proceeds going to the Lenders. Yet the CPA permitted liens being granted to an asset-based lender. In any event, Burford does not address any enrichment, let alone any alleged unfair enrichment, to the unsecured creditors.

The first element of a facially plausible fiduciary or confidential relationship is likewise not met, which precludes a constructive trust remedy as a matter of law.[57]

New York law provides that a conventional business relationship—without more—does not become a fiduciary or confidential relationship by allegation alone.[58] Where, as here, "parties deal

---

[54] *Id.* at 720 (quoting *Miller v. Schloss,* 218 N.Y. 400, 407 (N.Y. 1916)) (holding that the plaintiff did not demonstrate "substantial reason" for the court to allow the removal of the disputed property from the estate at the expense of other creditors).

[55] *See In re Flanagan*, 503 F.3d 171, 182 (2d Cir. 2007) ("[T]he effect of a constructive trust in bankruptcy is to take the property out of the debtor's estate and to place the constructive trust claimant ahead of other creditors with respect to the trust res. This type of privileging of one unsecured claim over another clearly thwarts the principle of ratable distribution underlying the Bankruptcy Code. As a consequence [sic] bankruptcy courts have been reluctant, absent compelling reason, to impose a constructive trust on the property in the estate."); *Southmark Corp.*, 49 F.3d at 1118 (5th Cir. 1995) (explaining that the imposition of a constructive trust in bankruptcy is a potent remedy that gives the successful claimant priority over the debtor's unsecured creditors and, therefore, should not be imposed "cavalierly").

[56] *See, e.g., In re Dewey & LeBoeuf LLP,* 493 B.R. 421, 434 (Bankr. S.D.N.Y. 2013) (noting that a constructive trust seemed inappropriate where the estate property would be distributed to the debtor's creditors according to the waterfall, and removing the property would only reduce recoveries to unsecured creditors; the debtor would not be unjustly enriched); *Flanagan*, 503 F.3d at 182 (affirming a bankruptcy court's refusal to impose a constructive trust where there was no argument as to why the debtor's general creditors would be unjustly enriched by the estate's continued ownership interest in the property); *Dreier LLP*, 429 B.R. at 137 ("Although the trustee's recovery of the disputed property enriches the bankruptcy estate, the estate is not 'unjustly' enriched."); *Chowaiki & Co. Fine Art Ltd.*, 593 B.R. at 720 (holding that bankruptcy trustee "simply cannot be said to hold property 'under such circumstances that in equity and good conscience he ought not to retain it'") (citation omitted).

[57] *See Chowaiki & Co. Fine Art Ltd.*, 593 B.R. at 723 (stating that the "failure to plead a confidential relationship precludes a constructive trust remedy as a matter of law").

[58] *See Compania Sud-Americana de Vapores, S.V. v. IBJ Schroder Bank & Trust Co.,* 785 F. Supp. 411, 426 (S.D.N.Y. 1992).

at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent ***extraordinary circumstances***." [59]

The "more" or "extraordinary circumstances" needed to elevate a commercial transaction to a fiduciary or confidential relationship is not met by Burford's allegations that: (a) the CPA contemplated that the Debtors "provided or may provide confidential materials protected by the attorney work product doctrine . . . to [Burford]," (b) Burford conducted research and analysis and communicated views and opinions to the Debtors in reliance on the work product doctrine, (c) the parties agreed that their continued sharing of work product or attorney-client privileged materials would not constitute a waiver of those protections, and (d) any information shared between the parties was shared subject to a common interest privilege. *See* Complaint ¶ 55. Indeed, the CPA contained an express disclaimer of any special relationship between the parties, including on account of any sharing of information. *See* CPA § 24.[60] Such disclaimers are enforceable under New York law as a matter of law.[61]

Additionally, the fact that the Debtors received or will receive the Antitrust Claims Proceeds, and the CPA provided that some of those Antitrust Claims Proceeds would be paid to Burford does

---

[59] *Id.* (emphasis added)

[60] Specifically, the CPA provides as follows:

> (a) [Burford and its Affiliates] are not law firms and are not engaged in the practice of law with respect to any Claim or the [Debtors]. The [Debtors] may not, and shall not, rely on [Burford] for legal advice.
> (b) Nothing in this Agreement or any other Transaction Documents shall give rise to or be construed to create a fiduciary, lawyer-client, lender-borrower, agency or other noncontractual relationship between [the Debtors] and Burford.
> (c) Neither this Agreement nor any other Transaction Documents creates any partnership, joint venture or any other type of affiliation between [the Debtors] and [Burford], nor does this Agreement or any other Transaction Document create a joint interest in any Claim for any purpose, including for U.S. federal, state and local income tax purposes. . .

[61] *See Underwood v. Lastrada Entm't Co.,* No. 16cv9058, 2020 WL 3640532, at *6–7 (S.D.N.Y. July 6, 2020) (dismissing a breach of fiduciary duty claim for constructive trust where the plaintiff did not allege that the parties were in a fiduciary relationship and the parties' agreement expressly disclaimed such relationship); *LNV Corp. v. Outsource Serv. Mgmt., LLC,* No. 13-cv-1926, 2014 WL 5106866, at *11 (D. Minn. Oct. 10, 2014) (holding that the plaintiff failed to allege a viable unjust enrichment claim or other claim for imposition of constructive trust where the parties were involved in arm's length transaction and the parties' agreement unequivocally disclaimed any "partnership, joint venture or other special relationship of any kind or nature").

not establish a confidential or fiduciary relationship.[62] ***The Debtors' failure to pay over the Antitrust Claims Proceeds to Burford certainly may give rise to a breach of contract claim for damages, but it does not give rise to the imposition of a constructive trust***.[63]

In summary, a constructive trust under the circumstances of this case is not warranted.[64]

Sadly for Burford, there is nothing extraordinary about the possibility that Burford will recover less than it may be entitled to under the CPA. All unsecured creditors face that possibility. In the words of the Second Circuit, "this is not injustice, it is bankruptcy."[65] The reality for Burford is that it is a mere general unsecured creditor in this case.

---

[62] *See Sanshoe Trading Corp. v. Mitsubishi Int'l Corp.*, 470 N.Y.S.2d 991, 993 (N.Y. Sup. Ct. 1984) (holding that the mere fact that the defendants collected money which they had an obligation to distribute to the plaintiff did not make the defendants fiduciaries).

[63] *See Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 896 F.2d 54, 58 (3d Cir. 1990) (where defendant breached its contractual duty to turnover bonds to plaintiff, the proper remedy was an award of damages for breach of contract, not the equitable remedy of constructive trust); *In re Tri-Way Sec. & Escort Servs., Inc.,* 114 B.R. 24, 27 (Bankr. E.D.N.Y. 1990) (holding that where complaint did not allege fraud or unconscionable conduct on the part of the debtor, but only that the debtor had failed to pay a debt, court could not impose a constructive trust because "[t]o

[64] Burford has also suggested in some of its argument that it has an equitable lien in the Antitrust Claims and Antitrust Claims Proceeds. "Equitable liens and constructive trusts share the same substantive basis; both are remedies in equity to redress unjust enrichment." *In re Flanagan,* 503 F.3d 171, 183 (2d Cir. 2007). The distinction between a constructive trust and an equitable lien is that the beneficiary of a constructive trust receives title to the asset whereas the holder of an equitable lien receives only a lien on the asset through which it may satisfy a money claim. *See In re Markair, Inc.*, 172 B.R. 638, 643 (9th Cir. BAP 1994). However, even if Burford pled sufficient facts to warrant equitable relief, Burford's equitable lien theory fails as a matter of law. First, an equitable lien will arise where "(a)n intention to create such a charge clearly appear(s) from the language and the attendant circumstances." *Cherno v. Dutch American Mercantile Corp.,* 353 F.2d 147, 153 (2d Cir. 1965) (quoting *Pennsylvania Oil Products Refining Co., v. Willrock Producing Co*, 196 N.E. 385, 387–88 (1935). "New York law allows the imposition of an equitable lien if there is an express or implied agreement 'that there shall be a lien on specific property.'" *M & B Joint Venture, Inc. v. Laurus Master Fund, Ltd.,* 12 N.Y.3d 798, 800 (Ct. App. 2009) (citation omitted). The doctrine is further limited to situations where a secured creditor is prevented from perfecting its interest by an uncooperative debtor. *See In re Trim-Lean Meat Products, Inc.*, 10 B.R. 333, 335 (D. Del. 1981); *In re O.P.M. Leasing Servs., Inc.,* 23 B.R. 104, 119 (Bankr. S.D.N.Y. 1982). Burford does not plead any such facts and has expressly stated that the CPA does not constitute a secured loan to which a lien was supposed to attach. Additionally, as a matter of law any such equitable lien would sit behind the Debtors' interests pursuant to section 544(a)(1) of the Bankruptcy Code. *See In re IYS Ventures, LLC,* 662 B.R. 336, 345 (Bankr. N.D. Ill. 2024) ("Even if the court imposed an equitable lien, it would be treated as unperfected. Therefore, pursuant to 11 U.S.C. § 544, it would be subordinated to the debtor-in-possession's status as a hypothetical lien creditor."); *In re Ajax Integrated, LLC,* 2016 WL 1178350, at *6 (Bankr. N.D.N.Y. 2016) ("The legislative history of the Bankruptcy Code makes clear that Article 9 of the Uniform Commercial Code treats equitable liens as unperfected security interests which the trustee can in any case set aside.") (quotation omitted). *See* U.C.C. § 9-301(3). Accordingly, the Complaint does not plead facts that could plausibly give rise to an equitable lien as a matter of law.

[65] *In re First Cen. Fin. Corp.*, 377 F.3d at 214; *see also In re Commodore Bus. Machs.*, 180 B.R. 72, 81–82 (Bankr. S.D.N.Y. 1995) (explaining that the plaintiff's disappointment with a meager recovery on its unsecured claim is not the basis upon which to grant it extraordinary relief in the form of a constructive trust; any recovery would be the equitable relief, as the plaintiff will be treated in the same fashion as other general unsecured creditors).

## VI.    CONCLUSION

Burford entered into an agreement that carried material credit risk and took no precautions to perfect or otherwise elevate its purported interest. The CPA is not a subordination agreement. The CPA is solely between the Debtors and Burford and does not create a common debtor—senior creditor—junior creditor relationship. No other creditor of the Debtors is a party to the CPA. Moreover, there is no separate agreement between Burford and any other of the Debtors' creditors regarding the order of payment of their respective claims.

There is also insufficient language and structure to have established either an express trust or constructive trust. To read the CPA as conferring a greater interest than is evident from its unambiguous four corners would elevate Burford's unsecured status to the detriment of thousands of other stakeholders in these chapter 11 cases. Burford's interpretation of the CPA is implausible.[66] As one court has eloquently stated:

> The Code recognizes that each creditor has suffered disappointed expectations at the hands of the [Debtors]; for this reason, it makes maximization of the estate the primary concern and entitlement to shares of the estate secondary. Imposing a constructive trust on the debtor's estate impermissibly subordinates this primary concern to a single claim of entitlement.[67]

The CPA is arguably unusual but is not complicated or ambiguous. There is only one plausible interpretation of it—it is a contract to provide the Debtors with funds in exchange for a promise that future proceeds of litigation would be remitted to Burford. This results in a simple unsecured

---

[66] *See Cotton v. Texas Express Pipeline, LLC,* 2017 WL 3709093, at *8 and *11 (W.D. Tex. 2017) (dismissing claim for declaratory judgment, and noting "[b]ecause Defendants interpretation is the only reasonable interpretation of the contract, the undersigned recommends that it be found to apply as a matter of law") report and recommendation adopted, No. 6:16-CV-453-RP-JCM, 2018 WL 1419346 (W.D. Tex. 2018); *Sims v. Allstate Fire and Casualty Insurance Company*, 650 F.Supp.3d 540, 545 (W.D. Tex. 2023) ("Determination whether a term is ambiguous is a legal question.").

[67] *In re Omegas Group, Inc.,* 16 F.3d 1443, 1452–53 (6th Cir. 1994).

contract claim. A ruling in favor of Burford would contradict bankruptcy policy[68] and universal perfection rules regarding commercial tort claims that require public disclosure. Burford provided litigation funding pursuant to the CPA while the Debtors already had secured financing in place— financing that quite clearly contemplated the possibility of amendments and additions of collateral. In fact, the possibility of "Permitted Liens" or "Encumbrances" to asset-based lenders of the Debtors was expressly permitted by the CPA. JPM's and the Lenders' actions in the First and Second Amendments to their Prepetition Credit Agreement were also public, as they filed updated financing statements to perfect their liens in the Antitrust Claims. Burford knowingly chose not to take any action with respect to potential claims, liens, and encumbrances of JPM and the Lenders, even though Burford is a sophisticated party that was represented by counsel. Ironically, Burford maintained early in this Chapter 11 case that the CPA should be kept sealed and secret from all stakeholders. It would be an entirely novel legal principle to hold that debtors could subordinate estate stakeholders with secret agreements. Burford's legal interpretation, therefore, cannot plausibly be correct and the motions to dismiss must be granted. Burford has not pled any facts of Debtor-misconduct that, if taken as true, could plausibly warrant the extraordinary equitable relief it seeks.[69]

---

[68] Section 544 of the Bankruptcy Code granted the Debtors, on the Petition Date, an interest in the Debtors' property that was superior to all creditors other than those with security interests that are validly created and perfected before the Petition Date. *See In re England Motor Co.*, 426 B.R. 178, 193 (Bankr. N.D. Miss. 2010) ("Section 544 gives a trustee, as of the date of the bankruptcy filing, the status of a 'hypothetical judicial lien creditor' on all property of the debtor under state law. 11 U.S.C. § 544. . . . [T]his lien represents an interest superior to that of all creditors, except for those with security interests that are validly created and perfected before the date of the bankruptcy filing. In other words, an unperfected security interest [is] treated under § 544 the same as an unsecured interest."). As described herein, Burford has not asserted that it has a security interest or that it took any steps to perfect such an interest.

[69] The Complaint does not allege any misconduct of the type required to establish a constructive trust. Burford only asserts that the Debtors took steps to impair Burford's rights under the CPA. That assertion, even taken at face value, is insufficient. This is a breach of an agreement, nothing more. Constructive trusts "should not be imposed merely to give effect to a prior agreement." *See In re Reviss*, 628 B.R. at 396. The circumstances that Burford faces "are similar to those faced by nearly every other creditor in these cases, [failure] to receive payment from [] debtors." *In re S & A Restaurant Corp.*, 2010 WL 3619779 at *10 (Bankr. E.D. Tex. 2010).

Accordingly, it is hereby **ORDERED** that the motions to dismiss of the Debtors, JPM, and the UCC are granted, and this Declaratory Judgment Action is hereby **DISMISSED WITH PREJUDICE. IT IS SO ORDERED**.

### END OF MEMORANDUM OPINION AND ORDER ###